```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      FORT LAUDERDALE DIVISION
                        CASE NO. 13-MJ-06398-BSS
 3

 4    UNITED STATES OF AMERICA,         Fort Lauderdale, Florida

 5                    Plaintiff,        August 23, 2013

 6          vs.                         10:11 a.m. to 11:50 a.m.

 7    BRADEN ESCOBAR,

 8                    Defendant.        Pages 1 to 81

 9    _____

10                    PRETRIAL DETENTION HEARING
            BEFORE THE HONORABLE BARRY S. SELTZER,
11          UNITED STATES CHIEF MAGISTRATE JUDGE
              (TRANSCRIBED FROM DIGITAL RECORDING)
12

13    APPEARANCES:

14

15    FOR THE GOVERNMENT:       MICHAEL G. WALLEISA, ESQ.
                                ASSISTANT UNITED STATES ATTORNEY
16                              500 East Broward Boulevard
                                Seventh Floor
17                              Fort Lauderdale, Florida 33301

18

19    FOR THE DEFENDANT:        JEFFREY VOLUCK, ESQ., and
                                RICHARD A. MERLINO, JR., ESQ.
                                VOLUCK & MERLINO, P.L.
20                              101 Northeast Third Avenue
                                Suite 1430
21                              Fort Lauderdale, Florida 33301

22

      TRANSCRIBED BY:           LISA EDWARDS, RDR, CRR
23                              Official Court Reporter
                                400 North Miami Avenue
24                              Twelfth Floor
                                Miami, Florida 33128
25                              (305) 523-5499
```

1

2

<u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

3                                        <u>Direct</u>  <u>Cross</u>   <u>Red.</u>

4    <u>WITNESSES FOR THE GOVERNMENT:</u>

5    Ignacio Esteban                              15      28

6

7    <u>WITNESSES FOR THE DEFENDANT:</u>

     Darwin Crenshaw                      32
8    Sandra Hudak Crenshaw                        39

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Be seated.

 2              I first apologize for running a little late.  We had

 3    some matters to attend to in chambers.

 4              Let me go ahead and call our case.  The United States

 5    versus Braden Escobar.

 6              Let me ask counsel to state their appearances.

 7              MR. WALLEISA:  Good morning, your Honor.  Mike Walleisa

 8    on behalf of the United States.

 9              THE COURT:  Welcome.

10              MR. WALLEISA:  Present at counsel table with me is

11    Special Agent Ignacio Esteban of the ATF.

12              THE COURT:  Welcome.

13              SPECIAL AGENT ESTEBAN:  Good morning, your Honor.

14              MR. VOLUCK:  Good morning, your Honor.  Jeffrey Voluck

15    representing Mr. Escobar.  Seated at counsel table with me is

16    my partner, Richard Merlino.

17              THE COURT:  Welcome.  Good morning.

18              MR. MERLINO:  Good morning, your Honor.

19              THE COURT:  Welcome.

20              All righty.  Both sides ready to begin?  We're here for

21    a pretrial detention hearing this morning.

22              MR. WALLEISA:  Yes, your Honor.

23              THE COURT:  And is the defense ready?

24              MR. VOLUCK:  Yes, your Honor.

25              THE COURT:  Mr. Walleisa, if you will approach the
```

1   lectern.

2           MR. WALLEISA:  Yes.

3           Before beginning, your Honor, the Government would

4   adopt the criminal complaint and affidavit that was filed in

5   this case for purposes of this hearing.

6           THE COURT:  Okay.

7           MR. WALLEISA:  I will try to briefly summarize the

8   facts that I believe are relevant to the discrimination bond in

9   this matter.

10          THE COURT:  All right.

11          MR. WALLEISA:  As your Honor is aware, the criminal

12  complaint charges the Defendant with providing false

13  information on ATF forms that are required to be kept by

14  firearms dealers in connection with the acquisition of

15  firearms.

16          Specifically, he is charged with making false

17  statements as to his residency in the United States for the

18  purpose of purchasing these firearms.

19          Well, the Government would show that in the two-year

20  period from July 2011 to August of 2013, when the Defendant was

21  arrested, the Defendant traveled from Ecuador to the Southern

22  District of Florida on six occasions.  On each of those

23  occasions, trips involved only short stays in Florida, ranging

24  from seven days to a maximum of 23 days.

25          By example, in 2011, the Defendant spent a total of 34

1    days in the State of Florida spread over the course of three

2    trips.  The first trip was from July 27th, 2011, to August 7th

3    of 2012, a period of 12 days.  During that period of time, the

4    Defendant purchased four firearms; that is, one shotgun, two

5    rifles and a lower receiver for a firearm.

6         The second trip was from November 11th of 2011 to

7    November 26th, 2011, a period of 15 days.  During that period

8    of time, the Defendant purchased eight firearms, consisting of

9    six rifles and two shotguns.

10        The third trip in 2011 was from December 15th, 2011, to

11   December 22nd, 2011.  And during that period of time, the

12   Defendant purchased a total of 26 firearms within a period of

13   seven days consisting of two semiautomatic pistols, 16 rifles,

14   five shotguns and a lower receiver for a Tack 30.

15        In the year 2012, the Defendant spent a total of 43

16   days in the State of Florida split between two trips.  The

17   first trip was on May 8th of 2012 and lasted until May 28th of

18   2012, a period of 20 days.  During that 20-day period, the

19   Defendant purchased a total of 33 firearms:  two semiautomatic

20   pistols, 19 rifles and 12 shotguns.

21        On the second trip, the Defendant arrived in the

22   Southern District of Florida on November the 4th, 2012, and

23   departed on November 27th, 2012, a period of 23 days, during

24   which time the Defendant purchased 20 firearms, consisting of

25   11 rifles and nine shotguns.

1              In 2013, the Defendant spent a total of seven days in

2       the United States as of August 20th, 2013, when he was

3       arrested.  He had one trip from January 24th, '13, to January

4       31st, 2013, a period of seven days, in which he purchased 14

5       firearms, consisting of one semiautomatic pistol, eight rifles

6       and five shotguns.

7              The Defendant was arrested on August 20th, 2013, which

8       would have been his second trip to the United States, arriving

9       from Ecuador in Miami, Florida.  He was scheduled to stay for a

10      period of seven days and he had arranged to pick up at least

11      five rifles during that period of time.

12             By way of summary, out of the possible 754 days between

13      July 27th, 2011, and August 20th, 2013, the Defendant spent a

14      total of 88 days in Florida split between six separate trips

15      from Ecuador to Florida.  During this time period --

16             THE COURT:  Let me get a calculation on that.

17             MR. WALLEISA:  (Inaudible).

18             It's less than 90 days, no matter what, between six

19      trips over a two-year period.

20             During this time, there is no record of any wage or

21      earnings reported to Florida Wage and Hour; there is no record

22      of the Defendant owning any real property in Florida or in the

23      United States; there are no vehicles registered to the

24      Defendant in Florida; there's no record of any utilities

25      registered to the Defendant in the Southern District of

1    Florida.

2          Additionally, at the time of his arrest, the Defendant

3    had with him some documents, one of which was a certificate of

4    foreign status of beneficial owner for the United States tax

5    (inaudible) dated 8-19-2013, representing the Defendant's

6    business in Ecuador.  He had an Ecuadorian driver's license.

7    It appears to be issued 8-27-2012 and is valid until 8-27-2017.

8    He had an identification card from Ecuador which was issued in

9    2005 -- June 2005 to June 2017 -- and other documents

10   referencing his business in Ecuador.

11         On each of the six occasions that the Defendant entered

12   the United States, he completed a United States customs

13   declaration form in which he declared Ecuador as his place of

14   residence.

15         On each of the ATF Form 4473s for the purchase of the

16   firearms in that two-year period, the Defendant claimed to be a

17   resident of the State of Florida a total of 21 times.  It would

18   relate to 21 counts of false statements.

19         On the Defendant's application to renew his United

20   States passport, he listed -- I'm probably going to

21   mispronounce this -- Guayaquil, Ecuador, as his mailing

22   address; in 2013 and attached to that application is his

23   passport from 2003, which also listed Guayaquil, Ecuador, as

24   his mailing address.  And that's spelled G-U-A-Y-A-Q-U-I-L.

25         When the Defendant was arrested, he was advised of his

1    Miranda rights.  And during that time, he waived his rights and

2    agreed to speak with the agents.  He was very cooperative, very

3    communicative.

4         He stated that he had resided in Ecuador since 2001.

5    He admitted lying about his residence on the ATF forms and

6    admitted to illegally shipping firearms to Ecuador --

7         THE COURT:  Go a little slower.  You say he had lived

8    in Ecuador since 2001?

9         MR. WALLEISA:  2001.

10        THE COURT:  Okay.

11        MR. WALLEISA:  He admitted that he had lied about his

12   residence on the ATF forms.

13        THE COURT:  4473s?

14        MR. WALLEISA:  That is correct, Judge.

15        THE COURT:  Okay.

16        MR. WALLEISA:  He admitted to illegally shipping

17   firearms to Ecuador disguised as fishing tackle on shipping

18   documents and provided the name of the shipping company that he

19   used, which is Econoco, located in Miami.

20        He also admitted to selling firearms in Ecuador.  He

21   admitted selling firearms to an individual named Ortega from

22   whom ten firearms which were purchased by this Defendant were

23   seized by Ecuadorian law enforcement.

24        To show the connection between Mr. Ortega and this

25   Defendant, the Defendant admitted visiting Mr. Ortega in jail

1    in Ecuador on numerous occasions and paying approximately

2    $25,000 in Mr. Ortega's legal expenses.

3          He admitted that Mr. Ortega had traveled from Ecuador

4    to the United States with the Defendant and that Ortega gave

5    him $13,000 to purchase firearms which were illegally shipped

6    to Ecuador.

7          In addition --

8          THE COURT:  (Inaudible) because this is not in the

9    affidavit.  This is all post-arrest.

10          So you said that he traveled with Ortega to the US and

11   Ortega gave him --

12          MR. WALLEISA:  $13,000 to purchase firearms, which were

13   then illegally shipped to Ecuador.  The corroboration for that

14   is that firearms dealers identified Mr. Ortega and the

15   Defendant as being together at the time that this Defendant

16   made firearms purchases.

17          THE COURT:  Okay.

18          MR. WALLEISA:  The Defendant also admitted selling

19   firearms to an individual named Durani, D-U-R-A-N-I, who had a

20   particular liking for Kilimanjaro rifles; and in fact, the five

21   firearms that were here for the Defendant to pick up are five

22   Kilimanjaro rifles.

23          The Defendant stated that he would buy the firearms in

24   the United States and then illegally ship them back to Ecuador,

25   where he would sell them to Mr. Durani.

```
 1              THE COURT:  D-U-R-A-N-I?

 2         MR. WALLEISA:  Yes, your Honor.

 3              The Defendant admitted that he made approximately a 15

 4    to 20 percent profit when he resold the firearms in Ecuador.

 5              In the course of his statement, the Defendant admitted

 6    to illegally buying over 100 firearms in Florida and shipping

 7    them to Ecuador, where he would resell them.

 8              The Defendant is not a licensed firearms dealer.  And I

 9    checked with the Department of State to ensure that the

10    Defendant is not registered or licensed to export firearms.

11              I mentioned Mr. Ortega.  As I say, your Honor, ten of

12    the firearms purchased by this Defendant were recovered by law

13    enforcement officials in Ecuador from Mr. Ortega in his

14    residence.  On at least two occasions, the Defendant told

15    firearms dealers that he resold firearms to customers in

16    Ecuador.  And one of those individuals is an unidentified

17    person he described as an uninfluential Russian who wanted

18    shotguns for his son.

19              With regard to additional bases for pretrial detention

20    in this matter, the Defendant owns and operates a business in

21    Ecuador.  That business involves frequent travel outside of

22    Ecuador.  He owns real property in Ecuador.  His wife and child

23    reside in Ecuador.

24              As I informed Mr. Voluck, he is charged with making

25    false statements in connection with the acquisition of firearms
```

1    by making false statements on the ATF Form 4473s.  Additional

2    charges are anticipated for illegal exportation of firearms and

3    unlicensed dealing in firearms.

4        The current estimate of the Defendant's sentencing

5    guideline range is a Level 26 for a term of imprisonment of 63

6    to 78 months.  It bears a ten-year statutory maximum penalty on

7    each of the current 21 violations.  And we would submit that

8    pretrial detention is warranted in this case based on the risk

9    of flight and danger to the community, based on the Defendant's

10   lack of ties to the United States, his substantial residency

11   and ties to Ecuador.

12       THE COURT:  I had counted 104 weapons that were

13   actually purchased and let me say another five that may be

14   purchased, so I guess 109 weapons.  Obviously, a very large

15   number.

16       Is there any indication as to the ultimate uses of

17   these weapons?

18       MR. WALLEISA:  Your Honor, there are two possible uses

19   here.  One, the Defendant runs a hunting expedition business in

20   Ecuador with travel to Peru and adjoining areas.

21       I believe that many of the weapons were most likely --

22       MR. VOLUCK:  I'd object to speculation.

23       MR. WALLEISA:  Well, it's beneficial to your client.

24   If you don't want me to say it, that's fine.

25       And I would qualify that based on the type of the

```
 1    weapons and the statements of the Defendant, because the
 2    Defendant told the firearms dealers that he purchased weapons
 3    for customers in Ecuador for hunting excursions.  In fact, he
 4    communicated with the special agent in an undercover capacity
 5    about arranging a hunting trip.  So there was a lot of
 6    discussion about, "Can I bring a weapon?  Can I get a weapon
 7    there?"  Those type of things.
 8         So what I believe is, there are two things.  One, he --
 9    I won't say legitimately; he purchased weapons for the purpose
10    of using them with customers in his hunting business.  Not
11    legal, but not nefarious.
12         The second, more problematic, is Mr. Ortega is
13    currently sitting in jail in Ecuador, having been caught in
14    possession of ten firearms from this Defendant.  There were 18
15    firearms that were seized.  Ten of them belonged to this
16    Defendant, or at least they've been identified.  We really
17    don't know where they came from at this point.
18         That aspect of the Defendant's acquisition is more
19    troublesome, given the information that the Ecuadorian
20    authorities have shared.  Mr. Ortega is believed to be involved
21    in the drug trade.
22         MR. VOLUCK:  Again, I'm going to object to speculation.
23    I'd object to what the prosecutor believes or has a suspicion
24    about.
25         MR. WALLEISA:  Well, I'm just saying that information
```

```
 1    was provided by the Ecuadorian law enforcement authorities.

 2              THE COURT:  All right.

 3              MR. WALLEISA:  So primarily -- I'm sure Mr. Voluck is

 4    going to argue this -- I would agree that most of his purchases

 5    were in connection with his business in Ecuador.  That does not

 6    change the fact that he illegally exported or illegally

 7    purchased the firearms to be used.  The rules are being a

 8    United States resident or resident of Florida to purchase the

 9    firearms.

10              On that basis, with his ties, we submit that pretrial

11    detention is appropriate.

12              THE COURT:  Do you have any idea what percentage of the

13    weapons went to third parties after he acquired them?

14              MR. WALLEISA:  Your Honor, I can't say for sure,

15    because the Defendant has said that Mr. Durani had an affinity

16    for Kilimanjaro rifles.  He brought a number of Kilimanjaro

17    rifles, five per year.  Are they all for Mr. Durani?  Only the

18    Defendant knows that.  So I can't state that.

19              He stated he bought (inaudible) for customers that

20    were -- some Russian individual.  So I really can't tell you.

21    The only thing I can tell you for sure is ten were on

22    Mr. Ortega.

23              THE COURT:  Did the post-arrest statement of

24    Mr. Escobar speak of doing any purchases beyond those at force

25    in the complaint affidavit?
```

1           MR. WALLEISA:  Mr. Escobar had admitted to buying

2   firearms over the last ten years.  And there is a record in the

3   immigration tax records of a prior seizure in 2006.

4           THE COURT:  From this Defendant?

5           MR. WALLEISA:  From this Defendant.

6           THE COURT:  Did he indicate over a period of the last

7   ten years approximately how many weapons he had purchased?

8           MR. WALLEISA:  His only statement with regard to that

9   was that he had purchased more than 100.

10          THE COURT:  Yes, although he had more than 100 right

11  here.

12          MR. WALLEISA:  That's the only statement he made,

13  Judge.

14          THE COURT:  Okay.  All right.  Thank you.

15          Does the Government have an agent available for

16  cross-examination?

17          MR. WALLEISA:  Yes, your Honor.  Special Agent Ignacio

18  Esteban is present in court.  He is the principal case agent on

19  the case.

20          THE COURT:  Okay, Mr. Voluck.  Do you wish to

21  cross-examine the agent?

22          MR. VOLUCK:  I sure do, Judge.

23          THE COURT:  All right.  If I may ask the agent to

24  approach and be sworn.

25          IGNACIO ESTEBAN, GOVERNMENT WITNESS, SWORN.

Ignacio Esteban - CROSS - By Mr. Voluck        15

1          THE COURT:  Please be seated.

2          Please state your name and spell your last name.

3          THE WITNESS:  Ignacio Esteban, E-S-T-E-B-A-N.

4          THE COURT:  All right.  Counsel, you may cross-examine.

5          MR. VOLUCK:  Thank you, your Honor.

6                        CROSS-EXAMINATION

7    BY MR. VOLUCK:

8    Q.  Good morning, Agent Esteban.  My name is Jeffrey Voluck,

9    and I represent Braden Escobar.

10       I'm looking at the criminal complaint.  And the very

11   first -- do you have a copy of that with you?

12   A.  Yes, I do.

13   Q.  The very first part there says he made a false statement on

14   the ATF firearms transaction Forms 4473.  Correct?

15   A.  That's correct.

16   Q.  What exactly is the false statement that you say he made?

17   A.  He claimed to be a Florida resident with an address --

18   Q.  All right.

19   A.  -- in Boca Raton.

20   Q.  So that is the main -- did I interrupt you?

21   A.  That's all right.

22   Q.  So the main contention is that you believe he said he was a

23   Florida resident, and he is not a Florida resident.  Is that

24   correct?

25   A.  Correct.  And --

Ignacio Esteban - CROSS - By Mr. Voluck          16

1   Q.   In sum --

2   A.   -- well, that, and also he straw purchased with Ortega,

3   lying on the form with reference to the purchase of the guns.

4   Q.   And you said at Paragraph 1 -- you start out, "During the

5   course of this investigation."

6        When did this investigation begin?

7   A.   It began for me in March of this year, when I received

8   information from our ATF office in Colombia, the attaché

9   office, in reference to guns being recovered by Ecuadorian

10  authorities that were traced back that were purchased by Braden

11  Escobar.

12  Q.   Okay.  And in March of this year, when you received that

13  information, as a result of receiving that information, what

14  exactly did you do?

15  A.   I started looking -- the investigation, started looking at

16  the guns purchase, going to different dealers, seeing if they

17  recognized or remembered Mr. Escobar.

18  Q.   When you say going to different dealers --

19  A.   Gun dealers.

20  Q.   Gun dealers.  And that would be within the United States.

21  Is that correct?

22  A.   In South Florida.

23  Q.   In South Florida.

24       And just so the record is clear, it's -- the allegation

25  is -- or the fact that all of these guns that were purchased

 1  were purchased from legitimate gun dealers.  Is that correct?

 2  A.  That's correct.  Licensed dealers.

 3  Q.  And there's no allegation that he purchased any of these

 4  guns from individuals on the street or any of the guns were

 5  stolen or anything like that.  Correct?

 6  A.  No, not right now.  Not so far.

 7  Q.  Okay.  And you don't have any information to the contrary,

 8  do you, Agent?

 9  A.  No.  No.

10  Q.  And as long as we're on that track, would you agree that in

11  all the purchases that Mr. Escobar made, he used his right name

12  and he used the same address in Florida?  Is that correct?

13  A.  He did.

14  Q.  And that address would be the Drayton Street address in

15  Boca Raton.  Correct?

16  A.  That's correct.

17  Q.  Okay.  Now, you say he's not a resident in the state where

18  the sales occurred.  Is that correct?

19  A.  That's correct.

20  Q.  And that he's a resident of Ecuador?

21  A.  Not just I say; he said it to me also.

22  Q.  Okay.  And in the -- in his travels to Florida to make

23  purchase of these firearms, did you also discover that he

24  purchased large amounts of fishing tackle?

25  A.  I didn't discover that.

Ignacio Esteban - CROSS - By Mr. Voluck          18

1    Q.   Okay.  You know nothing to the contrary?  You know nothing

2    to the contrary?

3    A.   Just that he used that in his manifest, fishing tackle, for

4    the exportation of the firearms.

5    Q.   And he is -- you would agree also that he is in the fishing

6    and hunting business in Ecuador?

7    A.   It appears.  I've never been there, so I don't know.

8    Q.   Okay.  Are you aware of the fact that Mr. Escobar has been

9    written -- written up in several magazines, including this

10   month's *Marlin* magazine, regarding his business of taking

11   people from the United States to Ecuador and to the islands to

12   go fishing and hunting?

13   A.   I never saw those articles.  But again, it appears he is.

14   Q.   Okay.  And when you say it appears, how is it that it

15   appears to you to be that?

16   A.   Oh, there's a website called Ecuagringo.  I've read his

17   website.  It's on his Facebook, which also lists him being a

18   resident of Ecuador for many years.

19   Q.   Okay.  So you went on -- you went on Facebook and you

20   Googled him.  Is that fair to say?

21   A.   I think I -- yeah.  I think I did Google him.

22   Q.   And in the course of your continuing investigation, did you

23   learn that he was written up in several of these magazines?

24   A.   Yeah.  I did not see that part, no.

25   Q.   Okay.  Now, the address of Drayton Drive:  You indicate

Ignacio Esteban - CROSS - By Mr. Voluck          19

