```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION

 3              Case No. 13-CR-60222-HURLEY/SELTZER

 4
     UNITED STATES OF AMERICA,
 5
 6              Plaintiff,
                                         FORT LAUDERDALE, FLORIDA
 7   vs.                                  AUGUST 30, 2013

 8
 9   BRADEN JAIRO ESCOBAR,
     et al.,
10
11              Defendants.

12   _____

13      TRANSCRIPT OF ARRAIGNMENT & MOTION TO RECONSIDER BOND
                 BEFORE THE HONORABLE BARRY S. SELTZER,
14                UNITED STATES MAGISTRATE JUDGE

15
     APPEARANCES:
16

17
     FOR THE GOVERNMENT:
18
19                            UNITED STATES ATTORNEY'S OFFICE
                              500 East Broward Boulevard
20                            Suite 500
                              7th Floor
21                            Fort Lauderdale, Florida 33301
                              BY: MICHAEL G. WALLEISA, A.U.S.A.
22

23

24
     REPORTED BY:           JERALD M. MEYES, RPR.
25   TELEPHONE:             954-431-4757
```

```
 1

 2

 3

 4    FOR THE DEFENDANT:

 5

 6

 7

 8

 9

10

11                              VOLUCK & MERLINO, P.L.
                                101 N.E. Third Avenue
12                              Suite 1430
                                Fort Lauderdale, Florida 33301
13                              BY: JEFFREY M. VOLUCK, ESQ.
                                BY: RICHARD A. MERLINO, JR., ESQ.
14

15

16

17

18

19

20    REPORTED BY:              JERALD M. MEYERS, RPR.
                                1601 N.W. 109th Terrace
21                              Pembroke Pines, Florida
                                Telephone: 954-431-4757
22                              E-mail Address: CRJM@AOL.COM

23

24

25
```

1                         TABLE OF CONTENTS

2

3   Witness:   ATF Special Agent Ignacio Esteban            PAGE

4
    Cross-Examination by Mr. Voluck ........................... 24

5
         Redirect Examination by Mr. Walleisa ................. 33
6
    Reporter's Certificate ................................... 45
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Call to order of the court)

      THE COURT:  Good morning.  Calling case number 13-Criminal-60222-Judge Hurley, United States of America versus Braden Jairo Escobar.

      Let me ask counsel to state their appearances.

      MR. WALLEISA:  Good morning, Your Honor.  Mike Walleisa on behalf of the United States.

      THE COURT:  Welcome.

      MR. VOLUCK:  Good morning, Your Honor.  Jeffrey Voluck on behalf of Mr. Escobar along with my partner Mr. Richard Merlino.

      MR. MERLINO:  Good morning.

      THE COURT:  Good morning.  All right.  We are here on a motion for reconsideration on additional evidence on a pretrial detention matter, and also there is an indictment that was returned yesterday.  So why don't we go forward with the arraignment first.

      Mr. Voluck and Mr. Merlino, you have entered permanent appearances, correct?

      MR. VOLUCK:  Yes.  That's correct, Judge.

      THE COURT:  Okay.  Let me ask Mr. Escobar to approach the lectern.

      Mr. Escobar, let me ask whether you have had an opportunity to read and review the indictment with counsel and do you understand the allegations against you?

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  Okay.  Very well.  Let me ask counsel

3  whether they waive reading of the indictment in open court and

4  are they prepared to enter a plea.

5           MR. MERLINO:  We do, Judge.  We will enter a plea of

6  not guilty, and we waive formal reading of the indictment,

7  demanding jury trial and request entry of the standing

8  discovery order.

9           THE COURT:  Very well.  The plea of not guilty and

10  demand for jury trial will be entered into the record, and the

11  standing discovery order will be issued as of this data.  A

12  status conference will be held on?

13          THE CLERK:  September 30th at 10:00 a.m. in West Palm

14  Beach, Judge.  It is a Judge Hurley case.

15          THE COURT:  The status conference will be September

16  30th at 10:00 a.m. in West Palm Beach at the Federal

17  Courthouse.

18          This case has fallen to Judge Hurley in West Palm

19  Beach which means that after today all further proceedings in

20  the matter will be held at the Federal Courthouse up in West

21  Palm Beach.

22          All right.  Are both sides ready to proceed on the

23  pretrial detention matter?

24          MR. WALLEISA:  Yes, Your Honor.

25          MR. VOLUCK:  Yes, Your Honor.

```
 1            THE COURT:  Okay.  Let me turn to the government.
 2            MR. WALLEISA:  Yes, Your Honor.
 3            THE COURT:  I received last evening a copy of the
 4  government's proffer of additional facts, or it was late
 5  yesterday afternoon, I believe.
 6            Does the defense have that as well?
 7            MR. VOLUCK:  Yes, Your Honor.
 8            THE COURT:  Okay.  All right.  Mr. Walleisa, let me
 9  give you an opportunity to be heard.
10            MR. WALLEISA:  Yes, Your Honor.  Pursuant to the
11  court's request, the government filed a 9 page proffer of
12  additional facts in support of the government's request for
13  pretrial detention.
14            Contained within that pleading are several different
15  headings.  The first one relates to New Orleans police
16  investigation conducted by ATF and HSI regarding Mr. Escobar's
17  purchase of 38 handguns in New Orleans which the investigation
18  showed were taken and removed from the United States by
19  Mr. Escobar.
20            Without going into details, Your Honor, you said that
21  you have received and read the government's pleading.
22            The highlights of that were not only were the agents
23  able to establish the purchase of 38 handguns by Mr. Escobar,
24  there were also recorded conversations between Mr. Escobar and
25  a cooperating individual.
```

1   That individual was subsequently convicted.  However,

2   Mr. Escobar was not charged.  He was not in the country.

3   During those conversations, Mr. Escobar admitted

4   purchasing firearms.  In fact the, person he was talking to was

5   the firearms salesperson that Mr. Escobar had dealt with.

6   He also admitted that the firearms were not in the

7   United States.  He advised the cooperating individual that if

8   ATF talked to him he should lie.

9   He should tell them they were for an individual who

10  had a farm in South America and not disclose the location of

11  the farm.

12  He also disclosed that if it appeared that he was

13  going to be arrested, he would not return to the United States

14  for some time.

15  Not only were these statements documented in ATF

16  reports, there are evidence logs showing the recordings of the

17  tapes.