```
 1    that that address is owned by a single woman named Sandra
 2    Escobar.  Is that correct?
 3    A.  According to the tax records.
 4    Q.  Okay.  And Sandra Escobar has the same last name as the
 5    gentleman sitting here.  Isn't that correct?
 6    A.  Yes.  That's his mother.
 7    Q.  Oh.  Did you know that Sandra Escobar was his mother?
 8    A.  Yes.
 9    Q.  Okay.  But --
10    A.  I'm sorry.  I believed so.
11    Q.  You believed so?
12    A.  I didn't know so until I actually met her at the airport.
13    Q.  Okay.  When you met her at the airport, you learned that
14    she was his mother.  Correct?
15    A.  It was official then.  I believe there was prior
16    information that appeared that that was his mom.  But then when
17    I officially met her, then he said, "That's my mother."
18    Q.  Okay.  Did you make the complaint out before he was
19    arrested or --
20    A.  No.  Before.  Before.
21    Q.  Before he was arrested.
22        Did you do anything to correct the complaint where it
23    indicates that he has no ties to anybody at that address?  Did
24    you do anything to correct that misstatement?
25              MR. WALLEISA:  I'm going to object because that's a
```

1    misstatement.

2          THE COURT:  Sustained.  It's not on the complaint.

3    BY MR. VOLUCK:

4    Q.   The complaint indicates that Sandra Escobar is a single

5    woman.  Is that correct?

6    A.   I believe she is.

7    Q.   Okay.  And you learned the fact that he is her son?

8    A.   Correct.

9    Q.   And therefore, he gave his mom's address on some of the

10   documents.  Is that correct?

11   A.   Gave -- which documents are you talking about?

12   Q.   Any of the documents.  Any of the forms he filled out.  He

13   used the address where his mother lives.  Correct?

14   A.   You're talking about -- are you talking about the ATF

15   document?

16   Q.   That's fine.

17   A.   Yes.

18   Q.   Correct?

19   A.   Where his mom lives, correct.

20   Q.   Right.

21        And did you talk to the mom to ask her whether or not

22   Braden ever lives at that particular address?

23   A.   No.  I didn't have a chance to talk to her when we were at

24   the airport.  We had to come in for an initial, so we didn't

25   have a conversation yet.

Ignacio Esteban - CROSS - By Mr. Voluck          21

1  Q.   Okay.  You're the lead investigator on this case.  Correct?

2  A.   That's right.

3  Q.   And as the lead investigator, it would be important to

4  know, would you agree, whether or not he has some sort of

5  residency with his mother?

6  A.   No.  It's talking to him in the course of the

7  investigation.  But based on his own statements, he was saying

8  he had no residency here.

9  Q.   Okay.  Other than your alleging that he said that he has no

10 residency here, would it be important to determine whether or

11 not he lived at -- some time, no matter how many days, with his

12 mother at that address?

13 A.   Of course.  But it seemed like he was just visiting.  And

14 based on his statements and the information that we had

15 prior --

16 Q.   But you would agree that it would be important to determine

17 that.  Would you say it's important because of the fact that

18 that is a specific allegation in the complaint?

19 A.   Absolutely.

20      MR. WALLEISA:  Your Honor, I'm going to object.

21 Argumentative and asked and answered.

22      THE COURT:  I'll sustain the objection.

23 BY MR. VOLUCK:

24 Q.   Did you learn that he has his own bedroom at that house?

25 A.   No.

Ignacio Esteban - CROSS - By Mr. Voluck          22

1    Q.   Did you learn that he keeps clothes in that house?

2    A.   Well, (inaudible) if someone is visiting, sure.

3    Q.   Did you learn that he has an office desk in the bedroom

4    there with a computer at it?

5    A.   A lot of people do when they're visiting family.

6    Q.   I'm not asking you whether a lot of people do.  I'm just

7    asking you in this case whether you learned that information.

8    A.   No.  No.

9    Q.   Okay.  Did you check to determine whether or not he

10   receives any mail at that address?

11   A.   I don't believe so.  Not yet.  When -- but --

12   Q.   So you don't know?

13   A.   I don't know if he has information, if he does receive

14   mail.

15   Q.   Okay.  Do you have any information that he receives bills

16   there?

17   A.   Mail?  Bills?  (Inaudible.)

18   Q.   Now, are you aware of the fact that he is a United States

19   citizen?

20   A.   Yes.

21   Q.   And you're aware of the fact that he was born in the United

22   States?

23   A.   That's fine.  A lot of Americans are born here and they

24   reside in other countries.

25   Q.   I'm not asking about a lot of Americans.  I'm just asking

1    you whether you know whether or not he was born in the United

2    States --

3    A.   Yes.

4    Q.   -- of America.

5    A.   Yes.  I answered that question.  Yes.

6    Q.   And are you aware of the fact that he went to college here,

7    to LSU?

8    A.   Yes.  He told me that.

9    Q.   And are you aware of the fact that he brings his son back

10   to the United States to attend LSU games?

11   A.   No.  We're not aware of that.  I don't know every aspect of

12   Mr. Escobar.

13   Q.   I'm just asking you whether you know that or not.

14   A.   No.

15   Q.   Are you aware, Agent, that at some -- at one point in time

16   in the '90s he lived at that house, that address, for two years

17   while he was employed here?

18   A.   He did mention spending time here in South Florida in the

19   '90s.  Correct.

20   Q.   Now, Agent, from your knowledge, is it illegal to be a

21   resident of Ecuador or have a business there and maintain a

22   residency in the United States?

23   A.   Dual residences?

24   Q.   Yes.

25   A.   No.  That's not illegal.

Ignacio Esteban - CROSS - By Mr. Voluck          24

1   Q.   And do you know, Agent, whether or not you have to own a

2   property to maintain a US address?

3   A.   To own it?

4   Q.   Yeah.  I mean, you could rent a condominium.

5   A.   If you're legitimately living here as a resident, correct.

6   Q.   Okay.  Or you could be living with someone else here.

7   A.   If you're living here, correct.  You have to be living

8   here.

9   Q.   All right.  And what is your definition of living here?

10  A.   Residing here.

11  Q.   Residing here.

12       For how long of a period of time?

13  A.   Per the definition, at least over a 90-day period.

14  Q.   Over a nine-day period?

15  A.   90.  90.

16  Q.   Over a 90-day period.  Okay.

17       Are you -- I may have asked you this, Agent, so forgive me

18  if I have.  But are you aware of the fact that Mr. Escobar

19  meets some of his clients and potential clients here in the

20  United States before he -- in order to discuss the various

21  hunting and fishing trips?

22  A.   Again, he might.  I don't know every aspect of Mr. Escobar.

23  Q.   Okay.  Did you as part of your investigation as the lead

24  investigator in this case -- did you do a background --

25  criminal background check on Mr. Escobar?

Ignacio Esteban - CROSS - By Mr. Voluck          25

```
 1    A.   I did.

 2    Q.   And did you determine he's never been arrested?

 3    A.   I did.

 4    Q.   Is that correct?

 5    A.   Correct.

 6    Q.   Now, on days that Mr. Escobar was here on the periods of

 7    time, 20 days one time and seven days another time and the

 8    various times that he was here, other than going to legitimate

 9    gun dealers and purchasing rifles, were you aware of any of his

10    other activities?

11    A.   No, not really.  I don't --

12    Q.   So you didn't follow him around?

13    A.   No.  By the time of that information, he hadn't been in the

14    country for quite a long time.

15    Q.   Okay.  And you don't know whether he visited with family --

16    A.   Prior to my investigation, I don't know.

17    Q.   -- or friends or whether he met with business clients?

18    A.   I did know he did buy guns illegally.

19    Q.   You're not answering my question.

20    A.   I don't know, I said.

21    Q.   Okay.  And as part of your investigation, did you learn

22    that not only was Mr. Escobar born here, not only does his

23    mother live here, but that he has numerous other family that

24    live and reside in the United States?

25    A.   I did.
```

1    Q.   Okay.  You wouldn't make the allegation that he has no ties

2    to this community, would you?

3    A.   I would say he has some ties.

4    Q.   Okay.  And you stated also that when you arrested

5    Mr. Escobar, he was very cooperative?

6    A.   He was.

7    Q.   He had no attitude?

8    A.   No.  No.

9    Q.   And you say that he told you that he illegally did various

10   things.

11       Did he use the actual word "illegally" or was that just

12   part of the proffer?

13   A.   I think I used it and then he repeated the words.

14   Q.   Okay.  So you said it and then he agreed with you?

15   A.   Correct.

16   Q.   Incidentally, this statement that he gave to you:  Was that

17   tape-recorded?

18   A.   No.

19   Q.   It was not tape-recorded?

20   A.   No.  I normally don't tape-record my interviews.

21   Q.   And -- so we have to assume that what you say he said is

22   the truth.  Is that correct?

23   A.   Not just myself.  I wasn't by myself.  The interview was

24   between myself and two other agents.

25   Q.   So we would have to believe that you and the other two

Ignacio Esteban - CROSS - By Mr. Voluck          27

1   agents, when you were saying what he allegedly said, you say

2   that accurately.  Correct?

3   A.  Well, we have our notes and we have the reports.

4   Q.  Sure.

5   A.  And they were written soon thereafter.

6   Q.  And in your office in the DEA headquarters -- your office

7   is in South Florida?

8   A.  I'm sorry.  I'm with ATF.

9   Q.  I'm sorry.  ATF.

10      And where is your office?

11  A.  I'm right here in this building.

12  Q.  And you have access to tape recorders?

13  A.  Again, I do, but I don't normally tape-record my

14  interviews.

15  Q.  And when he allegedly waived his Miranda rights, did you

16  use a written Miranda form?

17  A.  I did.

18  Q.  Now, were you aware that some of the people that purchased

19  these firearms were firearm collectors?

20  A.  I'm sorry.  The people who purchased the firearms?

21  Q.  Yes.  In Ecuador.

22  A.  From Mr. Escobar?

23  Q.  Yes.

24  A.  I know Mr. Ortega purchased the firearms.  He was --

25  Q.  Well, there's reference to one individual that liked the

1    Kilimanjaro rifles.

2    A.   Yeah.  He said he was a high-end collector.  We're still

3    investigating that, that part of the --

4    Q.   Okay.  Okay.

5         MR. VOLUCK:  May I have a minute, your Honor?

6         THE COURT:  Yes.

7         MR. VOLUCK:  I have nothing further of the agent, your

8    Honor.

9         THE COURT:  All right.  Any redirect?

10        MR. WALLEISA:  Very brief, yes.

11                      REDIRECT EXAMINATION

12   BY MR. WALLEISA:

13   Q.   Agent, just to clarify, during the course of your

14   investigation, did you learn of any other travel that the

15   Defendant had during the period of July 2011 to August 2013 to

16   anywhere else in the United States other than Miami?

17   A.   No, I did not.

18        MR. WALLEISA:  No more questions, Judge.

19        THE COURT:  Any recross?

20        MR. WALLEISA:  No, your Honor.

21        THE COURT:  Agent, do you have any idea what the size

22   of this business is, how many employees Mr. Escobar has, if

23   any, how large are these hunting parties?

24        THE WITNESS:  Just what I've read on his site, his

25   website, and the communications I had with him online.  It

```
 1   seems like it's a small company that he runs, these outfitting

 2   groups in South America and fishing parties in the Galapagos

 3   Islands.

 4          THE COURT:  All right.  But in terms of these hunting

 5   trips, is it 100 people that go?  Is it two or three people?

 6          THE WITNESS:  My interaction with him was that he had

 7   small parties that were (inaudible).  We were talking about two

 8   parties, maybe a third person.  It wasn't huge parties, from

 9   what we were going on.

10          THE COURT:  All right.  Do any of the attorneys have

11   any more questions, either side?

12          MR. VOLUCK:  No.

13          MR. WALLEISA:  No, Judge.

14          THE WITNESS:  Thank you, Judge.

15          THE COURT:  Actually, I'm sorry.  I do have.  I did

16   have.

17          What can you tell me about the 2006 seizure of weapons

18   from Mr. Escobar?  What happened there?

19          THE WITNESS:  I did see that in the text record.  I

20   would have to double-check for you.  I don't want to give you

21   any misinformation.

22          THE COURT:  Okay.  So you have no idea of the details

23   or anything?

24          THE WITNESS:  Not --

25          MR. WALLEISA:  (Inaudible) prosecution.
```

```
 1              THE WITNESS:  No.

 2              THE COURT:  Was it received in a shipment?  Was it

 3    received from Mr. Escobar?

 4              THE WITNESS:  I would have to look into it a little

 5    more for you.

 6              THE COURT:  Okay.

 7              THE WITNESS:  Thank you, Judge.

 8              (Inaudible phrase.)

 9              MR. WALLEISA:  My understanding is that -- as an

10    officer of the Court is that there was no seizure.

11              THE COURT:  All right.

12              THE WITNESS:  Thank you.

13              (Witness excused.)

14              THE COURT:  All right.  Does the Government rest?

15              MR. WALLEISA:  Yes, your Honor.  The Government rests.

16              THE COURT:  Okay.  We'll go over to the defense.

17              Mr. Voluck, first, with regard to the pretrial services

18    report, are there any errors or material omissions in the

19    report?

20              MR. VOLUCK:  Not that I'm aware of, Judge.

21              MR. MERLINO:  Judge, I do have a comment.  I did have

22    the opportunity to go over this with Mr. Escobar, if I may,

23    Judge.

24              THE COURT:  All right.

25              MR. MERLINO:  If I may approach the lectern.
```

```
 1              THE COURT:  You may.

 2              MR. MERLINO:  Judge, there's -- in the second box under

 3      Defendant, specifically with regard to the subject matter of

 4      employer, employer address, monthly income, time employed, and

 5      then skipping down to No. 2, below that, under Defendant

 6      History, the word "decline" or -- actually, it's the word

 7      "declined" in several of those instances.

 8              My client denies declining providing this certain

 9      information.  He indicated specifically it was just not asked

10      of him and that word was chosen for some reason.  That's the

11      only objection, per se, because it could give you --

12              THE COURT:  When it says he declined to discuss his

13      employment history, any consultation, you're saying that --

14              MR. MERLINO:  That he was never asked these questions.

15      He was open and honest with agents at the airport.  As you

16      heard, he was very cooperative.  He did not obstruct.  And in

17      this instance, he provided other information that was very

18      useful.  And with regard to that, he indicated specifically he

19      did not decline that --

20              THE COURT:  Let's hear from him -- the probation

21      officer is here, pretrial -- what happened.

22              Just for the record, if you can restate your name.

23              THE PROBATION OFFICER:  Yes, sir.  Darwin Crenshaw, US

24      pretrial services.

25              THE COURT:  Please raise your right hand.
```

1              DARWIN CRENSHAW, DEFENSE WITNESS, SWORN.

2         THE COURT:  You are -- are you the probation officer or

3    author of the pretrial service report?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  All right.  With regard to the entry in

6    Paragraph 2, where it says the Defendant declined to discuss

7    his employment history pending consultation with defense

8    counsel, tell me what happened.

9         THE WITNESS:  When I got to the employment section,

10   Judge, I asked the Defendant -- I said, "Does your current

11   employment history -- your current place of employment or

12   employment history involve this case?"

13        He said, "Yes."

14        I said, "At this point, do we originally agree that

15   we're not going to discuss your employment history since it may

16   conflict with the case pending consultation with defense

17   counsel?"  I said, "Because there may be a conflict between my

18   information and your information."

19        And he agreed with that.

20        And I actually said, "So we agree that you originally

21   decline to discuss your employment pending consultation with

22   defense counsel?"

23        He said, "Yes."

24        THE COURT:  Okay.  Fine.

25        (Witness excused.)

1        MR. MERLINO:  Thank you, Judge.  That clarifies it,

2   that misunderstanding.  The word "declined" can put a very

3   negative connotation and even seem like obstruction.  I just

4   wanted to clarify that issue.

5        THE COURT:  Well, he has a constitutional right to

6   decline.

7        MR. MERLINO:  I understand that, Judge.

8        THE COURT:  I don't hold that against him.

9        MR. MERLINO:  I understand, Judge.  But having

10   clarified it, I do appreciate pretrial advising him of those

11   rights.

12        Thank you.

13        THE COURT:  All right.  Mr. Voluck, any evidence,

14   testimonial or otherwise, that you wish to present?

15        MR. VOLUCK:  Yes, your Honor.  Mr. Merlino will handle

16   that, Judge.

17        THE COURT:  Okay.

18        MR. MERLINO:  I would call Sandra Escobar, if I may,

19   Judge.

20        THE COURT:  Why don't we do this first, if you can

21   please be seated.

22        Why don't you first proffer what her testimony would

23   be, and let's see if the Government has any questions.  If not,

24   then I'll accept your proffer.  If they do, then we'll call

25   Ms. Escobar.

```
 1              MR. MERLINO:  Absolutely, Judge.

 2              Judge, she would testify if she were called to the

 3    stand that she is the mother of Braden as well as a daughter,

 4    Shannon, who lives here in South Florida.

 5              Braden does reside at her address, at the Boca Raton

 6    address, that has been the subject of cross-examination and

 7    proffer in the earlier part of the proceedings.

 8              She would indicate that her son is a US citizen, as she

 9    is.  He was born in New Orleans, Louisiana, that he was

10    practically raised here.  He is in fact an American, holds a US

11    passport.  His educational background pretty much took place

12    here, including LSU, where he graduated with a degree in

13    agriculture.

14              He resided here for many years and worked in many

15    instances here in South Florida as well as a sulfuric acid

16    plant in Louisiana.  We have reported earnings that were

17    provided.

18              He has a Social Security number.

19              He receives mail at the address.

20              He has several credit cards with US banks, including a

21    visa.  Let me get these --

22              THE COURT:  I don't need the credit card number.

23              MR. MERLINO:  Okay.  He's a member of Enterprise

24    Rent-a-Car group.

25              He shows that he travels here frequently, meets with
```

1    clients.  He goes to sportsman shows.  He buys tackle for his

2    outrigging, this fishing portion of his business, that he meets

3    with clientele.

4         And as the agent learned from his conversation with

5    Mr. Escobar at the airport, with regard to the business, it is

6    a small business.  However, these individuals are high-paying,

7    very wealthy individuals that like, you know, a personal touch,

8    so to speak.  So he's here quite often, meeting with them,

9    wining and dining and doing client development.

10        The -- let me get this.  She would also indicate that

11   he holds a voter registration card.  He comes to the United

12   States and votes in US elections and local elections; that his

13   child was born here in the United States, is a US citizen.

14        They do reside -- when I say "they," the child as well

15   as his wife -- in Ecuador.  However, given these unfortunate

16   circumstances, they'll be coming here to reside, where they do

17   reside when they come here, at the Drayton address in Boca

18   Raton with Sandra Escobar.

19        The Defendant does run a business primarily based in

20   Ecuador.  The name itself of this business is Ecuagringo,

21   indicating the location as well as the primary clientele;

22   "gringo," a term that's quite often used for Americans.  That

23   is his client base.  He's here quite often to carry on that

24   business, being in a position where he has ties to Ecuador as

25   well as the United States, a dual resident.

1              He does have a residence in Ecuador.  He has property

2     there that he owns free and clear.  He's never been arrested.

3              He has a bank account here in the United States.

4              He travels here quite often for social events, to meet

5     with family and friends.  He has close-knit ties, a strong

6     network of family and friends here in the United States, that

7     he could rely upon.

8              That Sandra would be willing, given these allegations,

9     as his mother and trusting him and believing that no wrong was

10    done with reference to her son, to keep her doors open and

11    allow him to continue residing where he was residing, in the

12    house, if your Honor would see fit to allow him to have

13    pretrial release, either an ankle monitor; there are

14    restrictions; there are --

15             THE COURT:  I think at this point we're going beyond a

16    proffer and what the witness's testimony would be and we're

17    venturing over into argument, which I'll permit you to do if

18    you're done proffering.

19             MR. MERLINO:  I have a few more points, Judge.

20             THE COURT:  Okay.

21             MR. MERLINO:  That he has no history of mental health

22    issues, that he has no history of alcoholism or drug abuse.

23             THE COURT:  All right.

24             MR. MERLINO:  He indicated to the Court that he has

25    received mail at the address on a regular basis.

```
 1              His cousins and relatives are here in support, if I may
 2    have them stand up, provide their name, address --
 3              THE COURT:  Why don't you just proffer who they are.
 4    That's fine.
 5              MR. MERLINO:  Their relationship --
 6              MR. VOLUCK:  Just tell him who's here.
 7              MR. MERLINO:  We have Jessica Anderson.
 8              Stand up, please.
 9              And what's your relationship to Mr. Escobar?
10              MS. ANDERSON:  I'm his cousin.
11              MR. MERLINO:  Okay.  Do you reside here in the United
12    States?
13              MS. ANDERSON:  Yes.
14              MR. MERLINO:  South Florida?
15              MS. ANDERSON:  Boca Raton.
16              MR. MERLINO:  Okay.  And I have Shannon -- forgive me
17    if I mispronounce your name -- is it Penaloza?
18              MS. PENALOZA:  "Penaloza."
19              MR. MERLINO:  Okay.  Could you spell that for the
20    record?
21              MS. PENALOZA:  P-E-N-A-L-O-Z-A.
22              MR. MERLINO:  And what's your relationship to
23    Mr. Escobar?
24              MS. PENALOZA:  I'm his sister.
25              MR. MERLINO:  And where do you reside?
```

```
 1              MS. PENALOZA:  Coral Gables, Florida.

 2              THE COURT:  There's no need for you to ask that.  Just

 3    tell me sister, cousin, mother.

 4              MR. MERLINO:  We have the mother of his cousin and --

 5    I'm sorry -- the relationship of the two ladies at the end?

 6              A VOICE:  (Inaudible.)

 7              MR. MERLINO:  Judge, this is just a small sample of the

 8    individuals that he has close ties with here in the United

 9    States.

10              THE COURT:  Fine.

11              MR. MERLINO:  That is all for now, Judge.  Just the

12    evidence that he has no prior criminal history.

13              THE COURT:  Let me ask you this:  According to the

14    complaint affidavit and immigration records, it shows that over

15    the last 25 months he was here about 84 days --

16              MR. MERLINO:  Correct.

17              THE COURT:  -- about 10 percent of the time.  Do you

18    have any evidence that you wish to present to rebut that or

19    contradict that?

20              MR. MERLINO:  No, Judge.  I mean, the strongest

21    evidence would be from that of Homeland Security and the

22    records that they keep.