18  There is an electronic surveillance consensual

19  monitoring document that authorized the consensual monitoring

20  of conversations between the confidential informant and

21  Mr. Escobar.

22  It shows the dates of the recordings corresponding

23  with the information in the reports.

24  At the time of the pretrial detention hearing, the

25  government addressed a little bit of what is set forth in the

1    second heading, "Seizure of firearms."

2          I will confess I mistakenly told the court it was

3    2006.  It was actually 2005 that a Ruger Mini 14 Semi-automatic

4    Rifle that had been purchased by Mr. Escobar was seized in

5    Colombia.

6          THE COURT:  Do you have any information with regard to

7    the specifics of the seizure, whether it was seized from a

8    narcotics trafficking group, a revolutionary or terrorist

9    group?

10          What was or what type of group or individual had

11    possession of the firearm?

12          MR. WALLEISA:  Judge, I don't have any information

13    with regard to how it was seized in Colombia.

14          The information came to ATF as a result of a request

15    for a trace of a firearm seized in Colombia by Colombian

16    authorities which was referred by the Colombian attache to ATF

17    to ATF here in the United States.

18          They then ran the serial numbers provided by them and

19    traced that particular firearm to a purchase by Mr. Escobar,

20    and the purchase was at Bass Pro Shops right here in Dania,

21    Florida.

22          THE COURT:  All right.

23          MR. WALLEISA:  The following 3 items were not

24    mentioned by the government at the time of the pretrial

25    detention hearing, and that is the seizure of 3 firearms that

1    had been purchased by the defendant's father, Gilberto Escobar

2    in 2000, 2004 and 2008.

3         While that information is not directly relevant to the

4    defendant, it shows a familial shall we say hobby or practice

5    of having firearms.

6         MR. VOLUCK:  I am going to object to that type of

7    speculation.

8         MR. WALLEISA:  Well, Judge, we are going to get to

9    that in a moment because that ties into the financial

10   information, and that's why I included it, because later the

11   financial information shows that a bank account owned jointly

12   by Gilberto Escobar and Sandra Escobar was used to fund firearm

13   purchases by this defendant.

14        The next section is additional firearms purchased by

15   Braden Escobar, and the 21 firearms purchases listed there were

16   not part of the government's original proffer and are not part

17   of the 38 firearms that were part of the 1996 ATF

18   investigation.

19        Those 21 purchases account for an additional 35

20   handguns.  So if you take the 35 handguns from those

21   purchases -- the firearms -- I am sorry -- the 38 handguns from

22   the New Orleans investigation for which I have provided counsel

23   with the 4473's and the 105 firearms from the current case,

24   that brings us to 178 known firearms purchases, and I say known

25   firearms purchases because when we get to the financial

1  information, you will see that while the government was able to

2  corroborate at this point in time a number of purchases on

3  credit cards issued to Sandra Escobar and Brent Escobar, the

4  defendant's brother and mother, quite a number of purchases on

5  that card have not yet been verified, in that we have not

6  obtained the documents to corroborate the purchases that appear

7  on the credit card statement.

8        The following heading is on page 5, additional travel

9  related to firearms purchases.  This takes the 21 purchases

10 that are set forth in the previous section and correlates them

11 with travel dates that appear in government travel records for

12 Mr. Escobar's travel and.

13       THE COURT:  Showing basically the same pattern?

14       MR. WALLEISA:  The same pattern from 1999 up until the

15 time of his arrest in August of 2013.

16       THE COURT:  All right.

17       MR. WALLEISA:  And, again, as you look at them, they

18 are relatively brief stays in the United States, accompanying

19 the purchase of firearms, and I would submit that this is

20 consistent with the defendant's post arrest statement where he

21 said he had been doing this, as he admitted, for the last 10

22 years.  It appears to be quite longer.

23       THE COURT:  I am going to ask you to refresh my

24 recollection on the post arrest statement.

25       Will you tell me again what Mr. Escobar said in the

1  post arrest statement?

2        MR. WALLEISA:  Yes, Your Honor.  I have provided

3  counsel with a copy of the written report of his post arrest

4  statements.

5        Mr. Escobar, upon entering the United States, informed

6  Customs and Border Protection agents at the time of his

7  admission that he had lived in Ecuador for the past 8 years.

8        After he cleared Customs, he was arrested pursuant to

9  the arrest warrant that had been issued in this matter.

10        He was advised of his Miranda rights in a written

11  form, waived his rights and spoke with ATF and HSI agents.

12        During that time, Mr. Escobar stated that he had

13  resided in Ecuador since 2001 soon after graduating from

14  Louisiana State university.

15        He had a company in Ecuador, South America.  It was a

16  hunting and outfitting company.  He had admitted to lying on

17  the ATF forms, 4473 when listing the Boca Raton address of his

18  mother as his residential address in purchasing the firearms.

19        He also advised the agents that he had used a company

20  called Econo Caribe Consolidators, Incorporated as a South

21  Florida company that he used to ship firearms illegally from

22  the United States to Ecuador, and that he manifested the goods

23  as fishing tackle and other things in order to evade Customs.

24        THE COURT:  All right.  Will you go a little slower?

25        MR. WALLEISA:  I am sorry.

1        THE COURT:  You said he used a South Florida company

2   to illegally ship the guns to Ecuador.

3        MR. WALLEISA:  Ecuador, yes.

4        THE COURT:  Disguising them as?

5        MR. WALLEISA:  Fishing tackle.

6        THE COURT:  All right.

7        MR. WALLEISA:  The government issued a subpoena to

8   Econo Caribe and found that that Mr. Escobar had, indeed,

9   established an account with Econo Caribe Consolidators in

10  Miami, Florida in 2005.

11       THE COURT:  All right.

12       MR. WALLEISA:  Mr. Escobar stated that he knew that he

13  needed an export license to ship the firearms to Ecuador.

14       Mr. Escobar insisted he was not selling these firearms

15  to cartel members, but just to friends and other hunters,

16  including Michael Ortega, who we will get to in just a moment.

17       He admitted to selling guns to Ortega and buying

18  firearms for Ortega, including 12 shotguns when he visited a

19  gun dealer in South Florida, and that on one occasion

20  Mr. Ortega had accompanied Mr. Escobar to Florida for these

21  illegal gun purchases and provided Mr. Escobar close to $13,000

22  to purchase the firearms.