23              But prior to that, that's what I wanted his mother to

24    reflect on, the fact that he has close ties here.  He was

25    schooled here.  He worked here.  He earned here.  He does have
```

1   a Social Security number that does record his earnings.

2          I understand that he hasn't in the last few years of

3   his business in Ecuador reported wages or income with respect

4   to the State of Florida or any other state.  However, his

5   business does derive completely from the clientele here in the

6   US, specifically Florida.

7          THE COURT:  All right.  Mr. Walleisa, do you wish to

8   cross-examine the Defendant's mother with regard to what

9   Mr. Merlino has proffered?

10          MR. WALLEISA:  Yes, I do, your Honor.

11          THE COURT:  Okay.  Ma'am, if you would please approach

12   the stand to be sworn.  The witness stand, if you will, please.

13          SANDRA HUDAK ESCOBAR, DEFENSE WITNESS, SWORN.

14          THE COURT:  If you can go ahead and please be seated.

15   Once you get comfortable, if you can please state your name and

16   spell your last name.

17          THE WITNESS:  My name is Sandra Hudak Escobar,

18   E-S-C-O-B-A-R.

19          THE COURT:  All right.  Go ahead and give your

20   attention to Mr. Walleisa, who has some questions.

21                         CROSS-EXAMINATION

22   BY MR. WALLEISA:

23   Q.  Ms. Escobar, I only have a few questions.  I'll try to be

24   as brief as I can.

25          Can you tell the Court, in the year 2013 -- let me back up.

Sandra Escobar - CROSS - By Mr. Walleisa            40

1            Is it your testimony that Braden resides in Florida?

2   A.   When he is in the United States, he resides in Florida.

3   He's the child of a divorce, so he has a home in Ecuador, where

4   his father resides, and a home in the US, where his mother

5   resides.  And I am his mother here in Florida.

6   Q.   With regard to that, in the year of 2013, this year --

7   A.   Yes.

8   Q.   -- how many days did Braden live in your house?

9   A.   I don't know.  He's only made one trip.  I can't remember.

10  Q.   One trip.  Back in January?

11  A.   Yes.

12  Q.   Okay.  So other than that one trip, he has not lived in

13  your home?

14  A.   No.  Not this year.

15  Q.   He's married, right?

16  A.   He is.

17  Q.   He has a child?

18  A.   Yes.

19  Q.   Living in Ecuador?

20  A.   When they're in Ecuador.

21  Q.   Okay.  How many times did his wife and child reside with

22  you this year in Boca Raton?

23  A.   Not yet this year.  They -- they come every year.

24  Sometimes more than once a year.

25  Q.   Sometimes?

Sandra Escobar - CROSS - By Mr. Walleisa          41

```
 1   A.   Sometimes.   Sometimes once; sometimes more than once.

 2   Q.   Okay.   In the year 2012, that's last year --

 3   A.   Yes.

 4   Q.   -- how many days did Braden live in your home?

 5   A.   I don't know.   I can't -- I don't know the days.

 6   Q.   Okay.   Were you here for the proffer that was made to the

 7   Judge about Mr. Escobar's travel to the United States, the

 8   trips that he made?

 9   A.   This morning?

10   Q.   Yes.

11   A.   Yes.

12   Q.   According to the travel records that were mentioned this

13   morning, Braden made two trips last year to Florida from

14   Ecuador.

15   A.   Okay.

16   Q.   Other than two trips, did he spend time living in your

17   home?

18   A.   Not if he wasn't here.

19   Q.   I know it's difficult.   I'm not trying to put you on the

20   spot.   But from July of 2011 to January 1st of 2012, can you

21   tell the Court how many days Braden has lived in your home in

22   Boca Raton?

23   A.   2011?

24   Q.   Right.

25   A.   That was near the baby.   I don't know.   He was here for a
```

```
 1    while, but I don't know how long.  July, I think Mary's

 2    sister's baby was born up here and then -- and then the

 3    holidays.

 4    Q.  So the holidays, visiting, like Christmas?

 5    A.  Yes.  And working.  He works from my house.

 6    Q.  You said that -- or it was proffered that Braden receives

 7    mail at your house.

 8    A.  Yes.

 9    Q.  About how many (inaudible) this year has he personally

10    picked up now at your house?

11    A.  I don't -- whenever he's here.  And then I went to Ecuador

12    for a visit, so I took mail to him.

13    Q.  Okay.  So in the one trip in January when he was here, he

14    picked up his mail?

15    A.  Yes.

16    Q.  Other than that, how does he receive his mail from your

17    home in Florida?

18    A.  The travel back and forth.  His dad may take it down to him

19    or his brother or his sister or me or whoever is going.

20    Q.  Okay.

21         MR. WALLEISA:  Judge, I really don't have any other

22    questions.  I don't want to belabor Ms. Escobar.

23         THE COURT:  All right.  Mr. Merlino, do you have any --

24         MR. MERLINO:  I don't have any.

25         THE COURT:  Thank you, ma'am.  Watch your step.
```

```
 1              (Witness excused.)

 2         All right.  Mr. Merlino, any other evidence?

 3         MR. MERLINO:  No other evidence.  We'll rest on that.

 4         THE COURT:  All right.  Let's go ahead -- why don't you

 5    go ahead and proceed to argument.

 6         MR. VOLUCK:  Judge, based on the proffer and

 7    cross-examination of Sandra Escobar and the proffer of the

 8    Government in this matter --

 9         THE COURT:  I think you may have turned the microphone

10    off.

11         MR. VOLUCK:  It's clear that there's no indication that

12    Braden will be a flight risk.  He's been -- there's nothing

13    under this situation of circumstances in the past that would

14    indicate that there was a failure to appear for any court

15    appearance because there's no criminal history.  He's never

16    been involved in, from what I am told, in a civil suit, where

17    there was any type of judgment against him for non-appearance

18    or nonresponse, whatever the situation may be.

19              So there's no clear evidence that this individual would

20    in fact be a flight risk other than allegations that he has

21    ties to Ecuador, which we (inaudible) to.  But understand full

22    well, he has just as strong ties here in the United States.

23         THE COURT:  Let me ask you:  Is that really accurate?

24         MR. VOLUCK:  Given his recent job --

25         THE COURT:  Your client by his own admission admitted
```

1    that he lied on the forms, that he doesn't reside here.  He

2    said he resides in Ecuador.  He has his house in Ecuador.  His

3    wife and child are in Ecuador.  His business is in Ecuador.  He

4    put on his US Government forms, tax forms, immigration forms,

5    currency transaction forms, that he lives in Ecuador.

6         So I understand he comes to visit his mother here and

7    stays, you know, for a few days when transacting business.  But

8    is it accurate to say that his ties to the United States are

9    currently the same ties that he has to Ecuador?

10        MR. VOLUCK:  Well, where we would take exception,

11   Judge, is -- the first thing, with regard to the address that

12   was given on these forms, the first two points (inaudible)

13   other charges coming through the indictment.

14        However, what we're dealing with here today on the

15   complaint has to do with misinformation allegedly provided with

16   regard to where he resides.

17        And I understand and I respect --

18        THE COURT:  Wait.  Let me interrupt you.

19        The issue is flight risk.  And you made the statement

20   that his ties to Ecuador are no greater than his ties to the

21   United States.

22        MR. VOLUCK:  We have an unrecorded alleged confession

23   provided to ATF --

24        THE COURT:  Well --

25        MR. VOLUCK:  -- with all due respect --

1          THE COURT:  -- is there anything to rebut that in the

2     record?

3          MR. VOLUCK:  I have statements personally from my

4     client indicating that he did not per se or use the word that

5     he illegally put down or misrepresented that he does not reside

6     at his mother's address.  In fact, he indicated the contrary.

7     If we had the best evidence here, Judge, we would have a tape

8     recording of his alleged confession rather than something that

9     would fit the four corners of the complaint.

10          THE COURT:  If the pretrial services report is

11     accurate -- I was told that it was.  And in the pretrial

12     services report, he told the probation officer he lived in

13     Ecuador.  So I mean --

14          MR. VOLUCK:  Well, that's where he's -- it's subjective

15     and it's semantics, Judge.  That's where his child and wife are

16     right now.  He has family, just as strong ties, here.  He has a

17     mother, a sister and a brother and he was educated here.

18          THE COURT:  I understand.

19          MR. VOLUCK:  He has clothing in this house.

20          THE COURT:  I understand that.

21          MR. VOLUCK:  Toiletries.

22          THE COURT:  I understand that.

23          MR. VOLUCK:  A computer.

24          THE COURT:  But to make the statement that he has no

25     greater ties to Ecuador is not accurate.

1           MR. VOLUCK:  It's subjective and semantic, Judge.

2           I would say the same with my wife and child alone, let

3     alone my business.  His business physically is there; and

4     that's what gives life to the business, is the fact that he's

5     in the Galapagos Islands, in a tropical setting that's exotic

6     and very attractive to very wealthy Americans.  But if it

7     weren't for the Americans that reside here, where he has to

8     come and market and client-develop, and go to shows and get

9     product, there would be no business.

10          So it's all semantics and it's a way of looking at it.

11    I would say they're equally as important.

12          Without the US or ties to South Florida, he wouldn't

13    have a business or the ability to have a wife here or a wife

14    with his family in Ecuador.  It's the way you look at it.  And,

15    of course, the Government's going to look at it one way.

16          But given the case law, Judge, it's the intent of 18

17    USC 3142 to favor release under *US versus Garcia*, 801 F.Supp.

18    285, Southern District of Iowa, 1992, for an original

19    statement.

20          But it goes to the breadth of what we're dealing with

21    here, that an individual, given the Constitution in this

22    country, should be given every allowance when considering

23    that -- I understand we're dealing with a flight risk issue

24    right now.  There's no indication that he obstructed justice in

25    any way, shape or form.  It's why I brought up the declaration

```
 1   (inaudible) form.  He was cooperative.  He didn't use any
 2   attitude.  And allegedly, he gave this confession.
 3           Danger to the community:  Other than the subject matter
 4   of the firearm, however used, as the US Government has
 5   indicated, for hunting purposes, there's no indication that he
 6   in fact is a danger to the community.  There's no criminal
 7   history.  There's no prior arrests, no indication of mental
 8   health or alcohol issues.
 9           THE COURT:  Well, let me ask you:  He has a small
10   hunting business in which he, according to the agent, takes two
11   or three people.  Again, over the past two years alone, he's
12   acquired over 100 firearms.  By his own admission, he has
13   resold a certain number of them.
14           We know that ten of them turned up, you know, in a raid
15   of this fellow, his home, who the Ecuadorians, I guess, believe
16   is involved in narcotics.  And we know that he acknowledged
17   that he had been given the money to purchase them.  So at least
18   we know that not all of these weapons are being used for
19   hunting expeditions.
20           MR. VOLUCK:  Well, Judge -- I don't want to interrupt,
21   Judge.  Ortega is a hunting companion.
22           The other allegations, unless I hear from Ecuadorian
23   officials or DEA or Homeland Security or something more than
24   the word from this agent, it's all hearsay and speculation.
25   And that's fine to the argument here.  But with all due
```

1   respect, that's all it is.

2         THE COURT:  Well, can you draw an inference from the

3   fact that the Ecuadorian police executed a raid of Ortega's

4   home and seized these weapons --

5         MR. VOLUCK:  I believe the subject was the

6   unregistered, and that was what got him into hot water, and not

7   drug dealing allegedly occurring --

8         THE COURT:  And the sheer volume of the weapons, that

9   not all of them were used for your client's hunting

10  expeditions.

11        MR. VOLUCK:  That part I didn't hear or -- Judge, if

12  you look at the -- I'm sure the agent, if you would allow him

13  to take the stand again, the types of weapons that are seized

14  are, in fact, hunting weapons, hunting rifles, for the most

15  part.  And first and foremost, those ten are in fact used when

16  he (inaudible) with my client, Braden Escobar.

17        As far as -- there is no allegations here that Braden

18  is tied in any way, shape or form to any sort of drug dealing,

19  drug, you know, exotic animals smuggling, whatever the case may

20  be.

21        THE COURT:  Let me ask you this --

22        MR. VOLUCK:  It's a small operation.

23        THE COURT:  If, in fact, these weapons were all going

24  to be used for legitimate purposes, other than not shipped

25  illegally, why were they concealed as fishing tackle?  I mean,

```
 1   if this was all for legitimate purposes, why would your client
 2   have gone to the extent of disguising what they were?
 3        MR. VOLUCK:  The intent there I cannot comment on at
 4   this time.  I haven't even seen discovery yet, let alone what
 5   we're getting into --
 6        THE COURT:  Let's say this:  Taking it as true for
 7   purposes of this argument that your client acknowledged that he
 8   concealed it as -- or he disguised it as fishing tackle,
 9   fishing gear, all right, if indeed there was no illegitimate
10   purpose, if indeed it was simply for a hunting expedition, why
11   would he have done that?
12        MR. VOLUCK:  Possibly thinking that it would alert
13   authorities as to there possibly being ammunition with it where
14   it would require the opening, inspection and further delay,
15   what have you.
16        But it was not to (inaudible) illegally.  He has a
17   hunting and fishing expedition business.  Again, this is all a
18   supposed, you know, hypothetical scenario, Judge.  These are
19   alleged facts and circumstances that would be forthcoming in an
20   indictment as proffered by the Government.
21        However, the first we heard of this was today because,
22   again, we don't have discovery.
23        These labels can come preprinted.  And he does purchase
24   a great deal of fishing tackle and supplies here in the United
25   States.  And his company does (inaudible).  And to simply stamp
```

1    on these labels that have been preprinted for hundreds of

2    instances over the years of shipping for that purpose would be

3    just as easy as, you know, moving things along without the

4    intent (inaudible).

5            THE COURT:  If all this was for his legitimate hunting

6    business, why would he have taken $13,000 from Mr. Ortega and

7    made a straw purchase?

8            MR. VOLUCK:  Again, Judge, I don't have the discovery.

9    I have not had the opportunity to read the statement of

10   Mr. Ortega.  I'll investigate that further.

11           I can't answer that right now.  It would be, you know,

12   not in my client's best interest if I were to give you possible

13   scenarios.

14           And if that in fact is the case, it does not sound

15   good, the straw buyer part.  I believe that Mr. Ortega himself

16   was present with my client.  There may be reasons that

17   (inaudible) hypothetical.  The Government has told us why

18   Mr. Ortega himself couldn't make these purchases.

19           THE COURT:  Precisely.  So why Mr. Ortega himself --

20   it's his money.  Why could not he do it?

21           MR. VOLUCK:  I'm guessing, Judge.  Just --

22           THE COURT:  Ortega is a US citizen.  Why couldn't he

23   buy it?

24           MR. VOLUCK:  How do you know it wasn't (inaudible) and

25   how do you know Mr. Ortega didn't hand that money?  I don't

1   know.  It's easy -- because Mr. Ortega is in custody

2   (inaudible) Braden and, you know, another count with regard to

3   an alleged straw buyer that money was handed to Braden and

4   Braden brings it to the (inaudible) and the gun was (inaudible)

5   here in the United States.  That's convenient.

6          But I see no evidence or discovery to that effect that

7   there was that middleman transaction.  Until I see that, Judge,

8   I can't make an argument on that.  And it's not in the four

9   corners of this complaint and shouldn't be considered by your

10  Honor, with all due respect.

11         THE COURT:  Well, I would disagree.  I would consider

12  anything that bears on danger to the community, whether it

13  happens to be charged in this complaint or not.  Just as we

14  consider it in instances where people have criminal records, we

15  consider that as well.

16         MR. VOLUCK:  Well, with all due respect, Judge, if it

17  was a strong-enough case, it would be in the complaint.

18         THE COURT:  Any further argument that --

19         MR. VOLUCK:  No, sir.

20         THE COURT:  Mr. Walleisa?

21         MR. WALLEISA:  Just very, very brief, Judge.

22         Your Honor is correct.  Most of Mr. Escobar's ties and

23  his strongest ties are to Ecuador:  his wife, his child, his

24  business, his livelihood and his declarations of residence.

25         If you look in the pretrial services report, I suppose

1  we could balance a mother and brother here against a mother and

2  brother in Ecuador.

3        Clearly, Ms. Escobar established that when Braden comes

4  to the United States, he's doing no more than visiting.  He

5  doesn't come here regularly.  Now his mail is delivered to him

6  in Ecuador.  He only picks up his mail in person when he's

7  here.

8        And I think what this really comes down to is, what's

9  the difference between visitation and residence?  Well, by his

10  own customs declarations, his passport applications, his

11  financial filings, Mr. Escobar is a resident of Ecuador.

12  That's where his ties are.  And while he has some ties here,

13  they're insufficient to establish that he would appear at trial

14  as directed and not return to Ecuador if he had the

15  opportunity.

16        THE COURT:  About the issue of danger to the community,

17  what's the Government's position on that?

18        MR. WALLEISA:  The danger to the United States

19  community, I would say absolutely not.

20        THE COURT:  Well, danger everywhere.

21        MR. WALLEISA:  But danger to Ecuador, yes.  He is

22  smuggling firearms into Ecuador in violation of Ecuadorian law.

23  He is providing weapons to Mr. Ortega, who's currently in

24  custody, because he wasn't allowed to have weapons.  I think

25  that that presents a danger.  And that would be the basis of

1    that.

2        I think the strongest argument for pretrial detention

3    is on risk of flight, but I think danger is also met by those

4    facts.

5        THE COURT:  I'm obviously very concerned about the

6    sheer number of weapons and the purposes for which they're

7    being used.  And I think concerning the fact that they were

8    concealed, obviously, I think permits or compels an inference

9    that they were not all for legitimate purposes, as evidenced by

10   Ortega giving him the money to purchase these.

11       MR. WALLEISA:  Judge, I can give you one other fact, if

12   you would like.

13       When Mr. Ortega came to the United States --

14       THE COURT:  Yes.

15       MR. WALLEISA:  -- he used Ms. Escobar's address as his

16   place that he was going.  He is a resident of Ecuador, just as

17   Mr. Escobar is.  He could not purchase firearms here and have

18   the customs declarations.

19       THE COURT:  All right.  Is there -- do you have any

20   indication of this -- we know right now of 104 weapons -- of

21   what percentage of these were used or -- in this expedition,

22   hunting business?  Any idea?

23       MR. WALLEISA:  We have no way of knowing, Judge.

24       I can tell you, however, one person wanted (inaudible)

25   to hunt with.  So there's no way of correlating the number of

1    customers that Mr. Escobar would have with the number of

2    weapons that he purchased.

3            He told the undercover agent and there were

4    communications that some people bring their own guns.  Some

5    people like you to get guns for them.  Sometimes they get guns

6    in Ecuador for them.  So I can't tell you what percentage of

7    the 100 guns were for his business.

8            THE COURT:  Or I guess the flip side of that:  What

9    percentage of the guns were converted for other purposes?

10           MR. WALLEISA:  That is correct.  But we do know, if you

11   take as -- what the agent said, Mr. Escobar admitted that he

12   took guns and he resold them and he made a profit of 15 to 20

13   percent.

14           THE COURT:  Other than the fellow who collected -- was

15   it Duran or Durani? --

16           MR. WALLEISA:  Durani.

17           THE COURT:  -- who collected the Kilimanjaro rifles and

18   other than the ten that were seized from Ortega, I guess there

19   was one, a Russian individual.  Any other evidence that the

20   Government has in terms of where some of these weapons went?

21           MR. WALLEISA:  All we know is the ten that we have

22   recovered.  So we have no idea where the other guns are.

23           THE COURT:  And (inaudible) any crimes, criminal

24   investigations in Ecuador, to your knowledge?

25           SPECIAL AGENT ESTEBAN:  To the best of my knowledge,

1    it's only those ten that we know of.

2            MR. WALLEISA:  At this point, we only know of the ten,

3    Judge.

4            THE COURT:  Thank you.

5            Any rebuttal from the defense?

6            MR. VOLUCK:  Judge, I don't want to two-time you.  But,

7    you know, there have been cases --

8            THE COURT:  Just pull the mic over.

9            MR. VOLUCK:  There have been cases where -- for

10   instance, *US versus Patriarca*, 948 F.2d 789, First Circuit, a

11   1991 case, where the Defendant was the head of a Mafia family

12   and the Court said regarding flight -- the Court acknowledged

13   that the Mafia had both the will and the way to facilitate

14   flight; and the Government argued that the Defendant had once

15   assisted a fugitive flight by supplying them with $100,000 in

16   cash.  However, the Court found that the evidence of the

17   likelihood of the Defendant's flight was minimal and not enough

18   to satisfy the preponderance of proof.  And that was, you know,

19   a very, very serious case.

20           What we're really talking about is whether or not there

21   is a set of conditions that can assure your Honor regarding the

22   risk of flight.  And there are things such as electronic

23   monitoring.  The Defendant can communicate directly or

24   indirectly only with his attorney and an individual approved by

25   the Court.  They can have a (inaudible) telephone line at his

1    residence.  There can be unannounced visits and searches by law

2    enforcement, pretrial services, daily call-ins, curfew, limited

3    travel, remain in custody of a designated person and any other

4    conditions set by the Court.

5         And when you have a -- this is not like somebody comes

6    here before your Honor with no ties to the community and --

7         THE COURT:  Excuse me for one moment.

8         MR. VOLUCK:  Sure.

9         THE COURT:  I'm sorry.  Yes.

10        MR. VOLUCK:  That's okay.

11        Like somebody just came here and doesn't speak the

12   language and has no ties to the community whatsoever.

13        But we're talking about -- we're talking about letting

14   the Defendant possibly, you know, salvage his business, as

15   difficult as it would be to run it from here.  But to still,

16   you know, run his business and provide for his wife and his

17   child and to live with his mother, surrounded by all this other

18   family.

19        I mean, there would be -- you know, he could call in

20   daily, unannounced visits.  There definitely is enough types of

21   conditions that your Honor could fashion to assure your Honor

22   about the danger or risk of flight.  You know, I mean, we have

23   a man here that --

24        THE COURT:  Address the issue of danger to the

25   community, because I am very concerned about --

1          MR. VOLUCK:  You know, it's --

2          THE COURT:  I understand from the perspective of -- the

3    arguments with regard to flight.  But I can tell you, I am very

4    concerned about when guns from the United States in such large

5    numbers get shipped, concealed, disguised overseas and are used

6    for illicit purposes, killing people.

7          MR. VOLUCK:  The gun -- I'm sorry.

8          THE COURT:  And I understand, you know, the argument

9    with regard to your client's hunting business.

10         But I think, given the sheer volume of weapons and the

11   fact that at least some number of them -- I guess we have so

12   far 16 of them -- were given or sold to third parties, perhaps

13   more -- and I hear what the Government says about Ortega

14   possibly being involved in narcotics trafficking.  That, I will

15   tell you, gives me great concern, even more than the issue of

16   flight, to be honest.  Let me give you an opportunity to

17   address that.

18         MR. VOLUCK:  Here again, Judge, as Mr. Merlino said, we

19   don't know what Mr. Escobar knew about Mr. Ortega's business

20   except that, you know, they were friends.

21         THE COURT:  He paid $25,000 for his legal assistance.

22   So --

23         MR. VOLUCK:  They're -- you know, they're friends, you

24   know.

25         We're talking about -- we're talking about one instance

58

1    versus the Government's proffer that the majority of these

2    rifles, not pistols, but rifles, were used for his customers to

3    go hunting to the various islands.

4          And, you know, obviously, if he's bound to the house in

5    Boca Raton with his mother, he's not going to be importing any

6    more weapons.

7          It's interesting to note that if -- if you know a

8    little bit about -- and I don't presume to know a lot about

9    hunting.  But there are no AK-47s or TEC-9s or the type of

10   weapons that are generally used for illicit purposes.  These

11   are, you know, Kilimanjaro, expensive, hunting-type rifles,

12   shotguns, you know, not sawed-off shotguns, but bought from

13   legitimate dealers used for his business of which he has been

14   written up in numerous magazines, including in this month's

15   *Marlin* magazine, which I have a copy on your desk.

16         So again, I don't -- I don't mean to beat a dead horse,

17   Judge.  But the issue is, you know, whether you can satisfy

18   reasonably conditions to assure you about risk of flight and

19   the danger to the community.

20         It's not like we have a cocaine dealer here.  We have a

21   man that had a legitimate business with the majority of the

22   rifles going towards his customers and still at this juncture

23   presumed to be innocent, a man who has never had as much as a

24   traffic ticket in his entire life at the age of 30-something

25   years old with a lot of family to surround him.

1       You know, we talk a lot about semantics, whether he's a

2  full-time resident, a part-time resident.  But at this point in

3  the game, his family's going to come here from Ecuador and he's

4  going to be -- and his family have hired private counsel.  I

5  don't know what else we could, you know, tell your Honor to

6  fashion conditions that, you know, will assure you that he's

7  not going to be a further danger to the community, if you think

8  he's a danger to the community; and he's certainly not a risk

9  of flight.

10       THE COURT:  Fair enough.

11       Thank you.  I'm going to take a break for about two or

12  three minutes.

13       I want to look through -- you submitted, Mr. Voluck, a

14  packet of documents I want to look through.

15       MR. VOLUCK:  Would you like the *Marlin* magazine, Judge?

16       THE COURT:  No.  I'll take your word on that.  But I

17  think you gave me a packet here.  I just want to look through

18  it.  It'll take about two or three minutes, and I'll come back

19  with my decision.

20       (Pause in the proceedings.)

21       THE COURT:  We'll re-call our case, United States

22  versus Braden Escobar.  I see everybody is present.

23       Let me first thank the attorneys for their argument on

24  behalf of their respective clients, Mr. Merlino, Mr. Voluck on

25  behalf of Mr. Escobar, and Mr. Walleisa on behalf of the

60

 1   Government, for arguing their cases well on behalf of their

 2   respective clients.

 3         This is probably in more than 22 years doing this one

 4   of the closest calls in terms of a pretrial detention request.

 5   Obviously, arguments can be made on both sides.  And it's a

 6   very, very close call.

 7         What I have decided to do is this.  And when I'm done,

 8   I'll ask if there's a desire to have my decision stayed to

 9   appeal.

10         I'm willing to deny the Government's request for

11   pretrial detention.  I'll go through the statutory elements in

12   a moment.

13         The statute requires that we do so if there exists any

14   conditions or combination of conditions of release that would

15   assure the Defendant's appearance and the safety of the

16   community.

17         And I have come up with what I believe is, short of

18   pretrial detention, the only thing that would satisfy me as to

19   both of those prongs.  And what I am going to do is this:  Let

20   me ask Mr. Voluck, your client's wife and child:  Do they have

21   American passports?  Ecuadorian passports?  Any passports?  How

22   many passports?

23         MR. VOLUCK:  Well, his son is born here, so he's an

24   American citizen.

25         THE COURT:  Does he also have an Ecuadorian passport?