23       Those firearms were then illegally shipped by

24  Mr. Escobar and Mr. Ortega using Econo Caribe to South Florida.

25       Mr. Escobar admitted making anywhere from 15 to 20

percent profit on the firearms he purchased in Florida which were sold to friends in Ecuador

THE COURT:  15 percent?

MR. WALLEISA:  15 to 20 percent profit.  Mr. Escobar also mentioned an additional individual named Durini, D-u-r-i-n-i, a resident of Ecuador who was another purchaser of firearms from him, and that he had an affinity for Killimanjaro rifles.

Mr. Escobar also mentioned another individual who was not mentioned last time, a Filipe Estrada, E-s-t-r-a-d-a as another firearms purchaser, and at the time of his arrest Mr. Escobar had a check in his wallet from Filipe Estrada made out to Escobar for $1,300.

Additionally, as mentioned last time, Mr. Escobar had documentation showing payments to the wife of Miguel Ortega who is in custody in Ecuador and admitted paying $25,000 towards Mr. Ortega's legal fees for his difficulties in Ecuador.

Mr. Escobar admitted that in the last 10 years he had been buying firearms and illegally shipping them to Ecuador where they were sold.

THE COURT:  Your evidence is that it goes back 17 years at least?

MR. WALLEISA:  Yes, Your Honor, according to the travel records and the 4473's that we have provided to counsel.

Corroboration for a lot of what Mr. Escobar said in

his post arrest statement comes from documentary evidence and witness statements.

Braden Escobar traveled from Ecuador to Miami on May 8th of 2012.  9 days later Miguel Ortega traveled from Ecuador to Miami, and upon entering the United States, he completed a Customs declaration form saying that he was carrying in excess of $10,000.

He then had a CMIR, a currency, a Customs monetary instrument report -- I always get that one wrong -- generated in which he declared that he had $13,000 in cash.

Ortega gave his U.S. location the address of the defendant's mother, Sandra Escobar in Boca Raton as the place that he would be staying.

Miguel Ortega and Braden Escobar both flew from Miami to Ecuador on May 28th of 2012.

Mr. Ortega was identified by a federally licensed firearms dealer as having been present with Braden Escobar when Escobar purchased firearms, and that Mr. Escobar had introduced Ortega as his gun smith and friend.

ATF form 4473's show that during this period of time between May 17th and May 28th of 2012, Braden Escobar made purchases of firearms from this particular gun dealer store on May 17th when he purchased 14 firearms and on May 23rd when he purchased an additional 6 firearms.

Miguel Ortega and Braden Escobar also traveled from

1    Ecuador to Miami on January 24th of 2013.

2         Upon arrival in Miami, both Miguel Ortega and Braden

3    Escobar again listed the address of Sandra Escobar as the place

4    that they would be visiting in the United States, and on both

5    of these occasions, as previously mentioned, they listed their

6    place of residence as Ecuador on one of the Customs

7    declarations.

8         ATF forms show that Braden Escobar purchased 4

9    firearms from this same dealer who identified Mr. Ortega on

10   January 24th of 2013, and 4 other firearms from the same dealer

11   on January 30th of 2013.  That would tend to corroborate

12   Mr. Escobar's post arrest statements I would think.

13        I know Your Honor took some comfort in the fact that

14   Mr. Escobar had a number of family members present in the

15   courtroom who were supportive of him at the time of the

16   pretrial detention hearing.

17        The government has set forth the family financial ties

18   to firearms purchase has shown that checking and credit card

19   accounts related to very close family members; his mother, his

20   father, his brother, his sister and his brother-in-law all are

21   related to firearms purchases made by this defendant during the

22   time period charged in the criminal complaint and in the

23   indictment.

24        I have set forth that information on pages 7 and 8 of

25   the government's proffer.  I have provided to counsel the

1   supporting documents in the form of the 4473's with attached

2   transfer records for the gun dealer's highlighted in bold on

3   pages 7 and 8 that appear on the City Bank credit records that

4   have been provided to counsel for account number 3864 which is

5   jointly held by Sandra Escobar and the defendant's brother,

6   Brent Escobar.

7         THE COURT:  Many of these or most of the shops are out

8   of state which, of course, my understanding would be illegal

9   for Mr. Escobar to have made those purchases.

10        MR. WALLEISA:  No, Judge, and let me explain.

11        THE COURT:  Okay.

12        MR. WALLEISA:  Mr. Escobar would order firearms online

13  or via telephone from firearms dealers throughout the

14  continental United States and Hawaii.

15        THE COURT:  All right.

16        MR. WALLEISA:  He would then have those firearms

17  transferred to a local firearms dealer in the State of

18  Florida --

19        THE COURT:  All right.

20        MR. WALLEISA:  -- where they would then be delivered

21  to Mr. Escobar on his claim that he was a resident of Florida.

22        THE COURT:  Okay.

23        MR. WALLEISA:  The local dealer would charge a fee;

24  anywhere between 25 and $40 for each transfer of firearms.

25        So if there were 10 firearms, they were would charge

1   $25 apiece for handling the paperwork.

2        THE COURT:  All right.  Have you totaled up the number

3   do you know yet the number of additional firearms?

4        MR. WALLEISA:  It would be the 38 handguns from the

5   1996 investigation and 35 firearms --

6        THE COURT:  No, no, no.  I meant on these credit card

7   purchases.

8        MR. WALLEISA:  Oh.  I have to figure it out, Judge.

9   Honest, because of the shortness of time --

10        THE COURT:  No, no.

11        MR. WALLEISA:  -- I didn't go and total up how many

12   firearms were purchased for the $9,000 from Gulf Breeze or, you

13   know, the $11,000 from Killimanjaro Rifle.

14        The documents supporting those purchases are attached

15   to 4473's that have been provided to counsel.  That's why they

16   were highlighted in bold.

17        THE COURT:  Right.  Are the firearms in the 177 total?

18        MR. WALLEISA:  They are a part of this.

19        THE COURT:  Are there additional firearms?

20        MR. WALLEISA:  What I cannot tell the court at this

21   time is those items that are not highlighted in bold --

22        THE COURT:  Right.

23        MR. WALLEISA:  -- I don't know what firearms they

24   relate to.