```
 1              MR. VOLUCK:  (Inaudible phrase.)

 2          She has an Ecuadorian passport and a valid visa.

 3              THE COURT:  All right.  The wife has an Ecuadorian

 4  passport?

 5              MR. VOLUCK:  Yes.  A visa -- United States --

 6              THE COURT:  And his son?

 7              MR. VOLUCK:  His son?  His son has dual citizenship.

 8              THE COURT:  He has US and Ecuadorian passports?

 9              MR. VOLUCK:  He has both.

10              THE COURT:  US and Ecuadorian passports.  Any other

11  passports?

12              MR. VOLUCK:  No.

13              THE COURT:  All right.  What I'm going to do is this:

14  I'm going to set a $250,000 corporate surety bond with a *Nebbia*

15  requirement and a $500,000 personal surety bond cosigned by the

16  Defendant's mother.

17          In addition to that, I am going to require that

18  Mr. Escobar reside at Dismas House in Dania Beach, Florida.

19  However, he will not be released to the Dismas House.  I'd like

20  his wife and son to come to the United States.  And once they

21  arrive, they're going to have to surrender their respective

22  passports to the pretrial services as well.

23          Now, I'm going to go through in just a few moments the

24  standard and special conditions.  But again, Mr. Escobar will

25  not be released to Dismas House until the corporate surety is
```

1    posted, the *Nebbia* is satisfied, the personal surety bond is

2    signed and the Defendant's wife and son have arrived in the

3    United States and surrendered their passport.

4            In addition, let me go through the statutory

5    requirements; and then I will ask the Government if they wish

6    for me to stay my decision to give them an opportunity to take

7    an appeal.

8            Under 3142(g), I need to consider the following factors

9    in determining whether there are conditions that would

10   reasonably assure the appearance of the Defendant as required

11   and the safety of any other person in the community.  And I

12   take that also as any other person to include Ecuadorian

13   residents as well, not just in the United States.

14           First, the nature and circumstances of the offense,

15   including whether it falls into certain categories:  And one of

16   them is whether it involves a firearm.  Obviously, these

17   involve firearms.

18           The weight of the evidence against the person:  You

19   know, I'm not here to render an opinion as to the ultimate

20   outcome of the case.  Apparently, there are going to be

21   additional charges; and that will be for a different judge or a

22   different jury on a different day.  However, at this point, it

23   appears that the Government has a substantial case against

24   Mr. Escobar.  That includes not only the evidence proffered in

25   the affidavit in support of the criminal complaint, but

1    certainly corroborated and reinforced by Mr. Escobar's own

2    statements.

3          Third is the history and characteristics of the person,

4    including family ties, employment, financial resources, length

5    of residence in the community, community ties, criminal

6    history, record of alcohol or drug abuse and also whether the

7    person is on -- at the time of the offense on probation or

8    pretrial release or supervised release.

9          This is a mixed bag, I think.  As defense counsel

10   pointed out, the Defendant was born in the United States, is a

11   US citizen, went to school in the United States.  His mother

12   and sister, and I believe his cousins as well, reside in the

13   United States; and more particularly, here in South Florida.

14         On the other hand, it's also true, as the Government

15   proffered, that the Defendant's father and brother are in

16   Ecuador.  His wife and son are in Ecuador.  He's lived there

17   for a number of years.  He owns a home there and owns a

18   business there.  His home he owns free and clear.  And on

19   multiple documents, official government documents, he has made

20   clear that that's his place of residence, including tax

21   documents, immigration documents, currency transaction

22   documents.  I believe there are others as well.

23         So with regard to ties, he does have ties to the United

24   States.

25         But he also has substantial ties to Ecuador.  And I

1    calculated that in the last 25 months, he spent 84 days.  So

2    he's basically spent 90 percent of his time outside the United

3    States.

4            And certainly, were there no restraints on him with

5    regard to the bond, he could very easily just return to

6    Ecuador.  He's got a home there, a business.

7            There is no evidence of criminal history.  So those

8    considerations do not apply.

9            The fourth factor is the nature and seriousness of the

10   danger to the community that would be posed by his release.

11   And I've got to tell you this:  This really concerns me.  And I

12   know counsel focused more on flight risk issue.  But I am very

13   concerned about firearms going from the United States to other

14   countries and being used for illicit purposes.

15           There is certainly circumstantial evidence of that in

16   this case, given the sheer volume of firearms.  He has

17   acknowledged doing this over ten years.  We know that in two

18   years, there have been over 100; the fact that he has

19   acknowledged selling a certain number of them -- we don't know

20   how many; the fact that some of them were recovered by

21   Ecuadorian police in a raid of an individual who apparently is

22   suspected of narcotics involvement and for whom Mr. Escobar

23   acknowledged acting as a straw purchaser here in the United

24   States.

25           However, I do believe that the conditions of bond that

1    I have set forth, the Defendant's residence at Dismas House,

2    coupled with the financial security of the bond, both a

3    corporate surety in which we'd have a bondsman, as well as a

4    personal surety, putting the Defendant's mother's financial

5    fortune at stake, coupled with the Defendant's wife and child

6    coming in and residing in the United States and surrendering

7    their passports so they cannot leave the United States, that

8    that combination of conditions would give me comfort to believe

9    that Mr. Escobar would appear at trial as required and that he

10   would not be involved in any further criminal activity.

11          Now, that said, let me ask the Government if they wish

12   for me to stay my decision so that they can take an appeal.

13          MR. WALLEISA:  Judge, because it's a conditional bond

14   at this point, the conditions not being met --

15          THE COURT:  Right.

16          MR. WALLEISA:  -- there is time to appeal (inaudible).

17   To the extent that --

18          THE COURT:  I don't want you to go ahead and go to the

19   bondsman and go through all this and then -- so if you're going

20   to appeal -- I'll tell you what.  Why don't you do this:  I

21   don't want to put you on the spot where you have to decide this

22   very moment.  But if -- in the next day or two, let Mr. Voluck

23   know, so before they go through the expense and what this is

24   going to involve in terms of relocating the Defendant's family

25   and all that, let him know first.  If there's going to be an

1    appeal, then he may want to hold off until the appeal is

2    resolved.  So maybe in the next -- today is Friday.  By the end

3    of the day Monday do you think you could let him know?

4         MR. WALLEISA:  I think we could probably do that.

5         THE COURT:  Okay.

6         MR. WALLEISA:  Frankly, if it's not feasible for them,

7    the conditions, then there's no need to --

8         THE COURT:  I am going to go ahead -- I will stay my

9    decision until 5:00 on Monday.  If in fact the Government takes

10   an appeal, then I will stay it, then.  My decision will be

11   stayed pending the outcome of the appeal.  I'll stay it until

12   5:00 on Monday.  And just let Mr. Merlino and Mr. Voluck know

13   what you wish to do on that.

14        Mr. Escobar, I'm going to go through the following

15   standard and special conditions of bond with you.  This is in

16   the event that the Government does not appeal it or if they do

17   appeal it that they do not prevail.  I'll ask that you please

18   listen carefully.  When I'm done, I'll ask you whether you

19   understand each and every one of the conditions of bond that

20   I've set forth.

21        First and foremost, you are to appear in court at such

22   times and places as directed to appear.  Failure to do so may

23   result in a separate indictment or offense of bond jumping.

24        Your travel will be restricted to Broward County, and

25   more specifically you will be residing 24/7 at the Dismas House

1    in Dania Beach, Florida, except to come to court and to meet

2    with your attorneys.  And that'll have to be cleared with the

3    probation office, the hours of which will be (inaudible).  But

4    at all other times, you're going to be at the Dismas House

5    facility in Dania Beach, which is a halfway house.

6              You shall not commit any violation of local, state or

7    federal law.

8              Your passports:  They were seized by the agents at the

9    time of the arrest?  Do you have any other passports?

10             THE DEFENDANT:  No, your Honor.

11             THE COURT:  Bear in mind that while on bond you're not

12   to be in the possession of any passports or comparable travel

13   documents.

14             I'm not going to require you to report to the probation

15   office.  The probation officers will come to you at the Dismas

16   House.

17             Obviously, with your presence 24/7 at the Dismas House,

18   I'm going to delete the employment requirement.

19             You are to avoid any contact with any victims or

20   witnesses to this offense except for and with your attorneys as

21   they deem necessary in preparing your case.

22             Obviously, you're not to be in the possession of any

23   guns or other dangerous weapons.

24             And also, in Dismas House, you're to avoid the

25   consumption of excessive -- of any alcohol or any illegal

```
 1   narcotics, submit to any random urinalyses as they deem

 2   necessary as well as any recommended followup treatment.

 3          Let me ask if the Government or the defense has any

 4   other recommended additions or modifications of bond.  First,

 5   from the Government.

 6          MR. WALLEISA:  No additional suggestions, your Honor,

 7   understanding that we do object to the (inaudible).

 8          (Cellular telephone ringing.)

 9          THE COURT:  Let's turn that off.

10          MR. WALLEISA:  So I --

11          THE COURT:  No.  I don't take it personally.  That's

12   fine.

13          I think it's a very close call.  I really do.  Probably

14   one of the closest calls I've had to make in 22 years.

15          (Cellular telephone ringing.)

16          THE COURT:  Let's please turn that off.

17          UNIDENTIFIED SPEAKER:  You'd think I ought to know how

18   to do that, Judge.

19          THE COURT:  Anything from the defense?  Any recommended

20   additions or modifications of bond?