25        THE COURT:  All right.

1    MR. WALLEISA:  They may relate to the same ones or

2    not.  There was not documentation for those attached.

3    Independence Firearms was actually very, very

4    thorough.  They provided the bulk of the transfer documents,

5    including copies of the firearms dealers, the foreign firearms

6    dealers licensed, et cetera.  They kept emaculate records.

7    THE COURT:  Now, my understanding is the credit card

8    is in the name of the defendant's mother and his brother?

9    THE COURT:  His brother Brent.

10   THE COURT:  Okay.

11   MR. WALLEISA:  I would also tell the court Brent has

12   extensive travel during the same time periods as Mr. Escobar.

13   It is unknown whether it is related or not, but there is

14   extensive travel.

15   THE COURT:  And you say here that the credit card was

16   funded from a bank account in the name of the defendant's

17   mother and father?

18   MR. WALLEISA:  That is correct, Judge.  On page 8, the

19   City Bank account, ending in 3846, was funded by checks drawn

20   on Wachovia Bank of Gilberto Escobar and Sandra Escobar, and I

21   listed the dates and the amounts there.

22   Copies of those checks have been provided to defense

23   counsel.  Those checks bear on the memo line the notation of

24   the last four digits of the account 3864 correlating them to

25   that particular credit card account.

1    If you look at those 4 checks, it is approximately

2    $56,000.

3    Also related to this is a Wachovia bank account held

4    by Gilberto Escobar and Sandra Escobar.  That's the one that we

5    are talking about, the paragraph above.

6    That account was funded by two checks drawn on the

7    account of Shannon Escobar, the defendant's sister, and Juan

8    Panalosa, which is her husband, in the amount to $114,000.

9    One check was for $106,000 and the second check was

10   for the balance.  Also the City Bank account ending in 3864 was

11   funded by checks drawn on the Wells Fargo Bank account of

12   Sandra Escobar and Shannon Panalosa.

13   So that is the mother and the sister.  Shannon Escobar

14   and Shannon Panalosa are one in the same.  It is her maiden

15   name and her married name, and that is approximately another

16   $5,000.

17   The memo line on those checks which have been provided

18   counsel also bears reference to account number 3864.

19   The last heading is a pair misstatements by the

20   defendant at the initial appearance.

21   This information was provided by City Bank late

22   Wednesday afternoon, so I did not have time to order up the

23   transcript of his initial appearance, but Your Honor conducted

24   an inquiry at that time as to the defendant's finances and

25   suitability for the appointment of the public defender.

1        At no time during that hearing did he advise the court

2   that in 2011 he had allegedly made $150,000 as documented on an

3   application for approval of a credit card line of credit at

4   City Bank on July 25th of 2011 or that in 2012 he allegedly

5   made $J75,000 as documented on an application for an approved

6   line of credit on a credit card issued November 17th of 2012.

7        I only point that out to show the court that

8   Mr. Escobar has some difficulty being candid in these matters.

9        Your Honor, based upon all of that additional

10  evidence, as well as what the government set forth at the time

11  of the pretrial detention hearing, we submit to the court that

12  pretrial detention is not only appropriate, but warranted in

13  this case; that due to the apparent involvement of close family

14  members of the defendant in his criminal activities that they

15  would not be suitable persons to be co-signors on any bond or

16  personal surety, and I don't think they would provide the court

17  with adequate assurances that this defendant will appear as

18  directed by the court, particularly given his extensive ties to

19  Ecuador in this matter.

20        THE COURT:  Were you able to gather any more

21  information regarding the Ecuadorian police belief that

22  Mr. Ortega's involvement are narcotics activities?

23        MR. WALLEISA:  At this time, no, Your Honor.  I have

24  not been able to get that, due to the shortness of time.

25        Frankly, Your Honor, I acted with all due dispatch and

1  I understand he is in custody and you wanted to resolve this

2  matter.  So I gathered what information I could in that period,

3  and that is what I am offering up to the court at this time.

4          THE COURT:  What is on the indictment?  What are

5  Mr. Escobar's guidelines?

6          MR. WALLEISA:  He would be a level 26, Your Honor.  63

7  to 78 months.  Again, because of the fact that his preliminary

8  hearing is on Tuesday --

9          THE COURT:  Right.

10         MR. WALLEISA:  -- due to the holiday, there will be no

11 grand jury on Tuesday.

12         THE COURT:  Right.

13         MR. WALLEISA:  This is basically a place holding

14 indictment.  As I advised the court last time, I anticipate

15 additional charges for Mr. Escobar.

16         Those charges will include violations of Title 18,

17 United States Code, Section 922 (a)(1)(a), unlicensed dealing

18 in firearms, Title 18, United States Code, Section 554 for the

19 illegal exportation of firearms, Title 18, United States Code,

20 Section 1956(a)(2) --

21         THE COURT:  Money laundering?

22         MR. WALLEISA:  -- money laundering and Title 18,

23 United States Code, Section 1956(h), conspiracy to money

24 launder with Mr. Ortega regarding the bringing in the money to

25 purchase the firearms.

1           THE COURT:  So the guidelines will go much higher?

2           MR. WALLEISA:  So the guidelines would go higher based

3  on that.  The dollar value of the firearms is relatively

4  extensive, particularly if we consider the relevant conduct for

5  all of the firearms which could be attributed to the defendant,

6  and that is a 20 year maximum penalty for the money laundering

7  offense.

8           THE COURT:  Tell me again with regard to Mr. Ortega

9  what the Ecuadorian police said about his narcotics activity?

10          MR. WALLEISA:  The information was not very detailed,

11 Judge.  They detailed the number of firearms that were

12 obtained.

13          They provided the names of 3 individuals who were

14 arrested down there and that they suspected that the firearms

15 were part of a drug organization.

16          There were no details as to the name of the

17 organization and nothing further than that.

18          Frankly, Your Honor, even if Your Honor discounted

19 that information, I think there is overwhelming evidence of

20 this defendant's ties to Ecuador, as well as the extent of his

21 criminal activity.

22          THE COURT:  All right.  Mr. Voluck, Mr. Merlino, let

23 me give you an opportunity to be heard.