21          MR. VOLUCK:  No, your Honor.

22          THE COURT:  Mr. Escobar, do you have any questions that

23   I can answer today about what we've done today, about the terms

24   and conditions of your bond or about what will be occurring

25   next in your case?
```

1              THE DEFENDANT:  No, sir.

2              THE COURT:  All right.  Very well.  Gentlemen, thank

3    you for your efforts.

4              MR. VOLUCK:  Thank you.

5              THE COURT:  We'll go ahead and proceed to our 11:00.

6    We're running late.  I know.  I appreciate your patience.

7              (Proceedings concluded.)

8

                        C E R T I F I C A T E

9

10             I hereby certify that the foregoing is an

11   accurate transcription of the digitally recorded proceedings

12   in the above-entitled matter.

13

14
                         /s/Lisa Edwards
15   _____        LISA EDWARDS, RDR, CRR
        DATE             Official United States Court Reporter
16                       400 North Miami Avenue, Twelfth Floor
                         Miami, Florida 33128
17                       (305) 523-5499

18

19

20

21

22

23

24

25

**$**

**$100,000** [1] - 55:15
**$13,000** [3] - 9:5,
9:12, 50:6
**$25,000** [2] - 9:2,
57:21
**$250,000** [1] - 61:14
**$500,000** [1] - 61:15

**'**

**'13** [1] - 6:3
**'90s** [2] - 23:16,
23:19

**/**

**/s/Lisa** [1] - 69:14

**1**

**1** [2] - 1:8, 16:4
**10** [1] - 38:17
**100** [7] - 10:6, 14:9,
14:10, 29:5, 47:12,
54:7, 64:18
**101** [1] - 1:20
**104** [2] - 11:12, 53:20
**109** [1] - 11:14
**10:11** [1] - 1:6
**11** [1] - 5:25
**11:00** [1] - 69:5
**11:50** [1] - 1:6
**11th** [1] - 5:17
**12** [2] - 5:3, 5:20
**13-MJ-06398** [1] - 1:2
**14** [1] - 6:4
**1430** [1] - 1:20
**15** [4] - 2:5, 5:7, 10:3,
54:12
**15th** [1] - 5:10
**16** [2] - 5:13, 57:12
**18** [2] - 12:14, 46:16
**19** [1] - 5:20
**1991** [1] - 55:11
**1992** [1] - 46:18
**1st** [1] - 41:20

**2**

**2** [2] - 31:5, 32:6
**20** [5] - 5:18, 5:24,
10:4, 25:7, 54:12
**20-day** [1] - 5:18
**2001** [3] - 8:4, 8:8,

8:9
**2003** [1] - 7:23
**2005** [2] - 7:9
**2006** [2] - 14:3, 29:17
**2011** [12] - 4:20,
4:25, 5:2, 5:6, 5:7,
5:10, 5:11, 6:13,
28:15, 41:20, 41:23
**2012** [8] - 5:3, 5:15,
5:17, 5:18, 5:22, 5:23,
41:2, 41:20
**2013** [11] - 1:5, 4:20,
6:1, 6:2, 6:4, 6:7,
6:13, 7:22, 28:15,
39:25, 40:6
**2017** [1] - 7:9
**20th** [3] - 6:2, 6:7,
6:13
**21** [3] - 7:17, 7:18,
11:7
**22** [2] - 60:3, 68:14
**22nd** [1] - 5:11
**23** [3] - 1:5, 4:24,
5:23
**24/7** [2] - 66:25,
67:17
**24th** [1] - 6:3
**25** [2] - 38:15, 64:1
**26** [2] - 5:12, 11:5
**26th** [1] - 5:7
**27th** [3] - 5:2, 5:23,
6:13
**28** [1] - 2:5
**285** [1] - 46:18
**28th** [1] - 5:17

**3**

**30** [1] - 5:14
**30-something** [1] -
58:24
**305** [2] - 1:25, 69:17
**3142** [1] - 46:17
**3142(g** [1] - 62:8
**31st** [1] - 6:4
**32** [1] - 2:7
**33** [1] - 5:19
**33128** [1] - 1:24,
69:16
**33301** [2] - 1:17, 1:21
**34** [1] - 4:25
**39** [1] - 2:8

**4**

**400** [2] - 1:23, 69:16
**43** [1] - 5:15
**4473** [1] - 15:14

**4473s** [3] - 7:15,
8:13, 11:1
**4th** [1] - 5:22

**5**

**500** [1] - 1:16
**523-5499** [2] - 1:25,
69:17
**5:00** [2] - 66:9, 66:12

**6**

**63** [1] - 11:5

**7**

**754** [1] - 6:12
**78** [1] - 11:6
**789** [1] - 55:10
**7th** [1] - 5:2

**8**

**8-19-2013** [1] - 7:5
**8-27-2012** [1] - 7:7
**8-27-2017** [1] - 7:7
**801** [1] - 46:17
**84** [2] - 38:15, 64:1
**88** [1] - 6:14
**8th** [1] - 5:17

**9**

**90** [4] - 6:18, 24:15,
64:2
**90-day** [2] - 24:13,
24:16
**948** [1] - 55:10

**A**

**a.m** [2] - 1:6
**ability** [1] - 46:13
**above-entitled** [1] -
69:12
**absolutely** [3] -
21:19, 34:1, 52:19
**abuse** [2] - 36:22,
63:6
**accept** [1] - 33:24
**access** [1] - 27:12
**according** [4] - 19:3,
38:13, 41:12, 47:10
**account** [1] - 36:3
**accurate** [5] - 43:23,

54:25
**agents** [5] - 8:2,
26:24, 27:1, 31:15,
67:8
**agree** [7] - 13:4,
17:10, 18:5, 21:4,
21:16, 32:14, 32:20
**agreed** [3] - 8:2,
26:14, 32:19
**agriculture** [1] -
34:13
**ahead** [8] - 3:4,
39:14, 39:19, 43:4,
43:5, 65:18, 66:8,
69:5
**airport** [5] - 19:12,
19:13, 20:24, 31:15,
35:5
**AK-47s** [1] - 58:9
**alcohol** [3] - 47:8,
63:6, 67:25
**alcoholism** [1] -
36:22
**alert** [1] - 49:12
**allegation** [4] -
16:24, 17:3, 21:18,
26:1
**allegations** [4] -
36:8, 43:20, 47:22,
48:17
**alleged** [4] - 44:22,
45:8, 49:19, 51:3
**allegedly** [5] - 27:1,
27:15, 44:15, 47:2,
48:7
**alleging** [1] - 21:9
**allow** [3] - 36:11,
36:12, 48:12
**allowance** [1] - 46:22
**allowed** [1] - 52:24
**alone** [4] - 46:2,
46:3, 47:11, 49:4
**America** [2] - 23:4,
29:2
**AMERICA** [1] - 1:4
**American** [3] - 34:10,
60:21, 60:24
**Americans** [5] -
22:23, 22:25, 35:22,
46:6, 46:7
**ammunition** [1] -
49:13
**amounts** [1] - 17:24
**Anderson** [1] - 37:7
**ANDERSON** [3] -
37:10, 37:13, 37:15
**animals** [1] - 48:19
**ankle** [1] - 36:13
**answer** [2] - 50:11,
68:23

**44:8, 45:11, 45:25,**
**69:11**
**accurately** [1] - 27:2
**acid** [1] - 34:15
**acknowledged** [6] -
47:16, 49:7, 55:12,
64:17, 64:19, 64:23
**acquired** [2] - 13:13,
47:12
**acquisition** [3] -
4:14, 10:25, 12:18
**acting** [1] - 64:23
**activities** [1] - 25:10
**activity** [1] - 65:10
**actual** [1] - 26:11
**addition** [3] - 9:7,
61:17, 62:4
**additional** [4] -
10:19, 11:1, 62:21,
68:6
**additionally** [1] - 7:2
**additions** [2] - 68:4,
68:20
**address** [28] - 7:22,
7:24, 15:17, 17:12,
17:14, 18:25, 19:1,
19:23, 20:9, 20:13,
20:22, 21:12, 22:10,
23:16, 24:2, 31:4,
34:5, 34:6, 34:19,
35:17, 36:25, 37:2,
44:11, 45:6, 53:15,
56:24, 57:17
**adjoining** [1] - 11:20
**admission** [2] -
43:25, 47:12
**admitted** [14] - 8:5,
8:6, 8:11, 8:16, 8:20,
8:21, 8:25, 9:3, 9:18,
10:3, 10:5, 14:1,
43:25, 54:11
**adopt** [1] - 4:4
**advised** [1] - 7:25
**advising** [1] - 33:10
**affidavit** [5] - 4:4,
9:9, 13:25, 38:14,
62:25
**affinity** [1] - 13:15
**age** [1] - 58:24
**agent** [14] - 12:4,
14:15, 14:18, 14:21,
14:23, 28:7, 28:13,
28:21, 35:4, 47:10,
47:24, 48:12, 54:3,
54:11
**Agent** [8] - 3:11,
14:17, 15:8, 17:8,
23:15, 23:20, 24:1,
24:17
**AGENT** [2] - 3:13,

2

answered [2] - 21:21, 23:5

answering [1] - 25:19

anticipated [1] - 11:2

apologize [1] - 3:2

appeal [11] - 60:9, 62:7, 65:12, 65:16, 65:20, 66:1, 66:10, 66:11, 66:16, 66:17

appear [5] - 43:14, 52:13, 65:9, 66:21, 66:22

appearance [4] - 43:15, 43:17, 60:15, 62:10

appearances [1] - 3:6

APPEARANCES [1] - 1:13

appeared [1] - 19:16

application [2] - 7:19, 7:22

applications [1] - 52:10

apply [1] - 64:8

appreciate [2] - 33:10, 69:6

approach [4] - 3:25, 14:24, 30:25, 39:11

appropriate [1] - 13:11

approved [1] - 55:24

areas [1] - 11:20

argue [1] - 13:4

argued [1] - 55:14

arguing [1] - 60:1

argument [9] - 36:17, 43:5, 47:25, 49:7, 51:8, 51:18, 53:2, 57:8, 59:23

argumentative [1] - 21:21

arguments [2] - 57:3, 60:5

arranged [1] - 6:10

arranging [1] - 12:5

arrest [4] - 7:2, 9:9, 13:23, 67:9

arrested [9] - 4:21, 6:3, 6:7, 7:25, 19:19, 19:21, 25:2, 26:4, 36:2

arrests [1] - 47:7

arrive [1] - 61:21

arrived [2] - 5:21, 62:2

arriving [1] - 6:8

articles [1] - 18:13

aspect [3] - 12:18,

23:11, 24:22

assistance [1] - 57:21

ASSISTANT [1] - 1:15

assisted [1] - 55:15

assume [1] - 26:21

assure [2] - 55:21, 56:21, 58:18, 59:6, 60:15, 62:10

ATF [12] - 3:11, 4:13, 7:15, 8:5, 8:12, 11:1, 15:14, 16:8, 20:14, 27:8, 27:9, 44:23

attached [1] - 7:22

attaché [1] - 16:8

attend [2] - 3:3, 23:10

attention [1] - 39:20

attitude [2] - 26:7, 47:2

attorney [1] - 55:24

ATTORNEY [1] - 1:15

attorneys [4] - 29:10, 59:23, 67:2, 67:20

attractive [1] - 46:6

August [7] - 1:5, 4:20, 5:2, 6:2, 6:7, 6:13, 28:15

author [1] - 32:3

authorities [4] - 12:20, 13:1, 16:10, 49:13

available [1] - 14:15

Avenue [1] - 1:20, 1:23, 69:16

avoid [2] - 67:19, 67:24

aware [12] - 4:11, 18:8, 22:18, 22:21, 23:6, 23:9, 23:11, 23:15, 24:18, 25:9, 27:18, 30:20

**B**

baby [2] - 41:25, 42:2

background [3] - 24:24, 24:25, 34:11

bag [1] - 63:9

balance [1] - 52:1

bank [1] - 36:3

banks [1] - 34:20

BARRY [1] - 1:10

base [1] - 35:23

based [7] - 11:8, 11:9, 11:25, 21:7,

21:14, 35:19, 43:6

bases [1] - 10:19

basis [3] - 13:10, 36:25, 52:25

Beach [3] - 61:18, 67:1, 67:5

bear [1] - 67:11

bears [2] - 11:6, 51:12

beat [1] - 58:16

bedroom [2] - 21:24, 22:3

BEFORE [1] - 1:10

began [1] - 16:7

begin [2] - 3:20, 16:6

beginning [1] - 4:3

behalf [5] - 3:8, 59:24, 59:25, 60:1

belabor [1] - 42:22

believes [1] - 12:23

belonged [1] - 12:15

below [1] - 31:5

beneficial [2] - 7:4, 11:23

best [3] - 45:7, 50:12, 54:25

between [8] - 5:16, 6:12, 6:14, 6:18, 8:24, 26:24, 32:17, 52:9

beyond [2] - 13:24, 36:15

bills [2] - 22:15, 22:17

bit [1] - 58:8

Boca [8] - 15:19, 17:15, 34:5, 35:17, 37:15, 40:22, 41:22, 58:5

bond [15] - 4:8, 61:14, 61:15, 62:1, 64:5, 64:25, 65:2, 65:13, 66:15, 66:19, 66:23, 67:11, 68:4, 68:20, 68:24

bondsman [2] - 65:3, 65:19

born [9] - 22:21, 22:23, 23:1, 25:22, 34:9, 35:13, 42:2, 60:23, 63:10

bought [2] - 13:19, 58:12

Boulevard [1] - 1:16

bound [1] - 58:4

box [1] - 31:2

Braden [20] - 3:5, 15:9, 16:10, 20:22, 34:3, 34:5, 40:1, 40:8, 41:4, 41:13, 41:21, 42:6, 43:12, 48:16,

48:17, 51:2, 51:3, 51:4, 52:3, 59:22

BRADEN [1] - 1:7

breadth [1] - 46:20

break [1] - 59:11

brief [2] - 28:10, 39:24, 51:21

briefly [1] - 4:7

bring [2] - 12:6, 54:4

brings [2] - 23:9, 51:4

brother [5] - 42:19, 45:17, 52:1, 52:2, 63:15

brought [2] - 13:16, 46:25

Broward [2] - 1:16, 66:24

building [1] - 27:11

business [41] - 7:6, 7:10, 10:20, 10:21, 11:19, 12:10, 13:5, 18:6, 18:10, 23:21, 25:17, 28:22, 35:2, 35:5, 35:6, 35:19, 35:20, 35:24, 39:3, 39:5, 44:3, 44:7, 46:3, 46:4, 46:9, 46:13, 47:10, 49:17, 50:6, 51:24, 53:22, 54:7, 56:14, 56:16, 57:9, 57:19, 58:13, 58:21, 63:18, 64:6

buy [9] - 9:23, 25:18, 50:23

buyer [2] - 50:15, 51:3

buying [2] - 10:6, 14:1

buys [1] - 35:1

BY [6] - 1:22, 15:7, 20:3, 21:23, 28:12, 39:22

bondsman [2] - 65:3, 65:19

**C**

calculated [1] - 64:1

calculation [1] - 6:16

call-ins [1] - 56:2

cannot [2] - 49:3, 65:7

capacity [1] - 12:4

Car [1] - 34:24

card [2] - 7:8, 34:22, 35:11

cards [1] - 34:20

carefully [1] - 66:18

carry [1] - 35:23

CASE [1] - 1:2

case [22] - 3:4, 4:5, 11:8, 14:18, 14:19, 21:1, 22:7, 24:24, 32:12, 32:16, 46:16, 48:19, 50:14, 51:17, 55:11, 55:19, 59:21, 62:20, 62:23, 64:16, 67:21, 68:25

cases [1] - 55:7, 55:9, 60:1

cash [1] - 55:16

categories [1] - 62:15

caught [1] - 12:13

Cellular [1] - 68:8

cellular [1] - 68:15

certain [4] - 31:8, 47:13, 62:15, 64:19

certainly [4] - 59:8, 63:1, 64:4, 64:15

certificate [1] - 7:3

certify [1] - 69:10

chambers [1] - 3:3

chance [1] - 20:23

change [1] - 13:6

characteristics [1] - 63:3

charged [4] - 4:16, 10:24, 51:13

charges [4] - 4:12, 11:2, 44:13, 62:21

check [3] - 22:9, 24:25, 29:20

checked [1] - 10:9

CHIEF [1] - 1:11

child [13] - 10:22, 35:13, 35:14, 40:3, 40:17, 40:21, 44:3, 45:15, 46:2, 51:23, 56:17, 60:20, 65:5

chosen [1] - 31:10

Christmas [1] - 42:4

Circuit [1] - 55:10

circumstances [4] - 35:16, 43:13, 49:19, 62:14

circumstantial [1] - 64:15

citizen [6] - 22:19, 34:8, 35:13, 50:22, 60:24, 63:11

citizenship [1] - 61:7

civil [1] - 43:16

claimed [2] - 7:16, 15:17

clarified [1] - 33:10

clarifies [1] - 33:1

clarify [2] - 28:13, 33:4

clear [6] - 16:24,

36:2, 43:11, 43:19, 63:18, 63:20
**cleared** [1] - 67:2
**clearly** [1] - 52:3
**client** [11] - 11:23, 31:8, 35:9, 35:23, 43:25, 45:4, 46:8, 48:16, 49:1, 49:7, 50:16
**client's** [4] - 48:9, 50:12, 57:9, 60:20
**client-develop** [1] - 46:8
**clientele** [3] - 35:3, 35:21, 39:5
**clients** [6] - 24:19, 25:17, 35:1, 59:24, 60:2
**close** [5] - 36:5, 38:8, 38:24, 60:6, 68:13
**close-knit** [1] - 36:5
**closest** [2] - 60:4, 68:14
**clothes** [1] - 22:1
**clothing** [1] - 45:19
**cocaine** [1] - 58:20
**collected** [2] - 54:14, 54:17
**collector** [1] - 28:2
**collectors** [1] - 27:19
**college** [1] - 23:6
**Colombia** [1] - 16:8
**combination** [2] - 60:14, 65:8
**comfort** [1] - 65:8
**comfortable** [1] - 39:15
**coming** [3] - 35:16, 44:13, 65:6
**comment** [2] - 30:21, 49:3
**commit** [1] - 67:6
**communicate** [1] - 55:23
**communicated** [1] - 12:4
**communications** [2] - 28:25, 54:4
**communicative** [1] - 8:3
**community** [18] - 11:9, 26:2, 47:3, 47:6, 51:12, 52:16, 52:19, 56:6, 56:12, 56:25, 58:19, 59:7, 59:8, 60:16, 62:11, 63:5, 64:10
**companion** [1] - 47:21
**company** [3] - 8:18,

29:1, 49:25
**comparable** [1] - 67:12
**compels** [1] - 53:8
**complaint** [16] - 4:4, 4:12, 13:25, 15:10, 19:18, 19:22, 20:2, 20:4, 21:18, 38:14, 44:15, 45:9, 51:9, 51:13, 51:17, 62:25
**completed** [1] - 7:12
**completely** [1] - 39:5
**computer** [2] - 22:4, 45:23
**concealed** [4] - 48:25, 49:8, 53:8, 57:5
**concern** [1] - 57:15
**concerned** [4] - 53:5, 56:25, 57:4, 64:13
**concerning** [1] - 53:7
**concerns** [1] - 64:11
**concluded** [1] - 69:7
**conditional** [1] - 65:13
**conditions** [16] - 55:21, 56:4, 56:21, 58:18, 59:6, 60:14, 61:24, 62:9, 64:25, 65:8, 65:14, 66:7, 66:15, 66:19, 68:24
**condominium** [1] - 24:4
**confession** [3] - 44:22, 45:8, 47:2
**conflict** [2] - 32:16, 32:17
**connection** [4] - 4:14, 8:24, 10:25, 13:5
**connotation** [1] - 33:3
**consider** [4] - 51:11, 51:14, 51:15, 62:8
**considerations** [1] - 64:8
**considered** [1] - 51:9
**considering** [1] - 46:22
**consisting** [4] - 5:8, 5:13, 5:24, 6:5
**Constitution** [1] - 46:21
**constitutional** [1] - 33:5
**consultation** [4] - 31:13, 32:7, 32:16, 32:21
**consumption** [1] -

67:25
**contact** [1] - 67:19
**contention** [1] - 15:22
**continue** [1] - 36:11
**continuing** [1] - 18:22
**contradict** [1] - 38:19
**contrary** [1] - 17:7, 18:1, 18:2, 45:6
**convenient** [1] - 51:5
**conversation** [1] - 20:25, 35:4
**converted** [1] - 54:9
**cooperative** [4] - 8:2, 26:5, 31:16, 47:1
**copy** [2] - 15:11, 58:15
**Coral** [1] - 38:1
**corners** [2] - 45:9, 51:9
**corporate** [1] - 61:14, 61:25, 65:3
**correct** [37] - 8:14, 15:14, 15:15, 15:24, 15:25, 16:21, 17:1, 17:2, 17:5, 17:12, 17:15, 17:16, 17:18, 17:19, 19:2, 19:5, 19:14, 19:22, 19:24, 20:5, 20:8, 20:10, 20:13, 20:18, 20:19, 21:1, 23:19, 24:5, 24:7, 25:4, 25:5, 26:15, 26:22, 27:2, 38:16, 51:22, 54:10
**correlating** [1] - 53:25
**corroborated** [1] - 63:1
**corroboration** [1] - 9:13
**cosigned** [1] - 61:15
**counsel** [10] - 3:6, 3:10, 3:15, 15:4, 32:8, 32:17, 32:22, 59:4, 63:9, 64:12
**count** [1] - 51:2
**counted** [1] - 11:12
**countries** [2] - 22:24, 64:14
**country** [2] - 25:14, 46:22
**counts** [1] - 7:18
**County** [1] - 66:24
**coupled** [2] - 65:2, 65:5
**course** [8] - 5:1, 10:5, 16:5, 18:22,

21:6, 21:13, 28:13, 46:15
**court** [4] - 14:18, 43:14, 66:21, 67:1
**Court** [11] - 1:23, 30:10, 36:24, 39:25, 41:21, 55:12, 55:16, 55:25, 56:4, 69:15
**COURT** [135] - 1:1, 3:1, 3:9, 3:12, 3:17, 3:19, 3:23, 3:25, 4:6, 4:10, 6:16, 8:7, 8:10, 8:13, 8:15, 9:8, 9:17, 10:1, 11:12, 13:2, 13:12, 13:23, 14:4, 14:6, 14:10, 14:14, 14:20, 14:23, 15:1, 15:4, 20:2, 21:22, 28:6, 28:9, 28:19, 28:21, 29:4, 29:10, 29:15, 29:22, 30:2, 30:6, 30:11, 30:14, 30:16, 30:24, 31:1, 31:12, 31:20, 31:25, 32:2, 32:5, 32:24, 33:5, 33:8, 33:13, 33:17, 33:20, 34:22, 36:15, 36:20, 36:23, 37:3, 38:2, 38:10, 38:13, 38:17, 39:7, 39:11, 39:14, 39:19, 42:23, 42:25, 43:4, 43:9, 43:23, 43:25, 44:18, 44:24, 45:1, 45:10, 45:18, 45:20, 45:22, 45:24, 47:9, 48:2, 48:8, 48:21, 48:23, 49:6, 50:5, 50:19, 50:22, 51:11, 51:18, 51:20, 52:16, 52:20, 53:5, 53:14, 53:19, 54:8, 54:14, 54:17, 54:23, 55:4, 55:8, 56:7, 56:9, 56:24, 57:2, 57:8, 57:21, 59:10, 59:16, 59:21, 60:25, 61:3, 61:6, 61:8, 61:10, 61:13, 65:15, 65:18, 66:5, 66:8, 67:11, 68:9, 68:11, 68:16, 68:19, 68:22, 69:2, 69:5
**cousin** [1] - 37:10, 38:3, 38:4
**cousins** [2] - 37:1, 63:12
**credit** [2] - 34:20, 34:22
**CRENSHAW** [1] -

32:1