24          MR. VOLUCK:  Judge, can I cross-examine the agent

25 based upon the additional information?

```
 1            THE COURT:  All right.

 2            THE CLERK:  Please raise your right hand.

 3            ATF SPECIAL AGENT IGNACIO ESTEBAN, GOVERNMENT'S

 4                 WITNESS, WAS DULY SWORN BY THE COURT

 5            THE COURT:  Okay.  Please be seated and state your

 6   name and spell your last name.

 7            THE WITNESS:  Ignacio Esteban.  E-s-t-e-b-a-n

 8            THE COURT:  All right.  Agent Esteban, you heard the

 9   proffer by Mr. Walleisa, correct?

10            THE WITNESS:  Yes, sir.

11            THE COURT:  And you have read his additional factual

12   proffer that he submitted to the court?

13            THE WITNESS:  I have.

14            THE COURT:  All right.  Is all of the information

15   contained in there true and correct to the best of your

16   knowledge and belief?

17            THE WITNESS:  I do.  It is.

18            THE COURT:  All right.  Let me ask that you give your

19   attention to Mr. Voluck for cross-examination.

20            MR. VOLUCK:  May I proceed, Your Honor?

21            THE COURT:  Yes.

22            MR. VOLUCK:  Thank you.

23                      CROSS EXAMINATION

24   BY MR. VOLUCK:

25   Q.  Good morning, Agent Esteban.
```

1  A.  Good morning, sir.

2  Q.  You are the lead agent on this case?

3  A.  Yes, sir.

4  Q.  And when was it that you received all of this additional

5  information?

6  A.  Which information are you referring to?

7  Q.  Well, the information contained in the government's proffer

8  of additional facts in support of request for pretrial

9  detention.

10  A.  Well, we can start I guess on page 1, and the case file

11  from Baton Rouge, I received it yesterday.

12  Q.  Okay.

13  A.  We had other reports from HSI or Customs back then.  There

14  is a joint investigation.  So I haven't had anything official.

15  It is in the 4473's reports until we start making copies like I

16  said when we got it from FedEx yesterday.

17  Q.  Okay.  And how about the other stuff?

18  A.  All right.  On page 3 we have information on the trace, on

19  the Ruger 14 that Braden Escobar purchased in 2002 and was

20  recovered in Colombia in 2005.

21  Q.  When did you receive that information?

22  A.  I had it during the course of my investigation.

23  Q.  Okay.  And was that presented last Friday?

24  A.  It was not.

25  Q.  If you had the information then, why wasn't it presented

1  last Friday?

2  A.  I am not sure.

3  Q.  You have no idea whatsoever?

4          MR. WALLEISA:  Objection, Judge.

5          THE COURT:  I will sustain the objection.

6  BY MR. VOLUCK:

7  Q.  What other information?  Let's see if I can shortcut this.

8          In the government's proffer of additional facts, other

9  than what you have already testified to, was there any other

10 information contained in the proffer of additional facts that

11 you had at the last hearing but was not put into the hearing?

12 A.  Yes.  The purchases from 1999 from the Bass Pro Shop on

13 page 4.

14 Q.  Okay.  And why wasn't it that that was not put into

15 evidence?

16 A.  I am not sure.

17 Q.  Are you the person who actually received all of this

18 additional information?

19 A.  Yes.  I did go to the Bass Pro Shop and I did retrieve all

20 of the records.

21 Q.  Okay.  And the records that have been provided from the New

22 Orleans investigation, did you receive those from ATF in New

23 Orleans; is that correct?

24 A.  It is actually Baton Rouge.

25 Q.  Baton Rouge?

Ignacio Esteban - Cross

26

1   A.  Yes, and, you know, the case was archived, and in this kind

2   of a process to get the case, like I say, it is a case from the

3   90's, and it had been closed I believe since '99, and then it

4   goes to, it is a long process.  It goes to archives in Texas

5   and it wasn't easy to get the case file.

6   Q.  All right.  When you received that information, did you

7   identify who the investigating agent was at that time of the

8   investigation?

9   A.  When I received the reports, did it say who the

10  investigator was?

11  Q.  Yes.

12  A.  Yes, it did.

13  Q.  Did you contact that agent?

14  A.  No, I have not.

15  Q.  So you never spoke to the agent himself about this

16  investigation; is that correct?

17  A.  No.  I read the reports that are signed.

18  Q.  Okay.

19          THE COURT:  Let him finish his answer.

20          MR. VOLUCK:  Okay.  I am sorry.  Go ahead agent.

21          THE WITNESS:  I corroborated what information there

22  was on the reports; what the original documents of the ATF

23  transaction forms, the 4473 to corroborate the gun purchases.

24          MR. VOLUCK:  Okay.

25  BY MR. VOLUCK:

1   Q.   But you never corroborated it by talking to an actual live

2   human being; is that correct?

3   A.   No, no, because as I said I got the case file yesterday.

4   Q.   You never attempted to call that person?

5   A.   Not yet.

6   Q.   And on page 2 of the additional proffer talks about a

7   former salesman at Sports Unlimited; is that correct?

8   A.   Correct.

9   Q.   And that he was a cooperating individual who made

10  consensually monitored telephone calls, correct?

11  A.   Correct.  According to the reports, correct.

12  Q.   According to the reports.  Did you obtain those alleged

13  consensual monitored telephone calls?

14  A.   No.  I know that after serving a period of time the ATF

15  policy is to dispose of that after like a couple of years.

16  Q.   Okay.  Even though that is the policy, as a good agent did

17  you double check to see whether or not they were actually

18  destroyed or whether they were still in existence?

19  A.   No.  I said the file came yesterday.  It is still something

20  we can check.  It is still something we can find out.

21  Q.   Okay.  So today, as of today you have not personally

22  checked to see whether these recordings are still in existence;

23  is that correct?

24  A.   That is correct.

25  Q.   Do you know why the confidential informant in this case

1  cooperated or decided to cooperate?

2  A.  I won't speculate.

3  Q.  I am asking you whether you know?

4  A.  I don't know.

5  Q.  Okay.  And as I understand it, as a result of this

6  so-called New investigation, my client Braden Escobar was never

7  prosecuted; is that correct?

8  A.  That's correct.

9  Q.  Do you know why that was?

10  A.  I do not.

11  Q.  Now, on page 3 of the government's proffer of additional

12  facts it says that there was a Ruger Mini 14 recovered in

13  Colombia?

14  A.  Correct.

15  Q.  Do you know who that was recovered from?

16  A.  I would have to refresh my memory and look at the trace

17  report.