**Crenshaw** [3] - 2:7, 2:8, 31:23
**crimes** [1] - 54:23
**criminal** [13] - 4:4, 4:11, 15:10, 24:25, 38:12, 43:15, 47:6, 51:14, 54:23, 62:25, 63:5, 64:7, 65:10
**cross** [6] - 14:16, 14:21, 15:4, 34:6, 39:8, 43:7
**CROSS** [2] - 15:6, 39:21
**Cross** [1] - 2:3
**cross-examination** [3] - 14:16, 34:6, 43:7
**CROSS-EXAMINATION** [2] - 15:6, 39:21
**cross-examine** [3] - 14:21, 15:4, 39:8
**CRR** [2] - 1:22, 69:15
**curfew** [1] - 56:2
**currency** [2] - 44:5, 63:21
**current** [4] - 11:4, 11:7, 32:10, 32:11
**custody** [3] - 51:1, 52:24, 56:3
**customers** [7] - 10:15, 12:3, 12:10, 13:19, 54:1, 58:2, 58:22
**customs** [3] - 7:12, 52:10, 53:18

**D**

**dad** [1] - 42:18
**daily** [2] - 56:2, 56:20
**danger** [16] - 11:9, 47:3, 47:6, 51:12, 52:16, 52:18, 52:20, 52:21, 52:25, 53:3, 56:22, 56:24, 58:19, 59:7, 59:8, 64:10
**dangerous** [1] - 67:23
**Dania** [3] - 61:18, 67:1, 67:5
**darwin** [1] - 31:23
**Darwin** [1] - 2:7
**DARWIN** [1] - 32:1
**DATE** [1] - 69:15
**dated** [1] - 7:5
**daughter** [1] - 34:3
**days** [26] - 4:24, 5:1, 5:3, 5:7, 5:13, 5:16,

4

5:18, 5:23, 6:1, 6:4,
6:10, 6:12, 6:14, 6:18,
21:11, 25:6, 25:7,
38:15, 40:8, 41:4,
41:5, 41:21, 44:7,
64:1
   **DEA** [2] - 27:6, 47:23
   **dead** [1] - 58:16
   **deal** [1] - 49:24
   **dealer** [2] - 10:8,
58:20
   **dealers** [12] - 4:14,
9:14, 10:15, 12:2,
16:16, 16:18, 16:19,
16:20, 17:1, 17:2,
25:9, 58:13
   **dealing** [6] - 11:3,
44:14, 46:20, 46:23,
48:7, 48:18
   **December** [2] - 5:10,
5:11
   **decide** [1] - 65:21
   **decided** [1] - 60:7
   **decision** [6] - 59:19,
60:8, 62:6, 65:12,
66:9, 66:10
   **declaration** [2] -
7:13, 46:25
   **declarations** [3] -
51:24, 52:10, 53:18
   **declared** [1] - 7:13
   **decline** [4] - 31:6,
31:19, 32:21, 33:6
   **declined** [4] - 31:7,
31:12, 32:6, 33:2
   **declining** [1] - 31:8
   **deem** [2] - 67:21,
68:1
   **defendant** [1] - 1:8
   **Defendant** [58] -
4:12, 4:20, 4:21, 4:25,
5:4, 5:8, 5:12, 5:15,
5:19, 5:21, 5:24, 6:1,
6:7, 6:13, 6:22, 6:24,
6:25, 7:2, 7:11, 7:16,
7:25, 8:22, 8:25, 9:4,
9:15, 9:18, 9:21, 9:23,
10:3, 10:5, 10:8,
10:10, 10:12, 10:14,
10:20, 11:19, 12:1,
12:2, 12:14, 12:16,
13:15, 13:18, 14:4,
14:5, 28:15, 31:3,
31:5, 32:6, 32:10,
35:19, 55:11, 55:14,
55:23, 56:14, 62:10,
63:10
   **DEFENDANT** [4] -
1:18, 2:6, 67:10, 69:1
   **Defendant's** [15] -

7:5, 7:19, 11:4, 11:9,
12:18, 39:8, 55:17,
60:15, 61:16, 62:2,
63:15, 65:1, 65:4,
65:5, 65:24
   **DEFENSE** [2] - 32:1,
39:13
   **defense** [9] - 3:23,
30:16, 32:7, 32:16,
32:22, 55:5, 63:9,
68:3, 68:19
   **definitely** [1] - 56:20
   **definition** [2] - 24:9,
24:13
   **degree** [1] - 34:12
   **delay** [1] - 49:14
   **delete** [1] - 67:18
   **delivered** [1] - 52:5
   **denies** [1] - 31:8
   **deny** [1] - 60:10
   **departed** [1] - 5:23
   **Department** [1] -
10:9
   **derive** [1] - 39:5
   **described** [1] - 10:17
   **designated** [1] - 56:3
   **desire** [1] - 60:8
   **desk** [2] - 22:3, 58:15
   **details** [1] - 29:22
   **DETENTION** [1] -
1:10
   **detention** [8] - 3:21,
10:19, 11:8, 13:11,
53:2, 60:4, 60:11,
60:18
   **determine** [4] -
21:10, 21:16, 22:9,
25:2
   **determining** [1] -
62:9
   **develop** [1] - 46:8
   **development** [1] -
35:9
   **difference** [1] - 52:9
   **different** [5] - 16:16,
16:18, 62:21, 62:22
   **difficult** [2] - 41:19,
56:15
   **DIGITAL** [1] - 1:11
   **digitally** [1] - 69:11
   **dining** [1] - 35:9
   **Direct** [1] - 2:3
   **directed** [2] - 52:14,
66:22
   **directly** [1] - 55:23
   **disagree** [1] - 51:11
   **discover** [1] - 17:23,
17:25
   **discovery** [4] - 49:4,
49:22, 50:8, 51:6

   **discrimination** [1] -
4:8
   **discuss** [5] - 24:20,
31:12, 32:6, 32:15,
32:21
   **discussion** [1] - 12:6
   **disguised** [3] - 8:17,
49:8, 57:5
   **disguising** [1] - 49:2
   **Dismas** [9] - 61:18,
61:19, 61:25, 65:1,
66:25, 67:4, 67:15,
67:17, 67:24
   **DISTRICT** [2] - 1:1,
1:1
   **District** [4] - 4:22,
5:22, 6:25, 46:18
   **DIVISION** [1] - 1:2
   **divorce** [1] - 40:3
   **document** [1] - 20:15
   **documents** [13] -
7:3, 7:9, 8:18, 20:10,
20:11, 20:12, 59:14,
63:19, 63:21, 63:22,
67:13
   **done** [6] - 36:10,
36:18, 49:11, 60:7,
66:18, 68:23
   **doors** [1] - 36:10
   **double** [1] - 29:20
   **double-check** [1] -
29:20
   **down** [4] - 31:5,
42:18, 45:5, 52:8
   **draw** [1] - 48:2
   **Drayton** [3] - 17:14,
18:25, 35:17
   **Drive** [1] - 18:25
   **driver's** [1] - 7:6
   **drug** [6] - 12:21,
36:22, 48:7, 48:18,
48:19, 63:6
   **dual** [3] - 23:23,
35:25, 61:7
   **due** [4] - 44:25,
47:25, 51:10, 51:16
   **Duran** [1] - 54:15
   **Durani** [6] - 9:19,
9:25, 13:15, 13:17,
54:15, 54:16
   **DURANI** [2] - 9:19,
10:1
   **during** [12] - 5:3, 5:7,
5:11, 5:18, 5:23, 6:11,
6:15, 6:20, 8:1, 16:4,
28:13, 28:15

**E**

   **E-S-C-O-B-A-R** [1] -
39:18
   **E-S-T-E-B-A-N** [1] -
15:3
   **earned** [1] - 38:25
   **earnings** [3] - 6:21,
34:16, 39:1
   **easily** [1] - 64:5
   **East** [1] - 1:16
   **easy** [2] - 50:3, 51:1
   **Econoco** [1] - 8:19
   **Ecuador** [74] - 4:21,
6:9, 6:15, 7:6, 7:8,
7:10, 7:13, 7:21, 7:23,
8:4, 8:6, 8:8, 8:17,
8:20, 9:1, 9:3, 9:6,
9:13, 9:24, 10:4, 10:7,
10:13, 10:16, 10:21,
10:22, 10:23, 11:11,
11:20, 12:3, 12:13,
13:5, 17:20, 18:6,
18:11, 18:18, 23:21,
27:21, 35:15, 35:20,
35:24, 36:1, 39:3,
40:3, 40:19, 40:20,
41:14, 42:11, 43:21,
44:2, 44:3, 44:5, 44:9,
44:20, 45:13, 45:25,
46:14, 51:23, 52:2,
52:6, 52:11, 52:14,
52:21, 52:22, 53:16,
54:6, 54:24, 59:3,
63:16, 63:25, 64:6
   **Ecuadorian** [16] -
7:6, 8:23, 12:19, 13:1,
16:9, 47:22, 48:3,
52:22, 60:21, 60:25,
61:2, 61:3, 61:8,
61:10, 62:12, 64:21
   **Ecuadorians** [1] -
47:15
   **Ecuagringo** [2] -
18:16, 35:20
   **educated** [1] - 45:17
   **educational** [1] -
34:11
   **Edwards** [1] - 69:14
   **EDWARDS** [2] -
1:22, 69:15
   **effect** [1] - 51:6
   **efforts** [1] - 69:3
   **eight** [2] - 5:8, 6:5
   **either** [2] - 29:11,
36:13
   **elections** [2] - 35:12
   **electronic** [1] - 55:22
   **elements** [1] - 60:11

   **employed** [2] -
23:17, 31:4
   **employees** [1] -
28:22
   **employer** [2] - 31:4
   **employment** [10] -
31:13, 32:7, 32:9,
32:11, 32:12, 32:15,
32:21, 63:4, 67:18
   **end** [3] - 28:2, 38:5,
66:2
   **enforcement** [4] -
8:23, 10:13, 13:1,
56:2
   **ensure** [1] - 10:9
   **entered** [1] - 7:11
   **Enterprise** [1] -
34:23
   **entire** [1] - 58:24
   **entitled** [1] - 69:12
   **entry** [1] - 32:5
   **equally** [1] - 46:11
   **errors** [1] - 30:18
   **ESCOBAR** [1] - 1:7,
39:13
   **Escobar** [51] - 3:5,
3:15, 13:24, 14:1,
15:9, 16:11, 16:17,
17:11, 18:8, 19:2,
19:4, 19:7, 20:4,
23:12, 24:18, 24:22,
24:25, 25:6, 25:22,
26:5, 27:22, 28:22,
29:18, 30:3, 30:22,
33:18, 33:25, 35:5,
35:18, 37:9, 37:23,
39:17, 39:23, 42:22,
43:7, 48:16, 52:3,
52:11, 53:17, 54:1,
54:11, 57:19, 59:22,
59:25, 61:18, 61:24,
62:24, 64:22, 65:9,
66:14, 68:22
   **Escobar's** [4] - 41:7,
51:22, 53:15, 63:1
   **ESQ** [3] - 1:15, 1:18,
1:19
   **establish** [1] - 52:13
   **established** [1] -
52:3
   **ESTEBAN** [3] - 3:13,
14:25, 54:25
   **Esteban** [2] - 2:5,
3:11, 14:18, 15:3,
15:8
   **estimate** [1] - 11:4
   **event** [1] - 66:16
   **events** [1] - 36:4
   **everywhere** [1] -
52:20

5

**evidence** [15] - 33:13, 38:12, 38:18, 38:21, 43:2, 43:3, 43:19, 45:7, 51:6, 54:19, 55:16, 62:18, 62:24, 64:7, 64:15
**evidenced** [1] - 53:9
**exactly** [2] - 15:16, 16:14
**examination** [3] - 14:16, 34:6, 43:7
**EXAMINATION** [3] - 15:6, 28:11, 39:21
**examine** [3] - 14:21, 15:4, 39:8
**example** [1] - 4:25
**except** [3] - 57:20, 67:1, 67:20
**exception** [1] - 44:10
**excessive** [1] - 67:25
**excursions** [1] - 12:3
**excuse** [1] - 56:7
**excused** [3] - 30:13, 32:25, 43:1
**executed** [1] - 48:3
**exists** [1] - 60:13
**exotic** [2] - 46:5, 48:19
**expedition** [4] - 11:19, 49:10, 49:17, 53:21
**expeditions** [2] - 47:19, 48:10
**expense** [1] - 65:23
**expenses** [1] - 9:2
**expensive** [1] - 58:11
**export** [1] - 10:10
**exportation** [2] - 11:2, 18:4
**exported** [1] - 13:6
**extent** [2] - 49:2, 65:17

## F

**F.2d** [1] - 55:10
**F.Supp** [1] - 46:17
**Facebook** [2] - 18:17, 18:19
**facilitate** [1] - 55:13
**facility** [1] - 67:5
**fact** [29] - 9:20, 12:3, 13:6, 16:25, 18:8, 20:7, 21:17, 22:18, 22:21, 23:6, 23:9, 24:18, 34:10, 38:24, 43:20, 45:6, 46:4, 47:6, 48:3, 48:14,

48:15, 48:23, 50:14, 53:7, 53:11, 57:11, 64:18, 64:20, 66:9
**factor** [1] - 64:9
**factors** [1] - 62:8
**facts** [3] - 4:8, 49:19, 53:4
**failure** [2] - 43:14, 66:22
**fair** [2] - 18:20, 59:10
**falls** [1] - 62:15
**false** [7] - 4:12, 4:16, 7:18, 10:25, 11:1, 15:13, 15:16
**family** [13] - 22:5, 25:15, 25:23, 36:5, 36:6, 45:16, 46:14, 55:11, 56:18, 58:25, 59:4, 63:4, 65:24
**family's** [1] - 59:3
**far** [3] - 17:6, 48:17, 57:12
**fashion** [2] - 56:21, 59:6
**father** [2] - 40:4, 63:15
**favor** [1] - 46:17
**feasible** [1] - 66:6
**federal** [1] - 67:7
**fellow** [2] - 47:15, 54:14
**few** [5] - 36:19, 39:2, 39:23, 44:7, 61:23
**filed** [1] - 4:4
**filings** [1] - 52:11
**filled** [1] - 20:12
**financial** [4] - 52:11, 63:4, 65:2, 65:4
**fine** [8] - 11:24, 20:16, 22:23, 32:24, 37:4, 38:10, 47:25, 68:12
**firearm** [4] - 5:5, 27:19, 47:4, 62:6
**firearms** [50] - 4:14, 4:15, 4:18, 5:4, 5:8, 5:12, 5:19, 5:24, 6:5, 7:16, 8:6, 8:17, 8:20, 8:21, 8:22, 9:5, 9:12, 9:14, 9:16, 9:19, 9:21, 9:23, 10:4, 10:6, 10:8, 10:10, 10:12, 10:15, 10:25, 11:2, 11:3, 12:2, 12:14, 12:15, 13:7, 13:9, 14:2, 15:14, 17:23, 18:4, 27:19, 27:20, 27:24, 47:12, 52:22, 53:17, 62:17, 64:13, 64:16
**First** [1] - 55:10

**first** [17] - 3:2, 5:2, 5:17, 15:11, 15:13, 30:17, 33:20, 33:22, 44:11, 44:12, 48:15, 49:21, 59:23, 62:14, 65:25, 66:21, 68:4
**fishing** [3] - 8:17, 17:24, 18:3, 18:5, 18:12, 24:21, 29:2, 35:2, 48:25, 49:8, 49:9, 49:17, 49:24
**fit** [2] - 36:12, 45:9
**five** [7] - 5:14, 6:6, 6:11, 9:20, 9:21, 11:13, 13:17
**flight** [17] - 11:9, 43:12, 43:20, 44:19, 46:23, 53:3, 55:12, 55:14, 55:15, 55:17, 55:22, 56:22, 57:3, 57:16, 58:18, 59:9, 64:12
**flip** [1] - 54:8
**Floor** [3] - 1:16, 1:24, 69:16
**FLORIDA** [1] - 1:1
**Florida** [44] - 1:4, 1:17, 1:21, 1:24, 4:22, 4:23, 5:1, 5:16, 5:22, 6:9, 6:14, 6:15, 6:21, 6:22, 6:24, 7:1, 7:17, 10:6, 13:8, 15:17, 15:23, 16:22, 16:23, 17:12, 17:22, 23:18, 27:7, 34:4, 34:15, 37:14, 38:1, 39:4, 39:6, 40:1, 40:2, 40:5, 41:13, 42:17, 46:12, 61:18, 63:13, 67:1, 69:16
**focused** [1] - 64:12
**follow** [1] - 25:12
**following** [2] - 62:8, 66:14
**followup** [1] - 68:2
**FOR** [4] - 1:15, 1:18, 2:4, 2:6
**force** [1] - 13:24
**foregoing** [1] - 69:10
**foreign** [1] - 7:4
**foremost** [2] - 48:15, 66:21
**forgive** [2] - 24:17, 37:16
**form** [6] - 7:13, 16:3, 27:16, 46:25, 47:1, 48:18
**Form** [2] - 7:15, 11:1
**forms** [10] - 4:13, 8:5, 8:12, 20:12, 44:1,

44:4, 44:5, 44:12
**Forms** [1] - 15:14
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:17, 1:21
**forth** [3] - 42:18, 65:1, 66:20
**forthcoming** [1] - 49:19
**fortune** [1] - 65:5
**four** [3] - 5:4, 45:9, 51:8
**fourth** [1] - 64:9
**frankly** [1] - 66:6
**free** [2] - 36:2, 63:18
**frequent** [1] - 10:21
**frequently** [1] - 34:25
**Friday** [1] - 66:2
**friends** [5] - 25:17, 36:5, 36:6, 57:20, 57:23
**FROM** [1] - 1:11
**fugitive** [1] - 55:15
**full** [2] - 43:21, 59:2
**full-time** [1] - 59:2

## G

**G-U-A-Y-A-Q-U-I-L** [1] - 7:24
**Gables** [1] - 38:1
**Galapagos** [2] - 29:2, 46:5
**game** [1] - 59:3
**games** [1] - 23:10
**Garcia** [1] - 46:17
**gear** [1] - 49:9
**generally** [1] - 58:10
**gentleman** [1] - 19:5
**gentlemen** [1] - 69:2
**given** [12] - 12:19, 35:15, 36:8, 43:24, 44:12, 46:16, 46:21, 46:22, 47:17, 57:10, 57:12, 64:16
**Google** [1] - 18:21
**Googled** [1] - 18:20
**government** [1] - 63:19
**GOVERNMENT** [3] - 1:15, 2:4, 14:25
**Government** [23] - 4:3, 4:19, 14:15, 30:14, 30:15, 33:23, 43:8, 44:4, 47:4, 49:20, 50:17, 54:20, 55:14, 57:13, 60:1, 62:5, 62:23, 63:14,

65:11, 66:9, 66:16, 68:3, 68:5
**Government's** [4] - 46:15, 52:17, 58:1, 60:10
**graduated** [1] - 34:12
**great** [2] - 49:24, 57:15
**greater** [2] - 44:20, 45:25
**gringo** [1] - 35:22
**group** [1] - 34:24
**groups** [1] - 29:2
**Guayaquil** [2] - 7:21, 7:23
**guess** [5] - 11:14, 47:15, 54:8, 54:18, 57:11
**guessing** [1] - 50:21
**guideline** [1] - 11:5
**gun** [6] - 16:19, 16:20, 17:1, 25:9, 51:4, 57:7
**guns** [16] - 16:3, 16:9, 16:16, 16:25, 17:4, 25:18, 54:4, 54:5, 54:7, 54:9, 54:12, 54:22, 57:4, 67:23

## H

**halfway** [1] - 67:5
**hand** [3] - 31:25, 50:25, 63:14
**handed** [1] - 51:3
**handle** [1] - 33:15
**head** [1] - 55:11
**headquarters** [1] - 27:6
**health** [2] - 36:21, 47:8
**hear** [4] - 31:20, 47:22, 48:11, 57:13
**heard** [2] - 31:16, 49:21
**hearing** [2] - 3:21, 4:5
**HEARING** [1] - 1:10
**hearsay** [1] - 47:24
**hereby** [1] - 69:10
**high** [2] - 28:2, 35:6
**high-end** [1] - 28:2
**high-paying** [1] - 35:6
**himself** [3] - 50:15, 50:18, 50:19
**hired** [1] - 59:4

**History** [1] - 31:6
**history** [13] - 31:13, 32:7, 32:11, 32:12, 32:15, 36:21, 36:22, 38:12, 43:15, 47:7, 63:3, 63:6, 64:7
**hold** [2] - 33:8, 66:1
**holds** [2] - 34:10, 35:11
**holidays** [2] - 42:3, 42:4
**home** [12] - 40:3, 40:4, 40:13, 41:4, 41:17, 41:21, 42:17, 47:15, 48:4, 63:17, 63:18, 64:6
**Homeland** [2] - 38:21, 47:23
**honest** [2] - 31:15, 57:16
**Honor** [32] - 3:7, 3:13, 3:14, 3:18, 3:22, 3:24, 4:3, 4:11, 10:2, 10:11, 11:18, 13:14, 14:17, 15:5, 21:20, 28:5, 28:8, 28:20, 30:15, 33:15, 36:12, 39:10, 51:10, 51:22, 55:21, 56:6, 56:21, 59:5, 67:10, 68:6, 68:21
**HONORABLE** [1] - 1:10
**horse** [1] - 58:16
**hot** [1] - 48:6
**Hour** [1] - 6:21
**hours** [1] - 67:3
**House** [9] - 61:18, 61:19, 61:25, 65:1, 66:25, 67:4, 67:16, 67:17, 67:24
**house** [12] - 21:24, 22:1, 23:16, 36:12, 40:8, 42:5, 42:7, 42:10, 44:2, 45:19, 58:4, 67:5
**HUDAK** [1] - 39:13
**Hudak** [2] - 2:8, 39:17
**huge** [1] - 29:8
**hundreds** [1] - 50:1
**hunt** [1] - 53:25
**hunting** [24] - 11:19, 12:3, 12:5, 12:10, 18:6, 18:12, 24:21, 28:23, 29:4, 47:5, 47:10, 47:19, 47:21, 48:9, 48:14, 49:10, 49:17, 50:5, 53:22, 57:9, 58:3, 58:9,

58:11
**hunting-type** [1] - 58:11
**hypothetical** [2] - 49:18, 50:17

**I**

**idea** [5] - 13:12, 28:21, 29:22, 53:22, 54:22
**identification** [1] - 7:8
**identified** [2] - 9:14, 12:16
**Ignacio** [4] - 2:5, 3:11, 14:17, 15:3
**IGNACIO** [1] - 14:25
**illegal** [4] - 11:2, 23:20, 23:25, 67:25
**illegally** [14] - 8:6, 8:16, 9:5, 9:13, 9:24, 10:6, 13:6, 25:18, 26:9, 26:11, 45:5, 48:25, 49:16
**illegitimate** [1] - 49:9
**illicit** [3] - 57:6, 58:10, 64:14
**immigration** [4] - 14:3, 38:14, 44:4, 63:21
**important** [5] - 21:3, 21:10, 21:16, 21:17, 46:11
**importing** [1] - 58:5
**imprisonment** [1] - 11:5
**inaudible** [23] - 7:5, 9:8, 13:19, 22:2, 22:17, 29:25, 30:8, 38:6, 42:9, 43:21, 44:12, 47:1, 48:16, 49:16, 50:17, 50:24, 51:2, 51:4, 53:24, 54:23, 55:25, 61:1
**inaudible)** [7] - 6:17, 29:7, 49:25, 50:4, 65:16, 67:3, 68:7
**incidentally** [1] - 26:16
**include** [1] - 62:12
**includes** [1] - 62:24
**including** [7] - 18:9, 34:12, 34:20, 58:14, 62:15, 63:4, 63:20
**income** [2] - 31:4, 39:3
**indeed** [2] - 49:9, 49:10

**indicate** [5] - 14:6, 18:25, 34:8, 35:10, 43:14
**indicated** [5] - 31:9, 31:18, 36:24, 45:6, 47:5
**indicates** [2] - 19:23, 20:4
**indicating** [2] - 35:21, 45:4
**indication** [6] - 11:16, 43:11, 46:24, 47:5, 47:7, 54:21
**indictment** [3] - 44:13, 49:20, 66:23
**indirectly** [1] - 55:24
**individual** [9] - 8:21, 9:19, 13:20, 27:25, 43:19, 46:21, 54:19, 55:24, 64:21
**individuals** [5] - 10:16, 17:4, 35:6, 35:7, 38:8
**inference** [2] - 48:2, 53:8
**information** [17] - 4:13, 12:19, 12:25, 16:8, 16:13, 17:7, 19:16, 21:14, 22:7, 22:13, 22:15, 25:13, 31:9, 31:17, 32:18
**informed** [1] - 10:24
**initial** [1] - 20:24
**innocent** [1] - 58:23
**inspection** [1] - 49:14
**instance** [3] - 31:17, 55:10, 57:25
**instances** [4] - 31:7, 34:15, 50:2, 51:14
**insufficient** [1] - 52:13
**intent** [3] - 46:16, 49:3, 50:4
**interaction** [1] - 29:6
**interest** [1] - 50:12
**interesting** [1] - 58:7
**interrupt** [3] - 15:20, 44:18, 47:20
**interview** [1] - 26:23
**interviews** [2] - 26:20, 27:14
**investigate** [1] - 50:10
**investigating** [1] - 28:3
**investigation** [9] - 16:5, 16:6, 16:15, 18:22, 21:7, 24:23, 25:16, 25:21, 28:14

**investigations** [1] - 54:24
**investigator** [3] - 21:1, 21:3, 24:24
**involve** [3] - 32:12, 62:17, 65:24
**involved** [6] - 4:23, 12:20, 43:16, 47:16, 57:14, 65:10
**involvement** [1] - 64:22
**involves** [2] - 10:21, 62:16
**Iowa** [1] - 46:18
**Islands** [2] - 29:3, 46:5
**islands** [2] - 18:11, 58:3
**issue** [8] - 33:4, 44:19, 46:23, 52:16, 56:24, 57:15, 58:17, 64:12
**issued** [2] - 7:7, 7:8
**issues** [2] - 36:22, 47:8
**it'll** [1] - 59:18
**itself** [1] - 35:20

**J**

**jail** [2] - 8:25, 12:13
**January** [5] - 6:3, 40:10, 41:20, 42:13
**JEFFREY** [1] - 1:18
**Jeffrey** [2] - 3:14, 15:8
**Jessica** [1] - 37:7
**job** [1] - 43:24
**JR** [1] - 1:19
**Judge** [40] - 8:14, 14:13, 14:22, 28:18, 29:13, 29:14, 30:7, 30:20, 30:23, 32:10, 33:1, 33:7, 33:9, 33:16, 33:19, 34:1, 36:19, 38:11, 38:20, 41:7, 44:11, 45:7, 45:15, 46:1, 46:16, 47:20, 47:21, 48:11, 49:18, 50:8, 50:21, 51:7, 51:16, 51:21, 53:23, 55:3, 57:18, 58:17, 59:15, 68:18
**judge** [10] - 30:21, 31:2, 34:2, 38:7, 42:21, 43:6, 53:11, 55:6, 62:21, 65:13
**JUDGE** [1] - 1:11
**judgment** [1] - 43:17

**July** [6] - 4:20, 5:2, 6:13, 28:15, 41:20, 42:1
**jumping** [1] - 66:23
**juncture** [1] - 58:22
**June** [2] - 7:9
**jury** [1] - 62:22
**justice** [1] - 46:24

**K**

**keep** [2] - 36:10, 38:22
**keeps** [1] - 22:1
**kept** [1] - 4:13
**Kilimanjaro** [7] - 9:20, 9:22, 13:16, 28:1, 54:17, 58:11
**killing** [1] - 57:6
**knit** [1] - 36:5
**knowing** [1] - 53:23
**knowledge** [3] - 23:20, 54:24, 54:25
**knows** [1] - 13:18

**L**

**labels** [2] - 49:23, 50:1
**lack** [1] - 11:10
**ladies** [1] - 38:5
**language** [1] - 56:12
**large** [4] - 11:14, 17:24, 28:23, 57:4
**last** [10] - 14:2, 14:6, 15:2, 19:4, 38:15, 39:2, 39:16, 41:2, 41:13, 64:1
**lasted** [1] - 5:17
**late** [2] - 3:2, 69:6
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:17, 1:21