18  Q.  Could you do that?

19  A.  I don't think I have that trace with he unless counsel has

20  it.

21          THE COURT:  If you want to, Mr. Voluck, if you want to

22  take a minute or two to read through it, that will be fine.  I

23  can finish up here.

24          MR. VOLUCK:  No.  I am good.  I am good, Judge.

25          THE COURT:  All right.

```
 1              MR. VOLUCK:   Thank you.

 2    BY MR. VOLUCK:

 3    Q.  The last sentence on page 3 indicates that there was a

 4    purchase by Gilberto Escobar, the defendant's father of a Colt

 5    AR-15 semi-automatic rifle that was recovered in Colombia.

 6              Do you know where that particular weapon was

 7    purchased?

 8    A.   I think it says here on page 4 at Benny's Sports Goods in

 9    New Orleans.

10    Q.   Okay.   There is also mention of a Mr. Durini in the

11    government's proffer.  Have you talked personally talked to

12    Mr. Durini?

13    A.   No.  I have not had a chance yet.

14    Q.   Have you personally talked to Mr. Estrada?

15    A.   No.  Not yet.

16    Q.   In the ATF report, the report number 23 which I was handed

17    today, dated 8-22-13, which was prepared by you --

18    A.   Correct.

19    Q.   -- do you have a copy of that handy?

20    A.   I do.

21    Q.   On page 2 it indicates that Mr. Escobar allegedly said that

22    he was not selling these illegally imported firearms in Ecuador

23    to cartel members, just to friends and other hunters, including

24    Michael Ortega; is that correct?

25    A.   Correct.
```

Ignacio Esteban - Cross

30

1   Q.  And again as I recall from Friday's hearing, this alleged

2   post arrest statement was not recorded by you; is that correct?

3   A.  That's correct.

4   Q.  And somewhere also I believe in the proffer it said that

5   the gun dealer who was in contact with Mr. Ortega and

6   Mr. Escobar, when that happened the defendant introduced

7   Mr. Ortega as his friend; is that correct?

8   A.  Are you talking about at Independence Arms?

9   Q.  Yes.

10  A.  Friend and gun smith also.

11  Q.  Okay.  He introduced him as his friend?

12  A.  And also the gun smith.

13  Q.  Okay.  And as far as the other family members, do you have

14  any personal knowledge that the family members, any of the

15  family members knew what the various monies were used for?

16  A.  No.

17  Q.  Do you know approximately how many additional firearms we

18  are talking about since the last hearing?

19  A.  It is still ongoing.  We are still getting leads and

20  finding out more connections with Mr. Escobar.

21  Q.  So before you give an explanation, can you answer my

22  question yes or no, agent?

23  A.  Yes.  What is your question?

24  Q.  My question was since the last hearing do you know how many

25  additional firearms we are talking about?

```
 1   A.   Yes.  It is in the proffer.

 2   Q.   And what is the number?

 3   A.   One second, please.  We have the 38 handguns.  That's

 4   additional, and the ones from Bass Pro Shop on page 5 also are

 5   additional.

 6   Q.   As part of the proffer, it alleges that there is an

 7   apparent misstatement by the defendant at his initial

 8   appearance.  When you arrested Mr. Escobar, did you ask him how

 9   much money he had in his bank accounts?

10   A.   No, I did not.

11   Q.   Okay.  At the time of his hearing last Friday, did you have

12   any knowledge as to how much money, if any, he had in any of

13   his personal bank accounts?

14   A.   His personal bank accounts where I received subpoenas from

15   different banks --

16   Q.   That's not my question, agent.  My question is at the time

17   of the last hearing did you know or did you have any personal

18   knowledge as to --

19   A.   The amount?

20   Q.    -- as to whether or not Mr. Escobar had money in any of

21   his bank accounts?  Yes or no?

22   A.   Did I have knowledge?  In his accounts I would say, no.

23   Q.   Okay.  So you don't have any personal knowledge as to

24   whether or not he could afford private counsel at the time of

25   his initial appearance, do you?
```

1    A.  If he can afford it?

2    Q.  Yes or no, agent?

3    A.  He did give a financial statement to the judge, and it did

4    appear that he did have quite a bit; a home paid for in Ecuador

5    cash.  He had vehicles paid for in cash.  He had a boat.

6    Q.  That's not my question, agent.  I am not asking you about

7    things that he had.  I am asking you about whether or not you

8    had any knowledge --

9    A.  Well, I answered that question already.

10   Q.  No, you haven't.  No, you haven't.  I beg to differ with

11   you.

12          My question is do you have any personal knowledge, yes

13   or no, as to whether or not at the time of his initial

14   appearance he had any monies in any of his bank accounts.

15   A.  I answered that.  I said, no.

16   Q.  Okay.

17   A.  I answered that twice already.

18   Q.  So then again my follow up question is you have no

19   knowledge at the initial appearance whether or not he could

20   afford private counsel, correct?

21   A.  That's two different questions.  You asked me about bank

22   accounts and if he can in afford counsel; if he have assets

23   that are worth enough that he can sell to afford counsel.

24   Q.  Of course that  could take time, and there are

25   complications being in another country.  Would you agree to

1  that?

2  A.  Possibly.

3  Q.  Okay.  So my follow-up question to you --

4  A.  That's speculation.

5  Q.  My follow-up question to you --

6  A.  Let me finish, please.

7  Q.  Sure.

8  A.  That is speculation.  I am not sure.

9  Q.  Okay.  So you don't know then.  You have no knowledge as to

10  whether or not he could afford private counsel --

11  A.  No.

12  Q.   -- at the time of his initial appearance?

13        MR. WALLEISA:  Your Honor, objection.  It makes no

14  difference whether this defendant had knowledge.  It is what

15  the defendant told the court on the court's inquiry, and he

16  never mentioned $150,000 or $175,000 in income.  That's the

17  bottom line.

18        THE COURT:  All right.  I will sustain the objection.

19        MR. VOLUCK:  I have nothing further, Your Honor.

20        THE COURT:  All right.  Any redirect?

21        MR. WALLEISA:  Very briefly.

22                    REDIRECT EXAMINATION

23  BY MR. WALLEISA:

24  Q.  And only because it relates to that line of questioning,

25  during Mr. Ortega's arrest, you obtained documentary evidence

1  from Mr. Ortega, including cash deposit receipts in the amount

2  of sixty-five hundred U.S. dollars in an Ecuadorian bank in the

3  name of Susan Alaya, the wife of Michael Ortega?