**law** [7] - 8:23, 10:12, 13:1, 46:16, 52:22, 56:1, 67:7
**lead** [3] - 21:1, 21:3, 24:23
**learn** [6] - 18:23, 21:24, 22:1, 22:3, 25:21, 28:14
**learned** [4] - 19:13, 20:7, 22:7, 35:4
**least** [6] - 6:10, 10:14, 12:16, 24:13, 47:17, 57:11
**leave** [1] - 65:7

**lectern** [2] - 4:1, 30:25

**legal** [3] - 9:2, 12:11, 57:21

**legitimate** [8] - 17:1, 25:8, 48:24, 49:1, 50:5, 53:9, 58:13, 58:21

**legitimately** [2] - 12:9, 24:5

**length** [1] - 63:4

**less** [1] - 6:18

**letting** [1] - 56:13

**Level** [1] - 11:5

**license** [1] - 7:6

**licensed** [3] - 10:8, 10:10, 17:2

**lied** [2] - 8:11, 44:1

**life** [2] - 46:4, 58:24

**likelihood** [1] - 55:17

**likely** [1] - 11:21

**limited** [1] - 56:2

**line** [1] - 55:25

**LISA** [2] - 1:22, 69:15

**listed** [2] - 7:20, 7:23

**listen** [1] - 66:18

**lists** [1] - 18:17

**live** [5] - 25:23, 25:24, 40:8, 41:4, 56:17

**lived** [7] - 8:7, 21:11, 23:16, 40:12, 41:21, 45:12, 63:16

**livelihood** [1] - 51:24

**lives** [5] - 20:13, 20:19, 20:22, 34:4, 44:5

**living** [7] - 24:5, 24:6, 24:7, 24:9, 40:19, 41:16

**local** [2] - 35:12, 67:6

**located** [1] - 8:19

**location** [1] - 35:21

**look** [8] - 30:4, 46:14, 46:15, 48:12, 51:25, 59:13, 59:14, 59:17

**looking** [4] - 15:10, 16:15, 46:10

**Louisiana** [2] - 34:9, 34:16

**lower** [2] - 5:5, 5:14

**LSU** [3] - 23:7, 23:10, 34:12

**lying** [2] - 8:5, 16:3

## M

**ma'am** [2] - 39:11,

42:25

**Mafia** [2] - 55:11, 55:13

**magazine** [3] - 18:10, 58:15, 59:15

**magazines** [3] - 18:9, 18:23, 58:14

**MAGISTRATE** [1] - 1:11

**mail** [11] - 22:10, 22:14, 22:17, 34:19, 36:25, 42:7, 42:12, 42:14, 42:16, 52:5, 52:6

**mailing** [2] - 7:21, 7:24

**main** [2] - 15:20, 15:22

**maintain** [2] - 23:21, 24:2

**majority** [2] - 58:1, 58:21

**man** [3] - 56:23, 58:21, 58:23

**manifest** [1] - 18:3

**March** [2] - 16:7, 16:12

**market** [1] - 46:8

**Marlin** [3] - 18:10, 58:15, 59:15

**married** [1] - 40:15

**Mary's** [1] - 42:1

**material** [1] - 30:18

**matter** [8] - 4:9, 6:18, 10:20, 21:11, 31:3, 43:8, 47:3, 69:12

**matters** [1] - 3:3

**maximum** [2] - 4:24, 11:6

**mean** [7] - 24:4, 38:20, 45:13, 48:25, 56:19, 56:22, 58:16

**meet** [2] - 36:4, 67:1

**meeting** [1] - 35:8

**meets** [3] - 24:19, 34:25, 35:2

**member** [1] - 34:23

**mental** [2] - 36:21, 47:7

**mention** [1] - 23:18

**mentioned** [2] - 10:11, 41:12

**MERLINO** [31] - 1:19, 1:19, 3:18, 30:21, 30:25, 31:2, 31:14, 33:1, 33:7, 33:9, 33:18, 34:1, 34:23, 36:19, 36:21, 36:24, 37:5, 37:7, 37:11, 37:14, 37:16, 37:19,

37:22, 37:25, 38:4, 38:7, 38:11, 38:16, 38:20, 42:24, 43:3

**Merlino** [8] - 3:16, 33:15, 39:9, 42:23, 43:2, 57:18, 59:24, 66:12

**met** [6] - 19:12, 19:13, 19:17, 25:17, 53:3, 65:14

**Miami** [7] - 1:23, 1:24, 6:9, 8:19, 28:16, 69:16, 69:16

**mic** [1] - 55:8

**MICHAEL** [1] - 1:15

**microphone** [1] - 43:9

**middleman** [1] - 51:7

**might** [1] - 24:22

**mike** [1] - 3:7

**mind** [1] - 67:11

**minimal** [1] - 55:17

**minute** [1] - 28:5

**minutes** [2] - 59:12, 59:18

**Miranda** [3] - 8:1, 27:15, 27:16

**misinformation** [2] - 29:21, 44:15

**mispronounce** [2] - 7:21, 37:17

**misrepresented** [1] - 45:5

**misstatement** [2] - 19:24, 20:1

**misunderstanding** [1] - 33:2

**mixed** [1] - 63:9

**modifications** [2] - 68:4, 68:20

**mom** [3] - 19:16, 20:19, 20:21

**mom's** [1] - 20:9

**moment** [3] - 56:7, 60:12, 65:22

**moments** [1] - 61:23

**Monday** [3] - 66:3, 66:9, 66:12

**money** [5] - 47:17, 50:20, 50:25, 51:3, 53:10

**monitor** [1] - 36:13

**monitoring** [1] - 55:23

**month's** [2] - 18:10, 58:14

**monthly** [1] - 31:4

**months** [3] - 11:6, 38:15, 64:1

**morning** [9] - 3:7,

3:13, 3:14, 3:17, 3:18, 3:21, 15:8, 41:9, 41:13

**most** [4] - 11:21, 13:4, 48:14, 51:22

**mother** [24] - 19:6, 19:7, 19:14, 19:17, 20:13, 21:5, 21:12, 25:23, 34:3, 36:9, 38:3, 38:4, 38:23, 39:8, 40:4, 40:5, 44:6, 45:17, 52:1, 56:17, 58:5, 61:16, 63:11

**mother's** [2] - 45:6, 65:4

**moving** [1] - 50:3

**MR** [137] - 3:7, 3:10, 3:14, 3:18, 3:22, 3:24, 4:2, 4:7, 4:11, 6:17, 8:9, 8:11, 8:14, 8:16, 9:12, 9:18, 10:2, 11:18, 11:22, 11:23, 12:22, 12:25, 13:3, 13:14, 14:1, 14:5, 14:8, 14:12, 14:17, 14:22, 15:5, 15:7, 19:25, 20:3, 21:20, 21:23, 28:5, 28:7, 28:10, 28:12, 28:18, 28:20, 29:12, 29:13, 29:25, 30:9, 30:15, 30:20, 30:21, 30:25, 31:2, 31:14, 33:1, 33:7, 33:9, 33:15, 33:18, 34:1, 34:23, 36:19, 36:21, 36:24, 37:5, 37:6, 37:7, 37:11, 37:14, 37:16, 37:19, 37:22, 37:25, 38:4, 38:7, 38:11, 38:16, 38:20, 39:10, 39:22, 42:21, 42:24, 43:3, 43:6, 43:11, 43:24, 44:10, 44:22, 44:25, 45:3, 45:14, 45:19, 45:21, 45:23, 46:1, 47:20, 48:5, 48:11, 48:22, 49:3, 49:12, 50:8, 50:21, 50:24, 51:16, 51:19, 51:21, 52:18, 52:21, 53:11, 53:15, 53:23, 54:10, 54:16, 54:21, 55:2, 55:6, 55:9, 56:8, 56:10, 57:1, 57:7, 57:18, 57:23, 59:15, 60:23, 61:1, 61:5, 61:7, 61:9, 61:12, 65:13, 65:16, 66:4, 66:6, 68:6, 68:10,

68:21, 69:4

**MS** [6] - 37:10, 37:15, 37:18, 37:21, 37:24, 38:1

**multiple** [1] - 63:19

## N

**name** [13] - 8:18, 15:2, 15:8, 17:11, 19:4, 31:22, 35:20, 37:2, 37:17, 39:15, 39:16, 39:17

**named** [3] - 8:21, 9:19, 19:1

**narcotics** [4] - 47:16, 57:14, 64:22, 68:1

**nature** [2] - 62:14, 64:9

**near** [1] - 41:25

**Nebbia** [2] - 61:14, 62:1

**necessary** [2] - 67:21, 68:2

**need** [4] - 34:22, 38:2, 62:8, 66:7

**nefarious** [1] - 12:11

**negative** [1] - 33:3

**network** [1] - 36:6

**never** [7] - 18:7, 18:13, 25:2, 31:14, 36:2, 43:15, 58:23

**New** [1] - 34:9

**next** [3] - 65:22, 66:2, 68:25

**nine** [2] - 5:25, 24:14

**nine-day** [1] - 24:14

**NO** [1] - 1:2

**non** [1] - 43:17

**non-appearance** [1] - 43:17

**nonresponse** [1] - 43:18

**normally** [2] - 26:20, 27:13

**North** [2] - 1:23, 69:16

**Northeast** [1] - 1:20

**note** [1] - 58:7

**notes** [1] - 27:3

**nothing** [4] - 18:1, 28:7, 43:12

**November** [4] - 5:6, 5:7, 5:22, 5:23

**number** [12] - 11:15, 13:16, 34:18, 34:22, 39:1, 47:13, 53:6, 53:25, 54:1, 57:11, 63:17, 64:19

8

**numbers** [1] - 57:5
**numerous** [3] - 9:1, 25:23, 58:14

# O

**object** [6] - 11:22, 12:22, 12:23, 19:25, 21:20, 68:7
**objection** [2] - 21:22, 31:11
**obstruct** [1] - 31:16
**obstructed** [1] - 46:24
**obstruction** [1] - 33:3
**obviously** [8] - 11:14, 53:5, 53:8, 58:4, 60:5, 62:16, 67:17, 67:22
**occasions** [5] - 4:22, 4:23, 7:11, 9:1, 10:14
**occurred** [1] - 17:18
**occurring** [2] - 48:7, 68:24
**OF** [2] - 1:1, 1:4
**offense** [4] - 62:14, 63:7, 66:23, 67:20
**office** [8] - 16:8, 16:9, 22:3, 27:6, 27:10, 67:3, 67:15
**OFFICER** [1] - 31:23
**officer** [4] - 30:10, 31:21, 32:2, 45:12
**officers** [1] - 67:15
**official** [3] - 1:23, 19:15, 63:19
**Official** [1] - 69:15
**officially** [1] - 19:17
**officials** [2] - 10:13, 47:23
**often** [4] - 35:8, 35:22, 35:23, 36:4
**old** [1] - 58:25
**omissions** [1] - 30:18
**once** [6] - 39:15, 40:24, 41:1, 55:14, 61:20
**one** [24] - 5:4, 6:3, 6:5, 7:3, 10:16, 11:19, 12:8, 23:15, 25:7, 27:25, 40:9, 40:10, 40:12, 42:13, 46:15, 53:11, 53:24, 54:19, 56:7, 57:25, 60:3, 62:15, 66:19, 68:14
**online** [1] - 28:25
**open** [2] - 31:15,

36:10
**opening** [1] - 49:14
**operates** [1] - 10:20
**operation** [1] - 48:22
**opinion** [1] - 62:19
**opportunity** [5] - 30:22, 50:9, 52:15, 57:16, 62:6
**order** [1] - 24:20
**original** [1] - 46:18
**originally** [2] - 32:14, 32:20
**Orleans** [1] - 34:9
**Ortega** [29] - 8:21, 8:24, 8:25, 9:3, 9:4, 9:10, 9:11, 9:14, 10:11, 10:13, 12:12, 12:20, 13:22, 16:2, 27:24, 47:21, 50:6, 50:10, 50:15, 50:18, 50:19, 50:22, 50:25, 51:1, 52:23, 53:10, 53:13, 54:18, 57:13
**Ortega's** [3] - 9:2, 48:3, 57:19
**otherwise** [1] - 33:14
**ought** [1] - 68:17
**outcome** [2] - 62:20, 66:11
**outfitting** [1] - 29:1
**outrigging** [1] - 35:2
**outside** [2] - 10:21, 64:2
**overseas** [1] - 57:5
**own** [9] - 21:7, 21:24, 24:1, 24:3, 43:25, 47:12, 52:10, 54:4, 63:1
**owned** [1] - 19:1
**owner** [1] - 7:4
**owning** [1] - 6:22
**owns** [6] - 10:20, 10:22, 36:2, 63:17, 63:18

# P

**P-E-N-A-L-O-Z-A** [1] - 37:21
**P.L** [1] - 1:19
**packet** [2] - 59:14, 59:17
**Pages** [1] - 1:8
**paid** [1] - 57:21
**Paragraph** [2] - 16:4, 32:6
**part** [11] - 15:13, 18:24, 24:23, 25:21, 26:12, 28:3, 34:7,

48:11, 48:15, 50:15, 59:2
**part-time** [1] - 59:2
**particular** [2] - 9:20, 20:22
**particularly** [1] - 63:13
**parties** [7] - 13:13, 28:23, 29:2, 29:7, 29:8, 57:12
**partner** [1] - 3:16
**passport** [8] - 7:20, 7:23, 34:11, 52:10, 60:25, 61:2, 61:4, 62:3
**passports** [12] - 60:21, 60:22, 61:8, 61:10, 61:11, 61:22, 65:7, 67:8, 67:9, 67:12
**past** [2] - 43:13, 47:11
**patience** [1] - 69:6
**Patriarca** [1] - 55:10
**pause** [1] - 59:20
**paying** [2] - 9:1, 35:6
**Penaloza** [2] - 37:17, 37:18
**PENALOZA** [4] - 37:18, 37:21, 37:24, 38:1
**penalty** [1] - 11:6
**pending** [4] - 32:7, 32:16, 32:21, 66:11
**people** [12] - 18:11, 22:5, 22:6, 27:18, 27:20, 29:5, 47:11, 51:14, 54:4, 54:5, 57:6
**per** [4] - 13:17, 24:13, 31:11, 45:4
**percent** [4] - 10:4, 38:17, 54:13, 64:2
**percentage** [4] - 13:12, 53:21, 54:6, 54:9
**perhaps** [1] - 57:12
**period** [22] - 4:20, 5:3, 5:7, 5:11, 5:12, 5:18, 5:23, 6:4, 6:10, 6:11, 6:15, 6:19, 7:16, 14:6, 24:12, 24:13, 24:14, 24:16, 28:15
**periods** [1] - 25:6
**permit** [1] - 36:17
**permits** [1] - 53:8
**person** [10] - 10:17, 29:8, 52:6, 53:24, 56:3, 62:11, 62:12, 62:18, 63:3, 63:7

**personal** [4] - 35:7, 61:15, 62:1, 65:4
**personally** [3] - 42:9, 45:3, 68:11
**perspective** [1] - 57:2
**Peru** [1] - 11:20
**phrase** [2] - 30:8, 61:1
**physically** [1] - 46:3
**pick** [2] - 6:10, 9:21
**picked** [2] - 42:10, 42:14
**picks** [1] - 52:6
**pistol** [1] - 6:5
**pistols** [3] - 5:13, 5:20, 58:2
**place** [5] - 7:13, 32:11, 34:11, 53:16, 63:20
**places** [1] - 66:22
**Plaintiff** [1] - 1:5
**plant** [1] - 34:16
**point** [8] - 12:17, 23:15, 32:14, 36:15, 55:2, 59:2, 62:22, 65:14
**pointed** [1] - 60:3
**points** [2] - 36:19, 44:12
**police** [2] - 48:3, 64:21
**portion** [1] - 35:2
**posed** [1] - 64:10
**position** [2] - 35:24, 52:17
**possession** [3] - 12:14, 67:12, 67:22
**possible** [3] - 6:12, 11:18, 50:12
**possibly** [4] - 49:12, 49:13, 56:14, 57:14
**post** [2] - 9:9, 13:23
**post-arrest** [2] - 9:9, 13:23
**posted** [1] - 62:1
**potential** [1] - 24:19
**practically** [1] - 34:10
**precisely** [1] - 50:19
**preparing** [1] - 67:21
**preponderance** [1] - 55:18
**preprinted** [2] - 49:23, 50:1
**presence** [1] - 67:17
**present** [6] - 3:10, 14:18, 33:14, 38:18, 50:16, 59:22
**presents** [1] - 52:25

**presume** [1] - 58:8
**presumed** [1] - 58:23
**PRETRIAL** [1] - 1:10
**pretrial** [20] - 3:21, 10:19, 11:8, 13:10, 30:17, 31:21, 31:24, 32:3, 33:10, 36:13, 45:10, 45:11, 51:25, 53:2, 56:2, 60:4, 60:11, 60:18, 61:22, 63:8
**pretty** [1] - 34:11
**prevail** [1] - 66:17
**primarily** [2] - 13:3, 35:19
**primary** [1] - 35:21
**principal** [1] - 14:18
**private** [1] - 59:4
**probation** [7] - 31:20, 32:2, 45:12, 63:7, 67:3, 67:14, 67:15
**PROBATION** [1] - 31:23
**problematic** [1] - 12:12
**proceed** [2] - 43:5, 69:5
**proceedings** [3] - 34:7, 59:20, 69:11
**Proceedings** [1] - 69:7
**product** [1] - 46:9
**proffer** [10] - 26:12, 33:22, 33:24, 34:7, 36:16, 37:3, 41:6, 43:6, 43:7, 58:1
**proffered** [5] - 39:9, 42:6, 49:20, 62:24, 63:15
**proffering** [1] - 36:18
**profit** [2] - 10:4, 54:12
**prongs** [1] - 60:19
**proof** [1] - 55:18
**property** [4] - 6:22, 10:22, 24:2, 36:1
**prosecution** [1] - 29:25
**prosecutor** [1] - 12:23
**provide** [2] - 37:2, 56:16
**provided** [6] - 8:18, 13:1, 31:17, 34:17, 44:15, 44:23
**providing** [3] - 4:12, 31:8, 52:23
**pull** [1] - 55:8
**purchase** [12] - 7:15,

9:5, 9:12, 13:8, 16:3, 16:16, 17:23, 47:17, 49:23, 50:7, 53:10, 53:17

**purchased** [25] - 5:4, 5:8, 5:12, 5:19, 5:24, 6:4, 8:22, 10:12, 11:13, 11:14, 12:2, 12:9, 13:7, 14:7, 14:9, 16:2, 16:10, 16:25, 17:1, 17:3, 17:24, 27:18, 27:20, 27:24, 54:2

**purchaser** [1] - 64:23

**purchases** [5] - 9:16, 13:4, 13:24, 17:11, 50:18

**purchasing** [2] - 4:18, 25:9

**purpose** [4] - 4:18, 12:9, 49:10, 50:2

**purposes** [11] - 4:5, 47:5, 48:24, 49:1, 49:7, 53:6, 53:9, 54:9, 57:6, 58:10, 64:14

**put** [5] - 33:2, 41:19, 44:4, 45:5, 65:21

**putting** [1] - 65:4

### Q

**qualify** [1] - 11:25

**questions** [8] - 28:18, 29:11, 31:14, 33:23, 39:20, 39:23, 42:22, 68:22

**quite** [5] - 25:14, 35:8, 35:22, 35:23, 36:4

### R

**raid** [3] - 47:14, 48:3, 64:21

**raise** [1] - 31:25

**raised** [1] - 34:10

**random** [1] - 68:1

**range** [1] - 11:5

**ranging** [1] - 4:23

**rather** [1] - 45:8

**Raton** [8] - 15:19, 17:15, 34:5, 35:18, 37:15, 40:22, 41:22, 58:5

**RDR** [2] - 1:22, 69:15

**re** [1] - 59:21

**re-call** [1] - 59:21

**read** [3] - 18:16,

28:24, 50:9

**ready** [2] - 3:20, 3:23

**real** [2] - 6:22, 10:22

**really** [9] - 12:16, 13:20, 25:11, 42:21, 43:23, 52:8, 55:20, 64:11, 68:13

**reason** [1] - 31:10

**reasonably** [2] - 58:18, 62:10

**reasons** [1] - 50:16

**rebut** [2] - 38:18, 45:1

**rebuttal** [1] - 55:5

**receive** [2] - 22:13, 42:16

**received** [5] - 16:7, 16:12, 30:2, 30:3, 36:25

**receiver** [2] - 5:5, 5:14

**receives** [4] - 22:10, 22:15, 34:19, 42:6

**receiving** [1] - 16:13

**recent** [1] - 43:24

**recognized** [1] - 16:17

**recommended** [3] - 68:2, 68:4, 68:19

**record** [13] - 6:20, 6:21, 6:24, 14:2, 16:24, 26:20, 27:13, 29:19, 31:22, 37:20, 39:1, 45:2, 63:6

**recorded** [3] - 26:17, 26:19, 69:11

**recorders** [1] - 27:12

**recording** [1] - 45:8

**RECORDING** [1] - 1:11

**records** [6] - 14:3, 19:3, 38:14, 38:22, 41:12, 51:14

**recovered** [4] - 10:12, 16:9, 54:22, 64:20

**recross** [1] - 28:19

**Red** [1] - 2:3

**redirect** [1] - 28:9

**REDIRECT** [1] - 28:11

**reference** [4] - 16:3, 16:9, 27:25, 36:10

**referencing** [1] - 7:10

**reflect** [1] - 38:24

**regard** [16] - 10:19, 14:8, 30:17, 31:3, 31:18, 32:5, 35:5, 39:8, 40:6, 44:11,

44:16, 51:2, 57:3, 57:9, 63:23, 64:5