4  A.  Alaya.

5  Q.  Yes.

6  A.  Correct.

7  Q.  And you also have Mr. Escobar's statement that he paid over

8  $25,000 to help with Mr. Ortega's legal expenses over the past

9  few months, and there was a sheet of paper showing payments in

10  dollar amounts to Susan Alaya?

11  A.  Alaya, correct.

12  Q.  Alaya.  I got it I am sorry.

13          MR. WALLEISA:  Okay.  No other questions.

14          THE COURT:  Any recross?

15          MR. VOLUCK:  No, Your Honor.

16          THE COURT:  Okay.  Thank you, agent.

17          THE WITNESS:  Thank you, Judge,

18              [The witness was excused].

19          THE COURT:  All right.  First does the government

20  rest?

21          MR. WALLEISA:  The government would rest, Your Honor.

22          THE COURT:  All right.  I will go over to the defense.

23  Mr. Voluck or Mr. Merlino, do any of you wish to present any

24  evidence, testimonial or otherwise?

25          MR. VOLUCK:  No, Judge.

1          THE COURT:  All right.  Let's proceed to argument.

2    Since you are standing, why don't you go ahead and approach the

3    lectern, Mr. Voluck, and let me hear from the defense.

4          MR. VOLUCK:  Judge, I would just point out to Your

5    Honor a couple of cases; the case of United States versus

6    Jefferies at 679 Fed. Supp.  It is a 1988 Middle District of

7    Georgia case where the court held that possession of guns alone

8    should not constitute clear and convincing evidence of danger;

9    the case of United States versus Ploof, P-l-o-o-f at 851 F.2d 7

10   where the court said, "Only when there is a strong probability

11   that a person will commit additional crimes, if released, is

12   the community interest and safety sufficiently compelling to

13   overcome the criminal defendant's right to liberty."

14          The case of United States versus Medina at 775 F.2d

15   1398 which is an 11th Circuit 1985 case where the court said,

16   "In order to detain a defendant on the basis of dangereousness,

17   the government must prove by clear and convincing evidence that

18   no condition or combination of conditions will reasonably

19   assure the safety of any other person and the community."

20          Your Honor felt, although it was a tough decision on

21   Your Honor's part, you did fashion what you believed at that

22   time was a condition or series of conditions to assure that

23   there would be no danger to the community and no risk of

24   flight.

25          The fact that in Your Honor's conditions the defendant

1    would be in a halfway house and would be subject to 24 hour

2    monitoring, there is almost an impossibility that the defendant

3    will be out committing other crimes or doing anything that is a

4    danger to the community.

5         By the same, token by being in the halfway house and

6    no longer having a passport there is no really risk of flight.

7         So even though some of the factual allegations where

8    there is more that has been added to the prosecution's proffer,

9    nothing has changed the fact that there is a combination of

10   conditions that can assure Your Honor that Mr. Escobar will

11   appear when he has to appear and is not going to commit any

12   crimes, especially being locked into a halfway house.

13        We also have not only the surrendering of the

14   passports, but we have one of the conditions of his wife and

15   his child coming to the United States and surrendering their

16   passports.

17        So he will have his family here as well as his wife

18   and his child, again, you know, helping the fact that there is

19   very little danger to the community or any type of risk of

20   flight.

21        Again, I think I pointed out to Your Honor at the last

22   hearing the case of United States versus Patriarca, 948 F.2d

23   789, a First Circuit 1991 case where the defendant was the don

24   or the head of a Mafia family, and the court said regarding

25   dangerousness that the appellate court agreed with the trial

1   court that although in theory a Mafia boss was an intimidating

2   and highly dangerous character, the government had not

3   demonstrated that this boss posed a significant danger, at

4   least not a danger that could not be overcome by given

5   appropriate conditions.

6        Then they also addressed risk of flight saying the

7   court acknowledged that the Mafia had both the will and the way

8   to facilitate flight, and the government argued that the

9   defendant once assisted a fugitive's flight by supplying him

10   with $100 cash.

11        However, the court found that the evidence of the

12   likelihood of defendant's flight was minimal, not even enough

13   to satisfy the preponderance of the burden of proof.

14        So certainly Mr. Escobar does not fall into that

15   category.  He is way below that category of being a Mafia boss,

16   but I think that Your Honor can rest assured that even with the

17   government's additional proffer, that by being in the halfway

18   house and satisfying all of Your Honor's conditions that Your

19   Honor can feel comfortable that as far as the risk of flight

20   and possibly risk of flight and danger to the community.

21        THE COURT:  One of the pieces of new evidence is the

22   statement that your client made to the undercover or the

23   cooperating witness in New Orleans, stating that he thought or

24   words to the effect that he thought he was going to land in

25   jail he wouldn't come back to the United States.

1          Let me give you an opportunity to respond to that as

2    it concerns his risk of flight.

3          MR. VOLUCK:  How could anybody intelligently respond

4    to double hearsay?  Nobody at this hearing has listened to that

5    tape recording.  All we have is an allegation.

6          THE COURT:  All right.  Well, let's assume for the

7    sake of argument it is accurate, how do you respond to that?

8          MR. VOLUCK:  He is here now.

9          THE COURT:  I know, but if he were to be released on

10   bond, how does that address his flight risk?

11         MR. VOLUCK:  I would say to Your Honor if he wasn't in

12   a halfway house, you know, maybe that could be some fodder or

13   food for thought, even though it is double hearsay, but here he

14   is going to be in a halfway house, and you can fashion

15   additional conditions.

16         You can have daily call in.  You can have unannounced

17   visits.  You can have electronic monitoring.  There are all

18   kinds of conditions that can satisfy that situation.

19         THE COURT:  Part of or one of the conditions of bond

20   that I had set involved his family.

21         The government has come forth with evidence suggesting

22   or showing that his family was involved in financing these gun

23   purchases with significant amounts of money, I might add.

24         Mr. Walleisa makes the argument that, therefore, they

25   are not fit to be involved with any type of bond.  Let me give

1   you an opportunity to respond to that.