**regarding** [1] - 18:10, 55:12, 55:21

**registered** [3] - 6:23, 6:25, 10:10

**registration** [1] - 35:11

**regular** [1] - 36:25

**regularly** [1] - 52:5

**reinforced** [1] - 63:1

**relate** [1] - 7:18

**relationship** [4] - 37:5, 37:9, 37:22, 38:5

**relatives** [1] - 37:1

**release** [6] - 36:13, 46:17, 60:14, 63:8, 64:10

**released** [2] - 61:19, 61:25

**relevant** [1] - 4:8

**relocating** [1] - 65:24

**rely** [1] - 36:7

**remain** [1] - 56:3

**remember** [1] - 40:9

**remembered** [1] - 16:17

**render** [1] - 62:19

**renew** [1] - 7:19

**rent** [1] - 24:4

**Rent** [1] - 34:24

**Rent-a-Car** [1] - 34:24

**repeated** [1] - 26:13

**report** [7] - 30:18, 30:19, 32:3, 45:10, 45:12, 51:25, 67:14

**REPORTED** [1] - 1:22

**reported** [3] - 6:21, 34:16, 39:3

**Reporter** [2] - 1:23, 69:15

**reports** [1] - 27:3

**represent** [1] - 15:9

**representing** [2] - 3:15, 7:5

**request** [2] - 60:4, 60:10

**require** [3] - 49:14, 61:17, 67:14

**required** [2] - 4:13, 62:10, 65:9

**requirement** [2] - 61:15, 67:18

**requirements** [1] - 62:5

**requires** [1] - 60:13

**resell** [1] - 10:7

**reside** [15] - 10:23, 22:24, 25:24, 34:5, 35:14, 35:16, 35:17, 37:11, 37:25, 40:21, 44:1, 45:5, 46:7, 61:18, 63:12

**resided** [2] - 8:4, 34:14

**residence** [11] - 7:14, 8:5, 8:12, 10:14, 36:1, 51:24, 52:9, 56:1, 63:5, 63:20, 65:1

**residences** [1] - 23:23

**residency** [6] - 4:17, 11:10, 21:5, 21:8, 21:10, 23:22

**resident** [16] - 7:17, 13:8, 15:17, 15:23, 17:17, 17:20, 18:18, 23:21, 24:5, 35:25, 52:11, 53:16, 59:2

**residents** [1] - 62:13

**resides** [6] - 40:1, 40:2, 40:4, 40:5, 44:2, 44:16

**residing** [6] - 24:10, 24:11, 36:11, 65:6, 66:25

**resold** [4] - 10:4, 10:15, 47:13, 54:12

**resolved** [1] - 66:2

**resources** [1] - 63:4

**respect** [6] - 39:3, 44:17, 44:25, 48:1, 51:10, 51:16

**respective** [3] - 59:24, 60:2, 61:21

**rest** [2] - 30:14, 43:3

**restate** [1] - 31:22

**restraints** [1] - 64:4

**restricted** [1] - 66:24

**restrictions** [1] - 36:14

**rests** [1] - 30:15

**result** [2] - 16:13, 66:23

**return** [2] - 52:14, 64:5

**RICHARD** [1] - 1:19

**Richard** [1] - 3:16

**rifles** [19] - 5:5, 5:9, 5:13, 5:20, 5:25, 6:5, 6:11, 9:20, 9:22, 13:16, 13:17, 25:9, 28:1, 48:14, 54:17, 58:2, 58:11, 58:22

**rights** [4] - 8:1, 27:15, 33:11

**righty** [1] - 3:20

**ringing** [2] - 68:8, 68:15

**risk** [11] - 11:8, 43:12, 43:20, 44:19, 46:23, 53:3, 55:22, 56:22, 58:18, 59:8, 64:12

**rules** [1] - 13:7

**run** [3] - 35:19, 56:15, 56:16

**running** [2] - 3:2, 69:6

**runs** [2] - 11:19, 29:1

**Russian** [3] - 10:17, 13:20, 54:19

### S

**safety** [2] - 60:15, 62:11

**sales** [1] - 17:18

**salvage** [1] - 56:14

**sample** [1] - 38:7

**Sandra** [10] - 2:8, 19:1, 19:4, 19:7, 20:4, 33:18, 35:18, 36:8, 39:17, 43:7

**SANDRA** [1] - 39:13

**satisfied** [1] - 62:1

**satisfy** [3] - 55:18, 58:17, 60:18

**saw** [1] - 11:25

**sawed** [1] - 58:12

**sawed-off** [1] - 58:12

**scenario** [1] - 49:18

**scenarios** [1] - 50:13

**scheduled** [1] - 6:9

**school** [1] - 63:11

**schooled** [1] - 38:25

**se** [2] - 31:11, 45:4

**searches** [1] - 56:1

**seated** [5] - 3:1, 3:15, 15:1, 33:21, 39:14

**second** [5] - 5:6, 5:21, 6:8, 12:12, 31:2

**section** [1] - 32:9

**security** [1] - 65:2

**Security** [4] - 34:18, 38:21, 39:1, 47:23

**see** [7] - 18:24, 29:19, 33:23, 36:12, 51:6, 51:7, 59:22

**seeing** [1] - 16:16

**seem** [1] - 33:3

**seized** [8] - 8:23, 12:15, 48:4, 48:13, 54:18, 67:8

**seizure** [3] - 14:3,

29:17, 30:10
**sell** [1] - 9:25
**selling** [4] - 8:20,
8:21, 9:18, 64:19
**SELTZER** [1] - 1:10
**semantic** [1] - 46:1
**semantics** [3] -
45:15, 46:10, 59:1
**semiautomatic** [3] -
5:13, 5:19, 6:5
**sentencing** [1] - 11:4
**separate** [2] - 6:14,
66:23
**serious** [1] - 55:19
**seriousness** [1] -
64:9
**service** [1] - 32:3
**services** [7] - 30:17,
31:24, 45:10, 45:12,
51:25, 56:2, 61:22
**set** [5] - 55:21, 56:4,
61:14, 65:1, 66:20
**setting** [1] - 46:5
**seven** [6] - 4:24,
5:13, 6:1, 6:4, 6:10,
25:7
**Seventh** [1] - 1:16
**several** [4] - 18:9,
18:23, 31:7, 34:20
**shall** [1] - 67:6
**Shannon** [2] - 34:4,
37:16
**shape** [2] - 46:25,
48:18
**shared** [1] - 12:20
**sheer** [4] - 48:8,
53:6, 57:10, 64:16
**ship** [1] - 9:24
**shipment** [1] - 30:2
**shipped** [4] - 9:5,
9:13, 48:24, 57:5
**shipping** [6] - 8:6,
8:16, 8:17, 8:18, 10:6,
50:2
**short** [2] - 4:23,
60:17
**shotgun** [1] - 5:4
**shotguns** [8] - 5:9,
5:14, 5:20, 5:25, 6:6,
10:18, 58:12
**show** [2] - 4:19, 8:24
**shows** [4] - 34:25,
35:1, 38:14, 46:8
**side** [2] - 29:11, 54:8
**sides** [2] - 3:20, 60:5
**signed** [1] - 62:2
**simply** [2] - 49:10,
49:25
**single** [2] - 19:1,
20:4

**sister** [5] - 37:24,
38:3, 42:19, 45:17,
63:12
**sister's** [1] - 42:2
**site** [1] - 28:24
**sitting** [2] - 12:13,
19:5
**situation** [2] - 43:13,
43:18
**six** [5] - 4:22, 5:9,
6:14, 6:18, 7:11
**size** [1] - 28:21
**skipping** [1] - 31:5
**slower** [1] - 8:7
**small** [6] - 29:1, 29:7,
35:6, 38:7, 47:9,
48:22
**smuggling** [2] -
42:19, 52:22
**Social** [2] - 34:18,
39:1
**social** [1] - 36:4
**sold** [1] - 57:12
**someone** [2] - 22:2,
24:6
**sometimes** [6] -
40:24, 40:25, 41:1,
54:5
**son** [12] - 10:18,
20:7, 23:9, 34:8,
36:10, 60:23, 61:6,
61:7, 61:20, 62:2,
63:16
**soon** [1] - 27:5
**sorry** [8] - 19:10,
27:8, 27:9, 27:20,
29:15, 38:5, 56:9,
57:7
**sort** [2] - 21:4, 48:18
**sound** [1] - 50:14
**South** [10] - 16:22,
16:23, 23:18, 27:7,
29:2, 34:4, 34:15,
37:14, 46:12, 63:13
**SOUTHERN** [1] - 1:1
**Southern** [4] - 4:21,
5:22, 6:25, 46:18
**SPEAKER** [1] - 68:17
**Special** [1] - 3:11
**special** [4] - 12:4,
14:17, 61:24, 66:15
**SPECIAL** [2] - 3:13,
54:25
**specific** [1] - 21:18
**specifically** [6] -
4:16, 31:3, 31:9,
31:18, 39:6, 66:25
**speculation** [3] -
11:22, 12:22, 47:24
**spell** [3] - 15:2,

37:19, 39:16
**spelled** [1] - 7:24
**spend** [1] - 41:16
**spending** [1] - 23:18
**spent** [6] - 4:25,
5:15, 6:1, 6:13, 64:1,
64:2
**split** [2] - 5:16, 6:14
**sportsman** [1] - 35:1
**spot** [2] - 41:20,
65:21
**spread** [1] - 5:1
**stake** [1] - 65:5
**stamp** [1] - 49:25
**stand** [6] - 34:3,
37:2, 37:8, 39:12,
48:13
**standard** [2] - 61:24,
66:15
**start** [1] - 16:4
**started** [2] - 16:15
**state** [7] - 3:6, 13:18,
15:2, 17:17, 39:4,
39:15, 67:6
**State** [5] - 5:1, 5:16,
7:17, 10:9, 39:4
**statement** [11] -
10:5, 13:23, 14:8,
14:12, 15:13, 15:16,
26:16, 44:19, 45:24,
46:19, 50:9
**statements** [9] -
4:17, 7:18, 10:25,
11:1, 12:1, 21:7,
21:14, 45:3, 63:2
**States** [57] - 3:4, 3:8,
4:17, 6:2, 6:8, 6:23,
7:4, 7:12, 7:20, 9:4,
9:24, 11:10, 13:8,
16:20, 18:11, 22:18,
22:22, 23:2, 23:10,
23:22, 24:20, 25:24,
28:16, 35:12, 35:13,
35:25, 36:3, 36:6,
37:12, 38:9, 40:2,
41:7, 43:22, 44:8,
44:21, 49:25, 51:5,
52:4, 52:18, 53:13,
57:4, 59:21, 61:5,
61:20, 62:3, 62:13,
63:10, 63:11, 63:13,
63:24, 64:3, 64:13,
64:24, 65:6, 65:7,
69:15
**STATES** [4] - 1:1,
1:4, 1:11, 1:15
**status** [1] - 7:4
**statute** [1] - 60:13
**statutory** [3] - 11:6,
60:11, 62:4

**stay** [6] - 6:9, 62:6,
65:12, 66:8, 66:10,
66:11
**stayed** [2] - 60:8,
66:11
**stays** [2] - 4:23, 44:7
**step** [1] - 42:25
**still** [3] - 28:2, 56:15,
58:22
**stolen** [1] - 17:5
**straw** [5] - 16:2,
50:7, 50:15, 51:3,
64:23
**street** [1] - 17:4
**Street** [1] - 17:14
**strong** [4] - 36:5,
43:22, 45:16, 51:17
**strong-enough** [1] -
51:17
**strongest** [3] -
38:20, 51:23, 53:2
**subject** [4] - 31:3,
34:6, 47:3, 48:5
**subjective** [2] -
45:14, 46:1
**submit** [3] - 11:7,
13:10, 68:1
**submitted** [1] - 59:13
**substantial** [2] -
11:10, 62:23, 63:25
**suggestions** [1] -
68:6
**suit** [1] - 43:16
**Suite** [1] - 1:20
**sulfuric** [1] - 34:15
**sum** [1] - 16:1
**summarize** [1] - 4:7
**summary** [1] - 6:12
**supervised** [1] - 63:8
**supplies** [1] - 49:24
**supplying** [1] - 55:15
**support** [2] - 37:1,
62:25
**suppose** [1] - 51:25
**supposed** [1] - 49:18
**surety** [6] - 61:14,
61:15, 61:25, 62:1,
65:3, 65:4
**surrender** [1] - 61:21
**surrendered** [1] -
62:3
**surrendering** [1] -
65:6
**surround** [1] - 58:25
**surrounded** [1] -
56:17
**suspected** [1] -
64:22
**suspicion** [1] - 12:23
**sustain** [1] - 21:22

**sustained** [1] - 20:2
**SWORN** [3] - 14:25,
32:1, 39:13
**sworn** [2] - 14:24,
39:12

**T**

**table** [2] - 3:10, 3:15
**Tack** [1] - 5:14
**tackle** [7] - 8:17,
17:24, 18:3, 35:1,
48:25, 49:8, 49:24
**tape** [6] - 26:17,
26:19, 26:20, 27:12,
27:13, 45:7
**tape-record** [2] -
26:20, 27:13
**tape-recorded** [2] -
26:17, 26:19
**tax** [5] - 7:4, 14:3,
19:3, 44:4, 63:20
**TEC-9s** [1] - 58:9
**telephone** [3] -
55:25, 68:8, 68:15
**ten** [15] - 8:22, 10:11,
11:6, 12:14, 12:15,
13:21, 14:2, 14:7,
47:14, 48:15, 54:18,
54:21, 55:1, 55:2,
64:17
**ten-year** [1] - 11:6
**term** [2] - 11:5, 35:22
**terms** [5] - 29:4,
54:20, 60:4, 65:24,
68:23
**testify** [1] - 34:2
**testimonial** [1] -
33:14
**testimony** [3] -
33:22, 36:16, 40:1
**text** [1] - 29:19
**that'll** [1] - 67:2
**THE** [155] - 1:10,
1:15, 1:18, 2:4, 2:6,
3:1, 3:9, 3:12, 3:17,
3:19, 3:23, 3:25, 4:6,
4:10, 6:16, 8:7, 8:10,
8:13, 8:15, 9:8, 9:17,
10:1, 11:12, 13:2,
13:12, 13:23, 14:4,
14:6, 14:10, 14:14,
14:20, 14:23, 15:1,
15:3, 15:4, 20:2,
21:22, 28:6, 28:9,
28:19, 28:21, 28:24,
29:4, 29:6, 29:10,
29:14, 29:15, 29:19,
29:22, 29:24, 30:1,

30:2, 30:4, 30:6, 30:7, 30:11, 30:12, 30:14, 30:16, 30:24, 31:1, 31:12, 31:20, 31:23, 31:25, 32:2, 32:4, 32:5, 32:9, 32:24, 33:5, 33:8, 33:13, 33:17, 33:20, 34:22, 36:15, 36:20, 36:23, 37:3, 38:2, 38:10, 38:13, 38:17, 39:7, 39:11, 39:14, 39:17, 39:19, 42:23, 42:25, 43:4, 43:9, 43:23, 43:25, 44:18, 44:24, 45:1, 45:10, 45:18, 45:20, 45:22, 45:24, 47:9, 48:2, 48:8, 48:21, 48:23, 49:6, 50:5, 50:19, 50:22, 51:11, 51:18, 51:20, 52:16, 52:20, 53:5, 53:14, 53:19, 54:8, 54:14, 54:17, 54:23, 55:4, 55:8, 56:7, 56:9, 56:24, 57:2, 57:8, 57:21, 59:10, 59:16, 59:21, 60:25, 61:3, 61:6, 61:8, 61:10, 61:13, 65:15, 65:18, 66:5, 66:8, 67:10, 67:11, 68:9, 68:11, 68:16, 68:19, 68:22, 69:1, 69:2, 69:5

**thereafter** [1] - 27:5
**therefore** [1] - 20:9
**they've** [1] - 12:16
**thinking** [1] - 49:12
**Third** [1] - 1:20
**third** [5] - 5:10, 13:13, 29:8, 57:12, 63:3
**three** [5] - 5:1, 29:5, 47:11, 59:12, 59:18
**ticket** [1] - 58:24
**tied** [1] - 48:18
**ties** [30] - 11:10, 11:11, 13:10, 19:23, 26:1, 26:3, 35:24, 36:5, 38:8, 38:24, 43:21, 43:22, 44:8, 44:9, 44:20, 45:16, 45:25, 46:12, 51:22, 51:23, 52:12, 56:6, 56:12, 63:4, 63:5, 63:23, 63:25
**today** [5] - 44:14, 49:21, 66:2, 68:23
**together** [1] - 9:15
**toiletries** [1] - 45:21

**took** [3] - 34:11, 42:12, 54:12
**total** [7] - 4:25, 5:12, 5:15, 5:19, 6:1, 6:14, 7:17
**touch** [1] - 35:7
**towards** [1] - 58:22
**traced** [1] - 16:10
**track** [1] - 17:10
**trade** [1] - 12:21
**traffic** [1] - 58:24
**trafficking** [1] - 57:14
**transacting** [1] - 44:7
**transaction** [4] - 15:14, 44:5, 51:7, 63:21
**TRANSCRIBED** [1] - 1:11
**transcription** [1] - 69:11
**travel** [9] - 10:21, 11:20, 28:14, 41:7, 41:12, 42:18, 56:3, 66:24, 67:12
**traveled** [3] - 4:21, 9:3, 9:10
**travels** [3] - 17:22, 34:25, 36:4
**treatment** [1] - 68:2
**trial** [2] - 52:13, 65:9
**trip** [12] - 5:2, 5:6, 5:10, 5:17, 5:21, 6:3, 6:8, 12:5, 40:9, 40:10, 40:12, 42:13
**trips** [10] - 4:23, 5:2, 5:16, 6:14, 6:19, 24:21, 29:5, 41:8, 41:13, 41:16
**tropical** [1] - 46:5
**troublesome** [1] - 12:19
**true** [2] - 49:6, 63:14
**trusting** [1] - 36:9
**truth** [1] - 26:22
**try** [2] - 4:7, 39:23
**trying** [1] - 41:19
**turn** [2] - 68:9, 68:16
**turned** [2] - 43:9, 47:14
**Twelfth** [2] - 1:24, 69:16
**two** [27] - 4:19, 5:4, 5:9, 5:13, 5:16, 5:19, 6:19, 7:16, 10:14, 11:18, 12:8, 23:16, 26:24, 26:25, 29:5, 29:7, 38:5, 41:13, 41:16, 44:12, 47:10,

47:11, 55:6, 59:11, 59:18, 64:17, 65:22
**two-time** [1] - 55:6
**two-year** [3] - 4:19, 6:19, 7:16
**type** [5] - 11:25, 12:7, 43:17, 58:9, 58:11
**types** [2] - 48:13, 56:20

## U

**ultimate** [2] - 11:16, 62:19
**unannounced** [2] - 56:1, 56:20
**under** [5] - 31:2, 31:5, 43:13, 46:17, 62:8
**undercover** [2] - 12:4, 54:3
**unfortunate** [1] - 35:15
**UNIDENTIFIED** [1] - 68:17
**unidentified** [1] - 10:16
**uninfluential** [1] - 10:17
**UNITED** [4] - 1:1, 1:4, 1:11, 1:15
**United** [57] - 3:4, 3:8, 4:17, 6:2, 6:8, 6:23, 7:4, 7:12, 7:19, 9:4, 9:24, 11:10, 13:8, 16:20, 18:11, 22:18, 22:21, 23:1, 23:10, 23:22, 24:20, 25:24, 28:16, 35:11, 35:13, 35:25, 36:3, 36:6, 37:11, 38:8, 40:2, 41:7, 43:22, 44:8, 44:21, 49:24, 51:5, 52:4, 52:18, 53:13, 57:4, 59:21, 61:5, 61:20, 62:3, 62:13, 63:10, 63:11, 63:13, 63:23, 64:2, 64:13, 64:23, 65:6, 65:7, 69:15
**unless** [1] - 47:22
**unlicensed** [1] - 11:3
**unrecorded** [1] - 44:22
**unregistered** [1] - 48:6
**up** [15] - 6:10, 9:21, 18:9, 18:23, 37:2,

37:8, 39:25, 42:2, 42:10, 42:14, 46:25, 47:14, 52:6, 58:14, 60:17
**urinalyses** [1] - 68:1
**US** [19] - 9:10, 24:2, 31:23, 34:8, 34:10, 34:20, 35:12, 35:13, 39:6, 40:4, 44:4, 46:12, 46:17, 47:4, 50:22, 55:10, 61:8, 61:10, 63:11
**USC** [1] - 31:18
**useful** [1] - 31:18
**uses** [2] - 11:16, 11:18
**utilities** [1] - 6:24

## V

**valid** [2] - 7:7, 61:2
**various** [4] - 24:20, 25:8, 26:9, 58:3
**vehicles** [1] - 6:23
**venturing** [1] - 36:17
**versus** [5] - 3:5, 46:17, 55:10, 58:1, 59:22
**victims** [1] - 67:19
**violation** [2] - 52:22, 67:6
**violations** [1] - 11:7
**visa** [3] - 34:21, 61:2, 61:5
**visit** [2] - 42:12, 44:6
**visitation** [1] - 52:9
**visited** [1] - 25:15
**visiting** [6] - 8:25, 21:13, 22:2, 22:5, 42:4, 52:4
**visits** [2] - 56:1, 56:20
**VOICE** [1] - 38:6
**Voluck** [12] - 3:14, 10:24, 13:3, 14:20, 15:8, 30:17, 33:13, 59:13, 59:24, 60:20, 65:22, 66:12
**VOLUCK** [57] - 1:18, 1:19, 3:14, 3:24, 11:22, 12:22, 14:22, 15:5, 15:7, 20:3, 21:23, 28:5, 28:7, 29:12, 30:20, 33:15, 37:6, 43:6, 43:11, 43:24, 44:10, 44:22, 44:25, 45:3, 45:14, 45:19, 45:21, 45:23, 46:1, 47:20, 48:5,

48:11, 48:22, 49:3, 49:12, 50:8, 50:21, 50:24, 51:16, 51:19, 55:6, 55:9, 56:8, 56:10, 57:1, 57:7, 57:18, 57:23, 59:15, 60:23, 61:1, 61:5, 61:7, 61:9, 61:12, 68:21, 69:4
**volume** [3] - 48:8, 57:10, 64:16
**voter** [1] - 35:11
**votes** [1] - 35:12
**vs** [1] - 1:6

## W

**wage** [1] - 6:20
**Wage** [1] - 6:21
**wages** [1] - 39:3
**wait** [1] - 44:18
**waived** [2] - 8:1, 27:15
**WALLEISA** [54] - 1:15, 3:7, 3:10, 3:22, 4:2, 4:7, 4:11, 6:17, 8:9, 8:11, 8:14, 8:16, 9:12, 9:18, 10:2, 11:18, 11:23, 12:25, 13:3, 13:14, 14:1, 14:5, 14:8, 14:12, 14:17, 19:25, 21:20, 28:10, 28:12, 28:18, 28:20, 29:13, 29:25, 30:9, 30:15, 39:10, 39:22, 42:21, 51:21, 52:18, 52:21, 53:11, 53:15, 53:23, 54:10, 54:16, 54:21, 55:2, 65:13, 65:16, 66:4, 66:6, 68:6, 68:10
**Walleisa** [6] - 3:7, 3:25, 39:7, 39:20, 51:20, 59:25
**warranted** [1] - 11:8
**watch** [1] - 42:25
**water** [1] - 48:6
**wealthy** [2] - 35:7, 46:6
**weapon** [2] - 12:6
**weapons** [26] - 11:12, 11:14, 11:17, 11:21, 12:1, 12:2, 12:9, 13:13, 14:7, 29:17, 47:18, 48:4, 48:8, 48:13, 48:14, 48:23, 52:23, 52:24, 53:6, 53:20, 54:2, 54:20, 57:10, 58:6,

58:10, 67:23

**website** [3] - 18:16, 18:17, 28:25

**weight** [1] - 62:18

**welcome** [4] - 3:9, 3:12, 3:17, 3:19

**whatsoever** [1] - 56:12

**wife** [16] - 10:22, 35:15, 40:21, 44:3, 45:15, 46:2, 46:13, 51:23, 56:16, 60:20, 61:3, 61:20, 62:2, 63:16, 65:5

**willing** [2] - 36:8, 60:10

**wining** [1] - 35:9

**wish** [7] - 14:20, 33:14, 38:18, 39:7, 62:5, 65:11, 66:13

**witness** [1] - 39:12

**WITNESS** [16] - 14:25, 15:3, 28:24, 29:6, 29:14, 29:19, 29:24, 30:1, 30:4, 30:7, 30:12, 32:1, 32:4, 32:9, 39:13, 39:17

**Witness** [3] - 30:13, 32:25, 43:1

**witness's** [1] - 36:16

**WITNESSES** [2] - 2:4, 2:6

**witnesses** [1] - 67:20

**woman** [2] - 19:1, 20:5

**word** [8] - 26:11, 31:6, 31:10, 33:2, 45:4, 47:24, 59:16

**words** [1] - 26:13

**works** [1] - 42:5

**written** [6] - 18:9, 18:23, 27:5, 27:16, 58:14

## Y

**year** [20] - 4:19, 5:15, 6:19, 7:16, 11:6, 13:17, 16:7, 16:12, 39:25, 40:6, 40:14, 40:22, 40:23, 40:24, 41:2, 41:13, 42:9

**years** [14] - 14:2, 14:7, 18:18, 23:16, 34:14, 39:2, 47:11, 50:2, 58:25, 60:3, 63:17, 64:17, 64:18, 68:14