2           MR. VOLUCK:  That's a nice leap of faith by the

3   government, but one of the questions I asked of the agent was

4   whether he had any personal knowledge that any of the family

5   members had any indication or knew about the defendant's

6   activities or that the defendant's activities were illegal, and

7   he has no personal knowledge about that.  So that has not been

8   proven by even one iota at this hearing.

9           THE COURT:  Well, certainly you would know from the

10  credit card receipts that, you know, $84,000 worth of gun

11  purchases were being made.

12          MR. VOLUCK:  He is in the hunting business, Judge, and

13  you know --

14          THE COURT:  Over a period of 11 months.  I mean,

15  that's an armory.

16          MR. VOLUCK:  But do they know that buying and selling

17  guns is illegal the way he was doing it?  Do they know that?

18          I mean, you know, you are making an assumption.  You

19  are making an assumption at a bond hearing, with all due

20  respect, when, you know, the cases say that he has got a right

21  to bond, and if there is a reasonable condition or combination

22  of conditions he has got a right to bond, and making wild

23  assumptions or semi-wild assumptions is not enough to defeat

24  that.

25          THE COURT:  All right.  Very well.  Let me give

1  Mr. Walleisa an opportunity to respond.

2          MR. WALLEISA:  Your Honor, the government submits that

3  there is overwhelming evidence of risk of flight.

4          Addressing last things first, I strongly disagree with

5  counsel that it takes a great leap of faith to believe that the

6  family members whose checking accounts and credit card accounts

7  are used in funding these purchases had no knowledge whatsoever

8  of the defendant's activity, particularly when you consider the

9  fact that Gilberto Escobar is the signature on the checking

10  account that is paying the bills and Gilbert Escobar had 3

11  firearms that he had purchased were seized in Colombia over the

12  space of 2004 and 2008 during the same time period that his son

13  is purchasing and exporting firearms.  I don't think that takes

14  a great leap of faith.

15          With regard to the statements that are attributed to

16  the defendant in the government's proffer during the 1996

17  investigation, those statements are contained in written

18  reports of a federal government agent, supported by written

19  consents for electronic monitoring of Mr. Escobar, documented

20  by conversations that occurred on the day reflected in the

21  report and documented by an evidence log showing recordings for

22  those dates.

23          I submit again that that does not take a great deal of

24  faith and in the totality of the circumstances it certainly

25  fits with the evidence that the government has proffered.

1        With regard to Dismas House, I know the court has a
2   liking for Dismas House as far as being a useful facility.
3        However, as I am sure the court is aware, Dismas House
4   is an unsecured facility.  You can walk away at any time.  It
5   is basically a trust based institution.
6        I would submit to the court that the court's reliance
7   on the familial ties is strongly undermined by the financial
8   involvement of the family in the financing of the defendant's
9   purchases in considerable sums of, money not only as reflected
10  on the credit card, but $114,000 deposit to the account that
11  funds the payments for those credit cards.  That's a
12  substantial amount of money.
13       I think the court should also consider the potential
14  personal liabilities and motivations of the family members
15  should it be shown that they have actively known that the
16  defendant was engaging in this activity in funding his
17  activities through those payments.
18       In short, the strongest argument of the government is
19  the risk of flight.  I believe the volume of weapons, the time
20  period of weapons, the defendant's ability to continue that
21  activity from outside of the country all posses a danger to the
22  community.
23       THE COURT:  All right.  Let me again thank the
24  attorneys Mr. Voluck and Mr. Merlino on behalf of Mr. Escobar
25  and Mr. Walleisa on behalf of the government for presenting

1  their arguments very well on behalf of their respective

2  clients.

3         I indicated at the initial hearing that at that time I

4  thought it was a very, very close call, which, frankly, if you

5  had, you know, in my view 10 judges, 5 might have gone one way

6  and 5 might have gone the other way.

7         I erred on the side of granting a bond, but as I

8  indicated, I thought it was a very, very close.

9         The government had very reasonable and [legitimate]

10 grounds to ask for pretrial detention at that time.

11        Since that time they have come forward with evidence

12 that I think clearly puts it over on the other side, not the

13 least of which is Mr. Escobar's own statement that he felt that

14 if he would face jail that he would not becoming back to the

15 United States.

16        The fact that these gun purchases were not just an

17 isolated thing that happened over the last year or to two,

18 apparently go back at least 17 years, we are now up to at least

19 177 firearms.

20        The argument that had been made at the first hearing

21 was that, well, these rifles, you know, are all for hunting,

22 but now there is also about 38 handguns which it is unlikely to

23 be all for hunting.

24        The defendant acknowledged that he bought some of

25 these for other people and made some money by doing so.  Some

1   of them turned up in Colombia.  Some of them with Mr. Ortega

2   who there is not a lot of information, but there is some

3   indication that he is suspected to be involved in narcotics

4   trafficking.

5          There is evidence that his family, whether knowingly

6   or not, was involved in financing this, which I agree with

7   Mr. Walleisa which make it inappropriate for them to be

8   involved in in any way with a bond.

9          There is additional evidence I will go through in my

10  pretrial detention order, but I do find that Mr. Escobar is a

11  risk of flight and a danger to the community, and I will enter

12  a written order to that effect ordering that he be held without

13  bond until the time of trial.

14         The defense now will have an opportunity to take an

15  appeal, and that will be before Judge Hurley.  Some judges see

16  these differently.

17         Perhaps Judge Hurley will have a different take on it,

18  but I will set forth my reasons and, you know, you can go ahead

19  and argue in front of Judge Hurley.

20         All right.  Let me ask if the government or the

21  defense have any other matters as to Mr. Escobar that they wish

22  to raise?

23         MR. WALLEISA:  Not at this time, Your Honor.

24         THE COURT:  And from the defense?

25         MR. VOLUCK:  No, Your Honor.

1          THE COURT:  All right.  Mr. Escobar, do you have any

2    questions that I can answer either about what we have done

3    today or about what will be occurring next in your case?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  All right.  We will stand in recess.

6          (Whereupon the proceedings were concluded)

```
 1

 2                     C E R T I F I C A T E

 3          I hereby certify that the foregoing is an accurate

 4   transcription of proceedings in the above-entitled matter.

 5
     SEPTEMBER 8, 2013          S/JERALD M. MEYERS
 6   _____          _____
        DATE                    JERALD M. MEYERS, RPR-CM
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```